E-FILED
Friday, 19 August, 2005  11:01:33 AM
Clerk, U.S. District Court, ILCD

EXHIBIT

_B_

# FREEMAN UNITED COAL MINING COMPANY

## AND

# UNITED MINE WORKERS OF AMERICA

# BITUMINOUS COAL WAGE AGREEMENT OF 2003

# TABLE OF CONTENTS

Article I--ENABLING CLAUSE ................................................. 1

Article IA--SCOPE AND COVERAGE ......................................... 2
    Section (a) Work Jurisdiction ........................................... 2
    Section (b) Exemptions Clause ......................................... 2
    Section (c) Supervisors Shall Not Perform Classified Work ...................... 3
    Section (d) Management of the Mines ..................................... 3
    Section (e) Union's Rights ............................................. 3
    Section (f) Application of This Contract to the Employer's Coal Lands ............. 3
    Section (g) Contracting and Subcontracting ................................ 3
    Section (h) Leasing, Subleasing and Licensing Out of Coal Lands ............... 4
    Section (i) Construction Work .......................................... 4
    Section (j) Neutral Periods ............................................ 5

Article II -- JOB OPPORTUNITY AND BENEFIT SECURITY (JOBS) ................. 5
    A. Non-Signatory Operations Of The Signatory Employer ..................... 5
    B. Lessee-Licensee .................................................. 7
    C. Coordination Of Employment Obligations Under the JOBS Program ........... 9
    D-1. Employer-Wide Panel Rights To Signatory Operations ................... 9
    D-2. Exhaustion Of Employer Panel ..................................... 9
    D-3. Monitoring Of Job Selections ...................................... 9
    E. UMWA-Freeman Training and Education Fund ......................... 10
        Section 1. Establishment ......................................... 10
        Section 2. Purpose ............................................. 10
        Section 3. Administration ........................................ 11
        Section 4. Funding ............................................. 11
    F. Skills Training ................................................... 11
        Section 1. General ............................................. 11
        Section 2. Purpose ............................................. 12
        Section 3. Skills Training Program ................................. 12
    G. UMWA-Freeman Labor Management Local Circumstances ................. 12
    H. UMWA-BCOA Resolution of Disputes Trust ........................... 13

Article III--HEALTH AND SAFETY .......................................... 13
    Section (a) Right to a Safe Working Place ................................. 13
    Section (b) Federal Mine Safety and Health Act of 1977, As Amended ........... 13
    Section (c) Freeman UMWA Health and Safety Committee .................... 13
    Section (d) Mine Health and Safety Committee ............................ 14
    Section (e) Access to the Mine ......................................... 15
    Section (f) Reports .................................................. 16
    Section (g) Safety Rules and Regulations ................................. 16
    Section (h) Cooperation in Development of Mining Plans ..................... 16
    Section (i) Preservation of Individual Safety Rights ........................ 17
    Section (j) Physical Examination ....................................... 18

Section (k) Minimum Age ................................................................ 19
Section (l) Workers' Compensation and Occupational Disease .................... 19
Section (m) Safety Equipment and Protective Clothing Allowance ............... 19
Section (n) Maintenance .............................................................. 20
Section (o) Special Safety Problem Areas ............................................ 20
Section (p) Settlement of Health or Safety Disputes .............................. 21

Article IV--WAGES AND HOURS ......................................................... 22
Section (a) Basic Work Week ......................................................... 22
Section (b) Basic Work Day .......................................................... 22
Section (c) Alternate Work Schedules ............................................... 23
Section (d) Saturday, Sunday and Premium Work ................................... 23
Section (e) Standard Daily Wage Rate ............................................... 25

Article V--HELPERS ON FACE EQUIPMENT IN UNDERGROUND MINES ........... 25
Section (a) Assignment of Helpers ................................................... 25
Section (b) Duties and Responsibilities of Helpers ................................ 26
Section (c) Exemption ................................................................ 26

Article VI--SHIFTS AND SHIFT DIFFERENTIALS ..................................... 27
Section (a) Multiple Shifts .......................................................... 27
Section (b) Hoisting of Coal ........................................................ 27
Section (c) Shift Differentials ..................................................... 27
Section (d) Working into the Next Shift ............................................ 27
Section (e) Call-back ................................................................ 27
Section (f) Shift Rotation .......................................................... 27

Article VII--MINE COMMUNICATION COMMITTEES ............................... 28

Article VIII--STARTING TIME ......................................................... 28
Section (a) Shift Starting Time ..................................................... 28
Section (b) Lowering Employees ...................................................... 28
Section (c) Safety and Maintenance ................................................. 29
Section (d) Surface Facilities ...................................................... 29
Section (e) Changing Crews At The Face ............................................. 29

Article IX--ALLOWANCES ............................................................... 29
Section (a) Bereavement Pay ......................................................... 29
Section (b) Jury Duty ............................................................... 29
Section (c) Reporting Pay ........................................................... 29
Section (d) Military Duty ........................................................... 30
Section (e) Personal or Sick Leave ................................................. 30
Section (f) Family & Medical Leave ................................................. 31

Article X--WAGE INCREASE ............................................................ 33

Article XI--SICKNESS AND ACCIDENT BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    Section (a) General Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    Section (b) Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    Section (c) Commencement and Duration of Benefits . . . . . . . . . . . . . . . . . . . . . 35
    Section (d) Amount and Payment of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    Section (e) Filing of Claims for Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    Section (f) Structure and Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Article XII--HOLIDAYS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section (a) Holidays Observed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section (b) Sunday Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section (c) Monday Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section (d) Pay for Holidays Worked . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section (e) Pay for Holidays Not Worked . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section (f) Holidays During Vacation Period . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section (g) Birthday Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section (h) Holidays for Sick and Injured . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section (i) Time of Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Article XIII--REGULAR VACATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section (a) Annual Vacation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section (b) Dates of Regular Vacation Period . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section (c) Staggered Regular Vacation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section (d) Qualifying Period and Amount of Payment . . . . . . . . . . . . . . . . . . . . 41
    Section (e) Floating Vacation Days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    Section (f) Time of Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section (g) Obligation for Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section (h) Work During Shutdown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Article XIV--GRADUATED VACATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section (a) General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section (b) Definition of Additional Days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    Section (c) Definition of Continuous Employment and Qualifying Period . . . . . . . . . . 45
    Section (d) Amount of Continuous Employment . . . . . . . . . . . . . . . . . . . . . . . . . 45
    Section (e) Time of Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section (f) Rate of Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section (g) Scheduling and Pay in Lieu . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section (h) Sick and Injured Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Article XV--CHECKOFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Article XVI--TRAINING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section (a) Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section (b) Orientation for New Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section (c) General Retraining Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    Section (d) Safety Training for Specific Job . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Section (e) Maintenance Training and Rate of Pay .............................. 52
Section (f) General Training Provisions ..................................... 53
Section (g) Skills Enhancement Program ..................................... 53

**Article XVII--SENIORITY** ................................................ 54
Section (a) Definition of Seniority ........................................ 54
Section (b) Reduction; Realignment ........................................ 54
Section (c) Layoff Procedure .............................................. 56
Section (d) Panels ........................................................ 56
Section (e) Panel Custodians .............................................. 57
Section (f) Panel Members Accrue Seniority ................................ 58
Section (g) Right to be Recalled .......................................... 58
Section (h) Recall of Persons on Layoff Status ............................ 58
Section (i) Bidding ....................................................... 59
Section (j) Training for Vacancy Not Filled by Bidding .................... 61
Section (k) Transfer to Other Mines of Employer ........................... 61
Section (l) Leave of Absence .............................................. 62
Section (m) Permanent and Temporary Supervisors .......................... 62
Section (n) Shift Preference .............................................. 62
Section (o) Potential Job at Crown III .................................... 63

Article XVIII -- This Article Has Been Intentionally Omitted .............. 63

Article XIX--CLASSIFICATION ............................................... 63
Section (a) Working in Classification ..................................... 63
Section (b)Temporary Assignments .......................................... 63
Section (c) Protection Against Discrimination ............................. 64
Section (d) Compensation for Temporary Assignments ........................ 64
Section (e) Classifications at Underground Mines .......................... 64
    1.    Pay and Skills Improvement For Inby Employees ................... 64
    2.    Pay and Skills Improvement for Outby Employees ................. 65
    3.    Surface Jobs at Underground Mines .............................. 65
Section (f)  Mine Examiner, Inby Classification, Outby Classification, and Repairman  65
Section (g) Employees Hired After January 16, 2003 ........................ 66

Article XX--HEALTH AND RETIREMENT BENEFITS ............................... 66
Section (a) General Purpose ............................................... 66
Section (b) 1950 Pension Plan and Trust ................................... 67
Section (c) 1974 Pension Plan and Trust and Employer Benefit Plan ......... 67
Section (d) Contributions by Employer ..................................... 68
Section (e) Responsibilities and Duties of Trustees ....................... 71
Section (f) Audits, Reports and Notices ................................... 71
Section (g) Administration of Trusts ...................................... 72
Section (h) Guarantee of 1950 and 1974 Plans and Trusts ................... 73
Section (i) Medical Reimbursement Fund .................................... 74
GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS ... 74

          (1) PENSIONS FOR MINERS RETIRED UNDER THE 1950 PENSION PLAN:
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
    (1A)   1950 Widows' Pension: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
    (2)    Pensions for Miners Who Retired under the 1974 Pension Plan Prior to the
            Effective Date: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
    (3)    Pensions for Miners Who Retire on or after the Effective Date: . . . . . . . 78
    (4)    Signatory Service: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
    (5)    Pensions and Health Care for Disabled Miners: . . . . . . . . . . . . . . . . . . . 81
    (6)    Pensions for Surviving Spouses: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
    (6A)   Pre-retirement Survivor's Pension: . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
    (7)    Deferred Vested or Special Pensions: . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
    (7A)   Pension Bonuses: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
    (8)    Life and Accidental Death and Dismemberment Benefits: . . . . . . . . . . 87
    (9)    Pensioner's Death Benefits: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
    (10)   Health Care: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
    (11)   Vision Care: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
    (12)   Health Care Cost Containment: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
    (13)   National Health Care: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Article XXA --DENTAL PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Article XXB--UMWA CASH DEFERRED SAVINGS PLAN OF 1988 . . . . . . . . . . . . . . . 97
    Section (a)  General Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
    Section (b)  Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
    Section (c)  Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
    Section (d)  Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
    Section (e)  Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
    Section (f)  Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
    Section (g)  Plan and Trust Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Article XX-C--NEW FREEMAN UNITED RETIREMENT PROGRAM . . . . . . . . . . . . . . 100
    Section (A) General Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
    Section (B) Pension Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
    Section (C) Survivor Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
    Section (D) Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Article XXI--SURFACE MINES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
    Section (a)  Parking Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
    Section (b)  Manning of Surface Mining Equipment  . . . . . . . . . . . . . . . . . . . 105
    Section (c)  Eating Place . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
    Section (d)  Cabs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
    Section (e)  Special Health and Safety Problems in Surface Mines . . . . . . . . . . 106
    Section (f)  Toilets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
    Section (g)  Swing Shift . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
    Section (h)  Leasing of Employees' Vehicles  . . . . . . . . . . . . . . . . . . . . . . . . 108
    Section (i)  Production and Processing of Coal at Surface Mines . . . . . . . . . . . 108

Article XXII--MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
    Section (a)  Bathhouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
    Section (b)  Access Roads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
    Section (c)  Parking Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
    Section (d)  Bulletin Boards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
    Section (e)  Coke and Cleaning Plants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
    Section (f)  Compulsory Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
    Section (g)  House Coal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
    Section (h)  House Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
    Section (i)  Attendance Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
    Section (j)  Memorial Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
    Section (k)  Closing Following Fatal Accident . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
    Section (l)  New Machinery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
    Section (m)  Pay Day . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
    Section (n)  Lunches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
    Section (o)  Portals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
    Section (p)  Tools . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
    Section (q)  Tramming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
    Section (r)  Local Union Meeting Place . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
    Section (s)  Bonus Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

Article XXIII--SETTLEMENT OF DISPUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
    Section (a)  Mine Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
    Section (b)  District Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
    Section (c)  Grievance Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
    Section (d)  Ten Day Limitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
    Section (e)  Earnest Effort to Resolve Disputes . . . . . . . . . . . . . . . . . . . . . . . . . 116
    Section (f)  Employee's Right to Presence of Member of Mine Committee . . . . . . . . 117
    Section (g)  Right of Grievant to be Present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
    Section (h)  Finality of Decision or Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . 117
    Section (i)  Exclusion of Legal Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
    Section (j)  Waiver of Time Limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
    Section (k)  Prior Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Article XXIV--DISCHARGE PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
    Section (a)  Just Cause Required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
    Section (b)  Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
    Section (c)  Suspension . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
    Section (d)  Immediate Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
    Section (e)  Regular Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
    Section (f)  Compensation for Lost Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Article XXV--DISCRIMINATION PROHIBITED . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Article XXVI--DISTRICT AGREEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Section (a)  New Districts ................................................... 119
Section (b)  Prior Practice and Custom ...................................... 119
Section (c)  Protective Wage Clause ......................................... 120
Section (d)  Approval of District Agreements ................................. 120

Article XXVII--MAINTAIN INTEGRITY OF CONTRACT AND RESORT TO COURTS . 120

Article XXVIII--SEVERABILITY CLAUSE .................................... 120
Section (a)  General Rule .................................................... 120
Section (b)  Exception ....................................................... 121

Article XXIX--RATIFICATION AND TERMINATION OF THIS AGREEMENT ........ 121

TABLE I-A  ............................................................... 122

TABLE I-B  ............................................................... 123

Age 62 Pension  ......................................................... 124

TABLE I-C  ............................................................... 125

TABLE II ................................................................ 126

APPENDIX A PART I  ...................................................... 127

APPENDIX A PART II  ..................................................... 128

APPENDIX A PART III  .................................................... 129

APPENDIX B PART I ....................................................... 130

APPENDIX B PART II ...................................................... 133

APPENDIX B PART III ..................................................... 135

APPENDIX C ALTERNATIVE SCHEDULES ................................... 138

INDEX ................................................................... 144

Article I

FREEMAN UNITED COAL MINING COMPANY AND UNITED MINE WORKERS OF
AMERICA BITUMINOUS COAL WAGE AGREEMENT OF 2003

### Article I—ENABLING CLAUSE

THIS AGREEMENT, effective this 16th day of January, 2003 between Freeman United Coal Mining Company ("Freeman" or "the Employer"), as party of the first part and the International Union, United Mine Workers of America (hereinafter called "Union"), on behalf of each member thereof as party of the second part, covers all of the bituminous coal mines described in Article IA, Section (f), owned or operated by said first party. This Agreement carries forward and preserves the terms and conditions of all the various District agreements executed between the United Mine Workers of America and the various operators and coal associations subject to the terms and conditions of this Agreement and as amended, modified and supplemented by this Agreement as herein set out.

This Agreement shall be binding upon all signatories hereto and their successors and assigns. In consideration of the Union's execution of this Agreement, the Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement. Immediately upon the conclusion of such sale, conveyance, assignment or transfer of its operations, the Employer shall notify the Union of the transaction. Such notification shall be by certified mail to the Secretary-Treasurer of the International Union and shall be accompanied by documentation that the successor obligation has been satisfied. Provided that the Employer shall not be a guarantor or be held liable for any breach by the successor or assignee of its obligations, and the UMWA will look exclusively to the successor or assignee for compliance with the terms of this Agreement.

WITNESSETH: It is agreed that this contract is for the exclusive joint use and benefit of the contracting parties, as defined and set forth in this Agreement. It is agreed that at operations covered by this Agreement the United Mine Workers of America is recognized herein as the exclusive bargaining agency representing the Employees of the party of the first part. It is further agreed that as a condition of employment all Employees at operations covered by this Agreement shall be, or become, members of the United Mine Workers of America, to the extent and in the manner permitted by law, except in those exempted classifications of employment as hereinafter provided in this Agreement. This provision does not change the rules or practices of the industry pertaining to management. The Mine Workers intend no intrusion upon the rights of management as heretofore practiced and understood. It is the intent and purpose of the parties hereto that this Agreement will promote and improve industrial and economic relationships in the bituminous coal industry and to set forth herein the basic agreements covering rates of pay, hours of work and conditions of employment to be observed between the parties, and shall cover the employment of persons employed in the bituminous coal mines covered by this Agreement. Management will not abridge the rights of the Employees as set forth in this Agreement.

1

## Article IA--SCOPE AND COVERAGE

### Section (a) Work Jurisdiction

The production of coal, including removal of overburden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway, or rail not owned by Employer), repair and maintenance work normally performed at the mine site or at a central shop of the Employer and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above shall be performed by classified Employees of the Employer covered by and in accordance with the terms of this Agreement, except during "neutral periods" as defined in Section (j) of this Article. Contracting, subcontracting, leasing and subleasing, and construction work, as defined herein, will be conducted in accordance with the provisions of this Article.

Nothing in this section will be construed to diminish the jurisdiction, express or implied, of the United Mine Workers.

### Section (b) Exemptions Clause

It is the intention of this Agreement to reserve to the Employer and except from this Agreement an adequate force of supervisory employees to effectively conduct the safe and efficient operation of the mines and at the same time, to provide against the abuse of such exemptions by excepting more such employees than are reasonably required for that purpose.

Coal inspectors and weigh bosses at mines where men are paid by the ton, watchmen, clerks, engineering and technical forces of the Employer, working at or from a district or local mine office, are exempt from this Agreement.

All other Employees working in or about the mine shall be included in this Agreement except essential supervisors in fact such as mine foremen, assistant mine foremen who, in the usual performance of their duties, may make examinations for gas as prescribed by law, and such other supervisors as are in charge of any class of labor inside or outside the mines and who perform no production work.

The Union will not seek to organize or ask recognition for such excepted supervisory employees during the life of this contract.

The Employer shall not use this provision to exempt from the provisions of this Agreement as supervisors, more men than are necessary for the safe and efficient operation of the mine, taking into consideration the area covered by the workings, roof conditions, drainage conditions, explosion hazards, and the ability of supervisors, due to thickness of the seam, to make the essential number of visits to the working faces as required by law and safety regulations.

2

### Section (c) Supervisors Shall Not Perform Classified Work

Supervisory employees shall perform no classified work covered by this Agreement except in emergencies and except if such work is necessary for the purpose of training or instructing classified Employees. When a dispute arises under this section, it shall be adjudicated through the grievance machinery and in such proceedings the following rule will apply: the burden is on the Employer to prove that classified work has not been performed by supervisory personnel.

### Section (d) Management of the Mines

The management of the mine, the direction of the working force and the right to hire and discharge are vested exclusively in the Employer.

### Section (e) Union's Rights

Authorized representatives of the Union shall be permitted reasonable access to the mine property to insure compliance with this Agreement. The Employer shall provide candidates for Union office reasonable opportunity to campaign among his Employees during their nonworking hours and in nonworking areas, provided there is no interference with production. The Employer further agrees to provide, to the extent practicable, space on mine property for the holding of Union elections and the ratification of collective bargaining agreements.

### Section (f)  Application of This Contract to the Employer's Coal Lands

As part of the consideration for this Agreement, the Employers agree that this Agreement covers the operation of all the coal lands, coal producing and coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of this Agreement) be put into production or use. This section will immediately apply to any new operations upon the Union's recognition, certification, or otherwise properly obtaining bargaining rights. Notwithstanding the foregoing, the terms of this Agreement shall be applied without evidence of Union representation of the Employees involved to any relocation of an operation already covered by the terms of this Agreement.

### Section (g) Contracting and Subcontracting

(1) Transportation of Coal--The transportation of coal as defined in paragraph (a) may be contracted out under the Agreement only where contracting out such work is consistent with the prior practice and custom of the Employer at the mine; provided that such work shall not be contracted out at any time when any Employees at the mine who customarily perform such work are laid off.

3

(2) Repair and Maintenance Work--Repair and maintenance work of the type customarily performed by classified Employees at the mine or central shop shall not be contracted out except (a) where the work is being performed by a manufacturer or supplier under warranty, in which case, upon written request on a job-by-job basis, the Employer will provide to the Chairman of the Mine Committee a copy of the applicable warranty or, if such copy is not reasonably available, written evidence from a manufacturer or a supplier that the work is being performed pursuant to warranty; or (b) where the Employer does not have available equipment or regular Employees (including laid-off Employees at the mine or central shop) with necessary skills available to perform the work at the mine or central shop or (c) during "neutral periods" as defined in Section (j) of this Article;

(3) The Employer may not contract out the rough grading in mine reclamation work.

(4) Where contracting out is permitted under this section, prior custom and practice shall not be construed to limit in any way the Employer's choice of contractors.

## Section (h) Leasing, Subleasing and Licensing Out of Coal Lands

(1) The Employer agrees that it will not lease, sublease or license out any coal lands, coal producing or coal preparation facilities where the purpose thereof is to avoid the application of this Agreement or any section, paragraph or clause thereof.

Licensing out of coal mining operations on coal lands owned or held under lease or sublease by any signatory operator hereto shall not be permitted unless the licensing out does not cause or result in the layoff of Employees of the Employer.

(2)-(7) These sections have been incorporated into the JOBS Program, Article II, Section (b).

## Section (i) Construction Work

All construction of mine or mine related facilities including the erection of mine tipples and sinking of mine shafts or slopes customarily performed by classified Employees of the Employer normally performing construction work in or about the mine in accordance with prior practice and custom, shall not be contracted out at any time unless all such Employees with necessary skills to perform the work are working no less than 5 days per week, or its equivalent for Employees working on alternative schedules.

Provided further that where contracting out of such construction work customarily performed by classified Employees at the mine is permitted under this Agreement, such contracting shall be in accordance with prior practice and custom. Where contracting out is permitted under this section, prior practice and custom shall not be construed to limit the Employer's choice of contractors.

4

**Section (j) Neutral Periods**

In addition to other rights of the Employer to operate its mines and facilities on days when Employees are not working because of contractually provided for time off, the Employer during neutral periods may contract out construction, repair and/or maintenance work normally performed by the workforce on the surface. For purposes of this Section (j), ("Neutral Periods") shall mean Regular Vacation, as set forth in Article XIII, Section (b).

## Article II – JOB OPPORTUNITY AND BENEFIT SECURITY (JOBS)

The parties hereto recognize and agree that the production of bituminous coal involves, by its very nature, the depletion of resources at work locations. The parties agree further that varied mining arrangements and technological advances can adversely impact on job security and that their mutual goals of mining coal safely and efficiently can best be achieved by the use of experienced miners who are knowledgeable of the Employer's standards of operation.

As a result of the special nature of the bituminous coal mining industry and the parties' desire to develop a relationship in which the Employees as well as the Employers gain from a growth in productivity, the parties agree to establish the Job Opportunity and Benefit Security (JOBS) Program. The JOBS Program is designed to achieve, to the fullest extent allowed by law, job security for classified employees through extended panel rights and new training opportunities. Nothing in the JOBS Program shall be construed to diminish any rights of the Employees or the Union established in any other provision of this Agreement including, but not limited to, the successorship clause, Article IA(h) and Article XVII.

### A. Non-Signatory Operations Of The Signatory Employer

1. Except as modified in Section C, the first three out of every five new job openings for work of a nature covered by this Agreement at any existing, new, or newly acquired non-signatory bituminous coal operation of the Employer shall be filled by classified laid-off Employees on the panels of the Employer's operations covered by this Agreement, or by classified active Employees of the Employer who have provided notice indicating their interest in such job openings. It shall be the obligation of the signatory Employer to provide reasonable notice to its classified active Employees of the operations at which such job openings may be available. If the newly acquired or non-signatory operation has a panel of laid-off employees established pursuant to a valid collective bargaining agreement, those individuals shall first be recalled before this section applies.

2. Selection of employees for the above three out of every five new job openings shall be made from the senior Employee among the classified laid-off Employees on the Employer's panels and classified active Employees of the Employer who have notified the Employer in writing of their interest in and qualifications for any such job openings at the specific operation involved, provided that such classified laid-off and active Employees have the ability to step into and perform the work

5

of the job at the time the job is filled. For classified laid-off Employees, the order of selection of Article XVII shall also apply: selecting first from Employees on the panels of the Employer's operations covered by this Agreement within the district where the non-signatory operation is located, next from Employees on the panels of the Employer's operations covered by this Agreement within contiguous districts, and then from Employees on the panels of the Employer's operations covered by this Agreement within non-contiguous districts. For classified active Employees, the order of selection shall be: selecting first from active Employees of the Employer's operations covered by this Agreement within the district where the non-signatory operation is located, next from active Employees of the Employer's operations covered by this Agreement within contiguous districts, and then from active Employees of the Employer's operations covered by this Agreement within non-contiguous districts. The Employer shall not be required to make more than one offer of employment per operation to each such classified laid-off or active Employee, provided (i) that for classified laid-off Employees on the Employer's panels the offer is for work of the type listed on his panel form and the Employee refuses or fails to respond to that offer or report for the job, and (ii) that for classified active Employees of the Employer the offer is for work of the type listed in the Employee's written notification of interest to the Employer for the job opening in question and the Employee refuses or fails to respond to that offer or report for the job. The Employer may also consider its classified laid-off Employees on its panels, and classified active Employees who have notified the Employer in writing of their interest in any such job openings at the specific operation involved, for the last two out of every five job openings, which are to be selected at the Employer's sole discretion.

3. The filling of a position by an active Employee at a non-signatory operation as the result of his reassignment from one position at that operation to another position at that same operation does not constitute the filling of a new job opening for purposes of this section.

4. Offers of employment made to classified laid-off Employees on the Employer's panels pursuant to this section, shall be made without regard to the listing of that particular operation on the Employee's panel form.

5. Acceptance or rejection of an offer of employment under this section or any personnel action at the non-signatory operation shall not affect such Employee's other panel rights with the Employer as established by this Agreement.

6. Any disputes that arise under this Section shall be resolved exclusively pursuant to the procedures set forth under Section D-3 of this Article and are not subject to resolution under Article XXIII -- Settlement of Disputes.

7. Nothing in this section shall operate to extend the bargaining unit as of the date of this Agreement nor expand the rights of the Union with regard to the non-signatory operations, except for the job opportunities made available under this section.

6

8. Section A shall become effective immediately upon the Effective Date of this Agreement. No Employer shall be required to terminate or lay off any employee on its active payroll at said operations as of that date in order to comply with the foregoing hiring obligations. For purposes of complying with the foregoing, all hiring for jobs of a nature covered by this Agreement after the Effective Date shall be made in accordance with this section. Furthermore, except as modified by Section C, if the Employer has an existing UMWA panel obligation or other collective bargaining obligation at the operation, it shall first recognize such obligation.

## B. Lessee-Licensee

1. For purposes of lawfully preserving and protecting job opportunities for the Employees covered by this Agreement, the Employer further agrees that it will not lease, sublease, or license out any bituminous coal lands, bituminous coal mining operations and other facilities of the Employer unless the conditions set forth in the following paragraphs are satisfied.

2. Leasing, subleasing, or licensing out of such lands or operations shall be permitted where the lessee-licensee agrees in writing that all offers of employment by such lessee-licensee shall first be made to the Employer's classified laid-off Employees on the Employer's panels of the Employer's operations covered by this Agreement, if such employment at the leased, subleased or licensed out location is for jobs of the nature covered by this Agreement, and if such Employees are qualified for such jobs.

3. Selection of employees for these offers of employment shall be made from the senior Employee among the classified laid-off Employees on the Employer's panels, who has the ability to step into and perform the work of the job at the time the job is filled. The order of selection of Article XVII also shall apply: selecting first from Employees on the panels of the Employer's operations covered by this Agreement within the district where the lessee-licensee's operation is located, next from Employees on the panels of the Employer's operations covered by this Agreement from districts contiguous to the district where the lessee-licensee's operation is located, and then from Employees on the panels of the Employer's operations covered by this Agreement within non-contiguous districts. The lessee-licensee shall not be required to make more than one such offer of employment per operation to each such Employee, provided that offer is for work of the type listed on his panel form and the Employee refuses or fails to respond to that offer or report for the job.

4. Acceptance or rejection of such an offer of employment made by a lessee-licensee or any personnel action between the Employee and lessee-licensee shall not affect such Employee's panel rights with the Employer as established by this Agreement.

5. Any disputes regarding this section shall be resolved between the prior Employer and the Employee under Section D-3 of this Article. The Employer agrees that it will reserve in any lease, sublease or license subject to this section the ability of the Employer to remedy any finding as to noncompliance of an Employee's right to be considered for employment opportunity as provided

7

herein. If it chooses in its discretion to permit a sublease or sublicense, the Employer shall also require the lessee-licensee to convey this hiring obligation in any sublease or sublicense.

6. The prior Employer shall not be a guarantor or be held liable for any breach of the lessee-licensee of its hiring or bargaining obligations or the terms of any agreement between the Union and the lessee-licensee.

7. Within ten (10) days after the lease, sublease or licensing out of any bituminous coal lands, coal mining operations and/or other facilities, but in any event prior to the time that work of a nature covered by this Agreement commences, the Employer shall provide notice thereof to the appropriate District President. Such notice shall disclose the identity of all parties to the transaction and the location and identity of the bituminous coal lands, operations and/or other facilities affected thereby including the relevant MSHA legal I.D. number.

8. The Union agrees that this section, or its implementation, in no manner extends the bargaining unit of the Employer and does not create a joint employer, single employer, alter ego, agency relationship or successor relationship between the Employer and the lessee-licensee, which does not otherwise exist without reference to this section or its implementation.

9. Section B shall become effective immediately upon the Effective Date of this Agreement. For purposes of complying with this section, all hiring by any lessee-licensee for work of a nature covered by this Agreement after the Effective Date shall comply with this section. However, no lessee-licensee operating on the Employer's bituminous coal lands as of the Effective Date of this Agreement (hereinafter, the "current lessee-licensee") shall be required to terminate or lay off any employee on its active payroll at such locations as of that date in order to comply with the foregoing hiring obligation. Furthermore, a current lessee-licensee shall not be required to comply with the foregoing hiring obligations at those locations until ninety (90) days after the Effective Date of this Agreement, except if the lease, sublease or license under which the current lessee-licensee is conducting those operation(s) expires, terminates or is extended with the Employer prior to the ninety (90) day deadline or except if such lease, sublease or license involves a former signatory operation of the Employer. In the case of these two latter exceptions, the foregoing hiring obligations shall become effective immediately.

10. In the event the current lessee-licensee has an existing UMWA panel obligation or other collective bargaining obligation at any location on the Employer's bituminous coal lands, it shall first recognize such obligation except when its new operation was at any time a signatory operation of the Employer, in which case the Employer's laid-off Employees must be given the first offers of employment as provided in Section B(2) and (3) above before any other individual is employed in work of a classified nature.

11. Within thirty (30) days of the Effective Date of this Agreement, the Employer shall provide to the appropriate District President(s) a list of its lessee-licensees as of the Effective Date of the Agreement, with the same information as set forth in Section B(7).

## C. Coordination Of Employment Obligations Under the JOBS Program

At those locations where the Employer hereto is the lessee-licensee of another employer which is also party to the obligations of Article II, the Employer hereto shall first honor the hiring obligations to which it should be bound as a result of lessor-licensor's agreement with the Union. Thereafter, and at all other locations covered by this Article, the Employer hereto shall follow the requirements of Sections A and B above.

## D-1. Employer-Wide Panel Rights To Signatory Operations

The Employer also agrees to extend employer-wide panel rights to its signatory operations pursuant to Article XVII. Accordingly, within forty-five (45) days of the Effective Date of this Agreement, a laid-off employee may revise his panel form for any purpose, in addition to his annual right of revision under Article XVII(d).

## D-2. Exhaustion Of Employer Panel

Upon the Employer's notification to the Union that its panels have been exhausted and that it has no laid-off panel members or active miners who have provided notice indicating an interest in filling new job openings for work of a classified nature, the Union may provide the Employer with a list of qualified miners for hiring consideration. The Employer may consider but is under no obligation to hire any of the miners on the list provided by the Union.

## D-3. Monitoring Of Job Selections

In order to effectuate the implementation of these job opportunity provisions, BCOA and the International Union shall jointly select, within thirty (30) days following the Effective Date of this Agreement, an impartial Jobs Monitor to monitor the job selections pursuant to this Article, and to investigate any alleged violations herein. The monitor shall have the authority to request such information which may be reasonably necessary in order to secure compliance with the job selection provisions. The parties have the obligation to comply with such requests. In that regard, the monitor shall be provided on a regular basis at the end of each calendar quarter, with reports of all jobs filled pursuant to the job opportunity provisions. The report shall state the name of the mine, its location, the total number of jobs of a classified nature filled and the names and number of persons selected for jobs pursuant to this Article from among either active Employees or laid-off miners. The report shall be treated as confidential; however, at the monitor's discretion, the report may be provided to the UMWA. The monitor shall also be provided with a sixty (60) day notice prior to the start-up of production at any new operation covered by this Article. A copy of this sixty

9

(60) day notice shall also be sent to the Secretary-Treasurer of the UMWA. The sixty (60) day notice shall state the name of the operation, location, approximate start-up date, and projected number of jobs of a classified nature available.

Any dispute alleging a breach of the foregoing job opportunity provisions of Article II must be presented to the Employer in writing by the Local Union. This written charge shall concisely explain the basis for the dispute. Upon receiving a written charge, the Employer representative shall provide information to the Local Union in response to the charge. The Employer and the Local Union shall mutually attempt to resolve the dispute. If the dispute is not resolved by the Employer and the Local Union within thirty (30) days, it shall be referred to the District and the Employer representative who will attempt to resolve it. If unresolved, the District may submit the written charge to the Jobs Monitor for resolution of the dispute. The Jobs Monitor shall have the authority to reach a decision on written submissions. The Jobs Monitor shall also have the authority to conduct a hearing (formal or informal), request position statements, issue subpoenas for witnesses and documents, request additional information or briefs, and take any such steps as may be reasonably necessary to investigate and resolve the dispute. If the Jobs Monitor is unable to reach a decision within thirty (30) days of the close of the hearing (or the close of the record if no hearing is conducted), the Jobs Monitor shall promptly advise the parties of the reasons for the delay and the date when a decision will be issued. Any decision rendered by the Jobs Monitor shall be in writing and shall be final and binding on all parties to that decision. The Jobs Monitor shall not have authority to alter, amend, modify, add to or subtract from, or change in any way the provisions of this Article. All expenses and fees incurred by the Jobs Monitor in the resolution of disputes pursuant to this Article shall be borne equally by the District and the applicable signatory Employer.

## E. UMWA-Freeman Training and Education Fund

### Section 1. Establishment

The parties hereto recognize that unemployment currently exists in the Illinois coalfield and that unemployment places burdens on UMWA miners, their families and communities. To lessen those burdens and to aid them in acquiring gainful employment, the parties hereby establish the UMWA-Freeman Training and Education Fund.

### Section 2. Purpose

The UMWA-Freeman Training and Education Fund is established to provide financial assistance for training or education to unemployed UMWA miners, who have performed classified work under the Freeman United Coal Mining Company and United Mine Workers of America Coal Wage Agreement of 2003 or any predecessor agreement thereto, and/or their family dependents and/or the family dependents of active classified Employees of signatory Employers, so long as such persons are determined to be eligible for an Educational Assistance Grant (EAG). The decision to make an EAG to an eligible applicant, the form of the grant and the specific amount of each such

Grant shall be determined jointly by the parties' Trustees at their discretion. Grants may be renewed annually according to rules jointly adopted by the parties' Trustees.

## Section 3. Administration

The UMWA-Freeman Training and Education Fund shall be administered by two Trustees, one of whom shall be appointed by the UMWA and one of whom shall be appointed by Freeman. The Trustees shall be responsible for adopting all necessary rules for the distribution of training and education monies, establishing separate accounts, accounting for all monies owed to or received by the Fund, providing a full accounting of the Fund's monies in May and November of each year to the Presidents of the UMWA and Freeman and all other action necessary for the proper and efficient operation of the Fund. The salaries and expenses of each of the parties' Trustees shall be borne by each respective party and all other normal administrative costs shall be the responsibility of the Employer. The Fund will be responsible for extraordinary administrative costs, such as costs of litigation, administrative proceedings, arbitration, legal services and judgments/awards. Although the parties intend that the Fund will be "tax-qualified" and not subject to taxation, any taxes levied on the Fund shall be paid by the Fund. However, the Employer shall reimburse the Fund for amounts expended to pay taxes incurred by the Fund or its corpus. The parties intend that maximum funds be used for training and education purposes. Nothing herein shall preclude receipt of monies from other sources for purposes consistent with the Fund.

## Section 4. Funding

The Employer will establish the UMWA-Freeman Training and Education Fund up to a maximum funding level of $40,000 and with mutually agreed upon criteria for eligibility to become a beneficiary of such Fund. The Employer will maintain sufficient funds in the Training and Education Funds up to the specified maximum level. Unless mutually agreed between the parties, under no circumstances shall the Employer be required to contribute more than $80,000 in any calender year. In the event that the Employer closes a mine during the term of this Agreement, then the parties agree to meet and discuss additional funding, if necessary, to provide education and training to the newly laid off miners.

## F. Skills Training

## Section 1. General

The parties recognize that technological changes are now occurring and may continue to occur in the coal industry. These technological changes may require new Employee skills or the refinement of existing Employee skills in order for operations covered by this Agreement to be safe and efficient. To keep pace with these technological changes, as required by the Employer, and to develop and increase the skills of the classified work force and to enhance job security the parties establish the UMWA-Employer Skills Training Program.

11

Article II

## Section 2. Purpose

As a demonstrated need arises at a mine or facility covered by this Agreement, the Employer shall establish for such mine or facility a Skills Training Program. The Skills Training Program would be established to increase the efficiency of certain active classified Employees by enhancing or modifying existing skills or by developing the new skills necessary regarding new machinery or other equipment used in the course of the operation which has been modified or improved by technology or has not before been utilized at the mine or facility.

## Section 3. Skills Training Program

When new technology or improvements to existing technology are introduced at any operation covered by this Agreement and new skills are needed to utilize such new technology or improvements, the Employer shall provide the appropriate active classified Employees whom it deems necessary with the skills training necessary for the safe and efficient operation of the component, machine or equipment introduced. The skills training may be performed at the manufacturer's facility, at the Employer's training facility, on the job, or at any other site appropriate for such training.

Each training program shall emphasize health and safety in addition to the other requirements of the job. Appropriate local and district officials of the Union shall have the opportunity to review each training program and make comments and suggestions.

Employees shall be paid at their regular straight time classified rate for all time spent in skills training in accordance with the provisions of this Section, except when the overtime rate is required by statute. In those cases where travel away from the work place or overnight stay is required for the skill training the Employer and the Local Union shall meet and establish the amount and the manner in which expenses will be provided Employees for lodging and travel associated with the Training Program.

## G. UMWA-Freeman Labor Management Local Circumstances

The parties recognize that market, mining, economic, and competitive conditions in the coal industry vary greatly from one part of the country to the other and even from mine to mine and over the life of individual mines or facilities. As a result and since the Parties' desire to develop a relationship in which the Employer and the Employees retain the ability to provide and retain work, and to enhance job security, the parties agree that modifications to the 2003 UMWA/Freeman Coal Wage Agreement (The Agreement), may be reasonable and necessary during the term of the Agreement. Furthermore, the Union and the Employer recognize that modifications may be necessary in areas where other employers maintain either higher or lower labor standards for their employees. Therefore, either the Union or the Employer may request modification of the Agreement or development of a new labor agreement as applicable to a specific operation. Any such

12

modifications or a new agreement shall be applied to that operation, only if both the applicable Local Union and the Employer consent to the modifications or new agreement.

## H. UMWA-BCOA Resolution of Disputes Trust

Freeman shall not be subject to the ROD process nor shall such process have any binding force or effect. The parties agree that instead of the ROD process, that within ninety (90) days of ratification of this Agreement, they shall institute an agreed-upon special arbitration process which will recognize as precedential the appropriate Resolutions of Disputes issued by the Trustees of the 1974 Pension Plan.

## Article III—HEALTH AND SAFETY

### Section (a) Right to a Safe Working Place

Every Employee covered by this Agreement is entitled to a safe and healthful place to work, and the parties jointly pledge their individual and joint efforts to attain and maintain this objective. Recognizing that the health and safety of the Employees covered by this Agreement are the highest priorities of the parties, the parties agree to comply fully with all lawful notices and orders issued pursuant to the Federal Mine Safety and Health Act of 1977, as amended, and pursuant to the various state mining laws.

### Section (b) Federal Mine Safety and Health Act of 1977, As Amended

The parties to this contract, finding themselves in complete accord with the FINDINGS AND PURPOSE declared by the United States Congress in section 2 of the Federal Mine Safety and Health Act of 1977 do hereby affirm and subscribe to the principles as set forth in such section 2 of the Act.

(1) In consequence of this affirmation, the parties not only accept their several responsibilities, obligations and duties imposed by the Federal Mine Safety and Health Act, but freely resolve to cooperate among each other and with the responsible officials of federal and state governments in determined efforts to achieve greatly improved performance in coal mine health and safety.

(2) Neither party waives nor repudiates any administrative, procedural, legislative, or judicial rights under or relating to the Federal Mine Safety and Health Act of 1977, as amended.

### Section (c) Freeman UMWA Health and Safety Committee

It is recognized that there exists a Freeman UMWA Health and Safety Committee composed of four (4) members, two (2) to be appointed by the Union, one (1) of whom shall have special knowledge and expertise in coal mine health matters, and two (2) to be appointed by the Employer,

13

one of whom shall have special knowledge and expertise in coal mine health matters. The Committee shall consult with the Mine Safety and Health Administration and/or representatives of the Secretary of Health and Human Services, looking toward review and appropriate development and revision of improved mandatory health and safety standards as provided in section 101 of the Federal Mine Safety and Health Act of 1977. The Committee may also seek such joint consultations with the Mine Safety and Health Administration for discussion of the technical aspects of petitions by the Employer or the Union as provided in section 101(c) of the Act. The Committee may meet to discuss health and safety matters of importance to the coal industry.

## Section (d) Mine Health and Safety Committee

(1) At each mine there shall be a Mine Health and Safety Committee made up of miners employed at the mine who are qualified by mining experience or training and selected by the local union. The local union shall inform the Employer of the names of the Committee members. The Committee at all times shall be deemed to be acting within the scope of their employment in the mine within the meaning of the applicable workers' compensation law.

(2) The Union and Employer shall jointly establish and fund a course of health and safety training for members of the Mine Health and Safety Committee, which is designed to improve health and safety knowledge and skills. The Mine Health and Safety Committee shall participate in and shall be paid at their regular rates of pay by the Employer for attendance at training sessions.

(3) The Mine Health and Safety Committee may inspect any portion of a mine and surface installations, dams or waste impoundments and gob piles connected therewith. If the Committee believes conditions found endanger the lives and bodies of the Employees, it shall report its findings and recommendations to the Employer. In those special instances where the Committee believes that an imminent danger exists and the Committee recommends that the Employer remove all Employees from the involved area, the Employer is required to follow the Committee's recommendation and remove the Employees from the involved area immediately. The Mine Health and Safety Committee shall, when engaged in its official duties as herein provided, be furnished transportation at the mine.

(4) The Committee shall give sufficient advance notice of an intended inspection to allow a representative of the Employer to accompany the Committee. If the Employer does not choose to participate, the Committee may make its inspection alone.

(5) If the Mine Health and Safety Committee in closing down an area of the mine acts arbitrarily and capriciously, a member or members of such Committee may be removed from the Committee. An Employer seeking to remove a Committee member shall so notify the affected Committeeman and the other members of the Mine Health and Safety Committee. If the Committee objects to such removal, the matter shall be submitted directly to arbitration within 15 days. If the other members of the Committee so determine, the affected member shall remain on the Committee until the case is submitted to and decided by the appropriate panel arbitrator. If the Employer requests removal of the entire Committee, the matter automatically shall be submitted to arbitration

14

and the Committee will continue to serve until the case is submitted to and decided by the arbitrator. A Committee member shall not be suspended or discharged for his official actions as a Committee member.

(6) Mine management and the Mine Health and Safety Committee shall meet monthly at times arranged by the parties for the purpose of reviewing mine accident prevention efforts, discussing mine accidents and resolving health and safety problems at the mine. Special meetings may be called by either party for the purpose of resolving safety matters.

(7) The Employer shall be responsible for paying Committee members for the performance of the following duties:

(i) Inspecting the entire mine and surface installations connected therewith with management on a regular basis mutually agreed upon by the Employer and the Committee, but in no case any less often than every two (2) months. The Employer shall be responsible for paying each Committeeman one (1) shift at his regular rate of pay once in every two (2) month period for performance of his duties under this paragraph.

(ii) Committee members shall be paid at their regular straight time rate of pay for up to two (2) hours for time spent in joint monthly meetings with the Employer provided for in paragraph (6).

(iii) Investigating explosions and/or disasters including any mine fatality.

## Section (e) Access to the Mine

In recognition of the UMWA's concern with health and safety in the coal mines, Union officials as described below and any authorized representative of the UMWA Department of Occupational Health and Safety, without interfering with the Mine Health and Safety Committee and the Mine Committee in the performance of their duties, shall be granted access to the mines on the following conditions:

(1) Subject to the routine check-in and check-out procedures at the mine, the officers of the International Union, the District President of the District involved, and authorized representatives of the International Union's Department of Occupational Health and Safety shall be afforded the opportunity to visit a mine to consult with management or the Mine Health and Safety Committee and to enter the mine at the request of either management or the Mine Health and Safety Committee.

(2) If the Mine Health and Safety Committee calls in such representatives to meet with mine management to discuss health or safety problems, mine management shall have the right to be represented by its own health or safety representative. Where application of a federal or state law or regulation is involved, either management or the authorized Union representative may invite federal or state inspectors to participate.

15

(3) Representatives authorized by the International Union may accompany state or federal coal mine inspectors investigating any fatal or serious nonfatal accident, ignition, mine fire or mine explosion.

(4) The President, Vice President and Secretary-Treasurer of the UMWA International Union shall be granted the right to visit any and all mines covered by this Agreement at any time.

(5) The provisions of this section are in no way intended to impair or to waive any statutory rights under federal or state laws or regulations which Union officials and representatives may have to enter upon mine property or enter the mines.

## Section (f) Reports

The Mine Health and Safety Committee and the Employer shall maintain such records concerning inspections, findings, recommendations and actions, relating to the provisions of this Agreement, as may be agreed upon, and copies of all such reports shall be promptly exchanged.

The Employer shall each month provide the Mine Health and Safety Committee with two (2) copies of a list of all accidents reported to MSHA. Such report will reflect the nature of the injury and the location of the accident.

In addition, the Employer shall notify the Mine Health and Safety Committee promptly of all serious injuries known to management which must be immediately reported directly to MSHA.

## Section (g) Safety Rules and Regulations

Reasonable rules and regulations of the Employer, not inconsistent with federal and state laws, for the protection of the persons of the Employees and the preservation of property shall be complied with.

After the Effective Date of this Agreement, at least ten (10) days prior to the implementation of any new or revised safety rule or regulation, the Employer shall provide copies of the proposed rule or regulation to the Mine Health and Safety Committee and shall meet and discuss it with Committee members in an attempt to resolve any differences between the parties. If the Committee or any Employee believes that any such new rule or regulation or revision is unreasonable, arbitrary, discriminatory or adversely affects health or safety, they may file and shall process a grievance.

## Section (h) Cooperation in Development of Mining Plans

During development, modification or revision of any mining plan pertaining to health and safety which must be submitted for approval in accordance with the Federal Mine Safety and Health Act of 1977 covering the following subjects--roof control, ventilation, dust control, noise, maintenance, permissible equipment, escapeways, emergency procedures, emergency transport and

16

haulage--the Mine Health and Safety Committee shall be afforded the opportunity to submit comments or recommendations to the operator concerning such plans. At the request of the Committee, a representative of the UMWA Safety Division shall participate in such comments and recommendations.

The Employer shall provide an opportunity for review prior to the required submittal date and ten (10) days shall be allowed for written comments by the Mine Health and Safety Committee. Upon request of the Mine Health and Safety Committee, given within said ten (10) day period, the Employer shall provide to the Committee one (1) copy of any such plan, revision or modification.

## Section (i) Preservation of Individual Safety Rights

(1) No Employee will be required to work under conditions he has reasonable grounds to believe to be abnormally and immediately dangerous to himself beyond the normal hazards inherent in the operation which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated. When an Employee in good faith believes that he is being required to work under such conditions he shall immediately notify his supervisor of such belief and the specific physical conditions he believes exist. The Employee shall state the factual basis for his belief but shall not be required to cite applicable law or regulation. Unless there is a dispute between the Employee and management as to the existence of such condition, steps shall be taken immediately to correct or prevent exposure to such condition utilizing all necessary Employees, including the involved Employee.

(2) If the existence of such condition is disputed, the Employee shall have the right to be relieved from duty on the assignment in dispute. Management shall assign such Employee to other available work not involved in the dispute; and the Employee shall accept such assignment at the higher of the rate of the job from which he is relieved and the rate of the job to which he is assigned. The assignment of such alternative work shall not be used to discriminate against the Employee who expresses such belief. If the existence of such condition is disputed, at least one member of the Mine Health and Safety Committee shall review such condition with mine management within four (4) hours to determine whether it exists and each party shall state the facts upon which it relies as to whether such condition exists or does not exist. If there is agreement between the Mine Health and Safety Committee member or members and mine management that the condition does not exist, the Employee shall return to his regular job immediately.

(3) If the dispute remains unsettled following the investigation by a member of the Mine Health and Safety Committee and involves an issue concerning compliance with federal or state mine safety laws or mandatory health or safety regulations, the appropriate federal or state inspection agency shall be called in immediately and the dispute shall be settled on the basis of the findings of the inspector with both parties reserving all rights of statutory appeal. Should the federal or state inspector find that the condition complained of requires correction before the Employee may return to his job, the Employer shall take the corrective action immediately. Upon correction, the

17

complaining Employee shall return to his job. If the federal or state inspector does not find a condition requiring correction, the complaining Employee shall return to his job immediately.

(4) For disputes not otherwise settled, a written grievance shall be filed no later than five (5) working days after the findings of the inspector and the dispute shall be referred immediately to step 3 as provided for in Article XXIII, Settlement of Disputes, Section (c)(3). If upon final resolution of the dispute, as provided above, it is determined that an abnormally unsafe or abnormally unhealthy condition within the meaning of this section existed, the Employee shall be paid for all earnings he lost, if any, as a result of his removing himself from his job. In those instances where a determination has been made, as provided above, that an Employee did not act in good faith in exercising his rights under the provisions of this Agreement, he shall be subject to appropriate disciplinary action, subject, however, to his right to file and process a grievance. In no event, however, shall such discipline for failure to act in good faith be imposed prior to the review between at least one member of the Mine Health and Safety Committee and mine management required under paragraph (2) of this Section (i).

(5) None of the provisions of this section relating to compensation for Employees shall apply where the Employer withholds or removes an Employee or Employees from all or any area of a mine, or where a federal or state inspector orders withdrawal or withholds an Employee or Employees from all or any area of a mine. However, this Section is not intended to waive or impair any right to compensation to which such Employees may be entitled under federal or state law, or other provisions of this Agreement.

(6) The provisions of this section shall in no way diminish the duties or powers of the Mine Health and Safety Committee.

**Section (j) Physical Examination**

(1) Physical examination, required as a condition of or in employment, shall not be used other than to determine the physical condition or to contribute to the health and well-being of the Employee or Employees. The retention or displacement of Employees because of physical conditions shall not be used for the purpose of effecting discrimination.

(2) When a physical examination of a recalled Employee on a panel is conducted, the Employee shall be allowed to return to work at that mine unless he has a physical impairment which constitutes a potential hazard to himself or others.

(3) That once employed, an Employee cannot be terminated or refused recall from a panel or recall from sick or injured status for medical reasons over his objection without the concurrence of a majority of a group composed of an Employer-approved physician, an Employee-approved physician, and a physician agreed to by the Employer and the Employee, that there has been a deterioration in physical condition which prevents the Employee from performing his regular work.

Each party shall bear the cost of examination by the physician it designates and shall share equally the cost of examination by the jointly designated physician.

(4) Where an Employer challenges the physical ability of an Employee or panel member to perform his regular work and is subsequently proven wrong, the Employee shall be compensated for time lost due to the Employer's challenge, including medical examination expenses incurred in proving his physical ability to perform the requirements of the job.

## Section (k) Minimum Age

No person under 18 years of age shall be employed inside any mine nor in hazardous occupations outside any mine; provided, however, that where a state law provides a higher minimum age, the state law shall govern.

## Section (l) Workers' Compensation and Occupational Disease

Each Employer who is a party to this Agreement will provide the protection and coverage of the benefits under workers' compensation and occupational disease laws, whether compulsory or elective, existing in the states in which the respective Employees are employed. Refusal of any Employer to carry out this directive shall be deemed a violation of this Agreement. Notice of compliance with this section shall be posted at the mine.

## Section (m) Safety Equipment and Protective Clothing Allowance

Safety equipment and devices, including electric cap lamps, self-rescuers, personal ear plugs, prescription safety glasses exclusive of eye examination costs, nonprescription safety glasses or goggles, and knee pads, shall be furnished by the Employer without charge. The Employee shall use and take reasonable care of equipment provided by the Employer. The Employer shall not be required to provide personal wearing apparel such as clothing, shoes, boots where worn as part of normal footwear, hats, belts, and gloves. Instead of supplying such personal wearing apparel, the Employer shall pay each Employee an annual protective clothing allowance. The protective clothing allowance will be $230, payable to each active classified Employee on the second payday following the Effective Date of this Agreement between the parties, and $230 during the year 2004: and $250 during each of the years 2005, 2006 and 2007, payable on the first payday following the respective anniversary dates of this Agreement. A new Employee will be entitled to the appropriate allowance on the first payday following his employment. No Employee shall be entitled to more than one (1) clothing allowance during any contract year. Hip boots or waders shall be kept by the Employer at the mine and issued for use on the job to the Employee as unusual circumstances warrant.

Article III

## Section (n) Maintenance

A maintenance program shall be established at each mine to ensure that equipment is maintained in a safe operating condition. Such programs shall include the requirement that equipment operators report promptly all equipment defects of which they have actual knowledge. Maintenance Employees shall exercise required safety precautions while carrying out their duties.

## Section (o) Special Safety Problem Areas

To provide a specific contractual solution to safety problems which regularly occur and to insure uniform health and safety practices, the parties agree as follows:

(1) The Employer shall establish a program for operation and maintenance of all hoisting facilities and emergency escapeways. The escapeways shall be passable by injured Employees requiring stretchers, and shall be equipped with directional signs using reflective material.

(2) The Employer shall design, build and maintain all coal waste embankments and water impoundments in accord with statutory and regulatory requirements.

(3) The Employer shall maintain at each mine a thoroughly equipped first-aid station and make appropriate arrangements for a doctor or nurse to be on call on short notice in cases of emergencies.

(4) The Employer shall provide a safe, quick and efficient means of transporting injured or sick Employees from any section of the mine to the surface and from the surface to nearby medical facilities.

(5) When an Employee is injured during his shift, he shall be promptly removed from the mine, and, upon submission of proof of medical treatment for that injury, he shall be paid for the complete shift. When an Employee becomes sick during his shift, and leaves because he cannot perform his work, he shall be paid until he reaches the portal.

(6) The Employer shall equip all port-a-buses where used with first-aid kits and potable drinking water stored for emergency purposes.

(7) The Employer shall station a responsible Employee on the surface available to communicate at all times with Employees when they are at work underground.

(8) The Employer shall provide a safe mantrip for every miner as transportation in and out of the mines to and from the working section.

20

(9) No Employee shall be required to lift more weight than he or she is physically capable of lifting.

(10) Engineer and Pumper Duties--When required by the Employer, engineers, pumpers, firemen, power plant and substation attendants shall under no conditions suspend work but shall at all times protect all the Employer's property under their care, and operate fans and pumps and lower and hoist persons or supplies as may be required to protect the Employer's coal mine and other related facilities.

(11) The Employer shall prohibit cutting, welding or burning in the face areas of any underground mine when any miners are inby unless the contaminated air is immediately directed into a return air course, or unless the cutting, welding or burning is far removed from the working areas so as to present no hazard to the men inby.

(12) The Employer shall regularly instruct all Employees as to the location of all escapeways and the proper procedure to be followed in cases of emergency exit. When an Employee is assigned to work in a section with which he is not familiar, his foreman shall inform him of the designated escapeways for that section.

## Section (p) Settlement of Health or Safety Disputes

When a dispute arises at the mine involving health or safety, an immediate, earnest and sincere effort shall be made to resolve the matter through the following steps:

(1) By the aggrieved party and his immediate supervisor. Any grievance which is not filed by the aggrieved party within twenty-four (24) hours following the shift on which the grievant reasonably should have known of such grievance shall be considered invalid and not subject to further consideration under the grievance procedure. If the grievance is not settled at this step, the Freeman-UMWA Standard Health and Safety Grievance Form shall be completed and signed jointly by the parties.

(2) If no agreement is reached at step 1, the grievance shall be taken up by the Mine Health and Safety Committee, the UMWA district health and safety representative and mine management within four (4) days of the conclusion of step 1.

If the dispute involves an issue concerning compliance with federal or state mine safety laws or mandatory health or safety regulations, the appropriate federal or state inspection agency shall be called in immediately and the dispute shall be settled on the basis of the inspector's findings, with both parties reserving all statutory rights of appeal. If the dispute is not settled, a record shall be made of the position of the parties and the evidence at this step.

(3) If no agreement is reached at step 2 within five (5) days, the dispute shall be referred to an arbitrator for settlement in accordance with the procedure under Article XXIII, Section (c) (4).

The grievant shall have the right to be present at each step, if he so desires, of the foregoing procedures until such time as all evidence is taken. A decision reached at any stage prior to step 4 of the proceedings above outlined shall be reduced to writing and signed by both parties. The decision shall be binding on both parties and shall not be subject to reopening except by mutual agreement.

## Article IV--WAGES AND HOURS

### Traditional Schedules

### Section (a) Basic Work Week

The basic work week shall begin at 12:01 a.m. Monday.

### Section (b) Basic Work Day

(1) INSIDE EMPLOYEES: For all inside Employees a work day of eight (8) hours from portal-to-portal, which means collar-to-collar or bank-to-bank, is established including a staggered thirty (30) minutes for lunch, and without any intermission or suspension of operation throughout the day. For inside day workers these eight (8) hours shall be paid for at straight time rate. Overtime beyond eight (8) hours per day and forty (40) hours per week shall be paid for at time and one-half except as provided in Section (d) with no pyramiding of overtime. Straight time rates for inside day workers shall be the total daily normal shift earnings for eight (8) hours divided by eight (8) hours.

(2) OUTSIDE EMPLOYEES: For all outside Employees except those covered in paragraph (3) of this section (including all surface mine and coke oven Employees), a work day of seven (7) hours and fifteen (15) minutes is established including a staggered thirty (30) minutes for lunch, and without any intermission or suspension of operations throughout the day. These seven (7) hours and fifteen (15) minutes shall be paid for at straight time rate. Overtime beyond seven (7) hours and fifteen (15) minutes per day and thirty-six and one quarter (36.25) hours per week except as provided in Section (d) shall be paid for at time and one-half, with no pyramiding of overtime. Straight time earnings for outside day workers covered by this paragraph shall be the total daily normal shift earnings for seven (7) hours and fifteen (15) minutes divided by seven and one-quarter (7.25) hours. However, the work day of any outside Employee engaged in the dumping, handling and preparation of coal and the manufacture of coke may be extended to eight (8) hours provided overtime is paid for work in excess of seven (7) hours and fifteen (15) minutes per day.

(3) OUTSIDE CONTINUOUS EMPLOYEES: For all outside continuous Employees who are engaged at powerhouses, substations and pumps operating continuously for twenty-four (24)

22

hours daily, and continuous hoisting engineers, a work day of eight (8) hours is established including a staggered thirty (30) minutes for lunch and without any intermission or suspension of operations throughout the day. These eight (8) hours shall be paid for at straight time rate. Overtime beyond eight (8) hours per day and forty (40) hours per week shall be paid for at time and one-half, except as provided in Section (d), with no pyramiding of overtime. Straight time earnings for day workers covered by this paragraph shall be the total daily normal shift earnings for eight (8) hours divided by eight (8) hours.

## Section (c) Alternate Work Schedules

In order to address employment and overtime issues, and notwithstanding the Traditional Schedules set forth in this Article and the Alternative Schedules set forth in Appendix C of this Agreement, the parties agree that alternate work schedules may be adopted pursuant to the following procedure. Any such alternate schedules shall be governed solely by the following procedure of this Section.

At least thirty (30) days before the proposed implementation of any alternative work schedule, the Employer and the Local Union will meet to consider in good faith any modifications to the proposed schedule that may be suggested by either party. The proposed schedule may change the basis on which overtime is paid, so long as such payments are consistent with applicable law. At the conclusion of such thirty (30) day period, the Employer may install an alternative work schedule if mutually agreed to and ratified by the Local Union.

## Section (d) Saturday, Sunday and Premium Work

(1) Work performed on Saturday shall be paid for at time and one-half or rate and one-half, except that double time or double rates shall be paid for all work in excess of an Employee's basic work day as defined in Section (b). Work performed on Sunday shall be paid for at double time or double rates. Work performed on holidays shall be paid for at triple time or triple rates. No coal will be produced or processed on the Christmas Eve and Christmas Day holidays provided for in this Agreement; coal may be produced, processed or loaded for shipment on all other holidays provided for in this Agreement, and Saturdays and Sundays, provided that Sunday (for those Employees whose work week begins on Monday) and holiday work shall only be worked at the Employee's option, and in accordance with the procedure set forth in subparagraph (6) below.

(2) The Employer shall have the right to operate on any day of the week, including Sundays and holidays. Work on the seventh consecutive day and all holidays is optional.

(3) All Employees at mines which produce coal six (6) days per week shall be given a fair and equal opportunity to work on each of such six (6) days. Laying off individual Employees during the week for the purpose of denying them six (6) days' work is prohibited.

23

(4) The Employer has the right to operate on Sundays and holidays by scheduling full or partial operations and/or full or partial crews on any shift. Nothing in this Article shall affect the Employer's right to operate with less than a full complement on any day or shift in the event scheduled Employees do not report for work. Where the Employer schedules partial operations and/or partial crews for any reason, such work must be shared on an equitable basis to the extent practicable.

(5) The Employer shall have the right to schedule maintenance crews, powerhouse and substation Employees, pumpers, lamphouse and bathhouse men, firemen, fan attendants, switchboard operators and other similar Employees for Saturday and Sunday work and schedule their days off during the first five (5) days of the work week (except continuous hoisting engineers as now provided in subsection (b)(3) hereof). However, such Employees shall be given the opportunity to work the same number of days per week as the number of days on which the mine produces coal, and shall be given equal opportunity to share the available work on premium days, except that Sunday or holiday work may be scheduled at the Employer's discretion so long as the opportunity to work on Sundays or holidays is shared on an equitable basis to the extent practicable and work on the seventh consecutive day is voluntary.

(6) In the event the Employer knows that work will be available on Sunday or holidays, the Employer will post a notice that such work is available. Such notice will be posted before the end of the day shift on the Wednesday before the Sunday (or four days before a holiday) on which such work is available. Employees shall have until the end of the day shift on Thursday (or three days before a holiday) to volunteer for such work, and the Employer shall notify those volunteers who will work by the end of the day shift on Friday (or two days before a holiday).

(7) Except in cases of emergency, all Employees required to perform idle day work on Saturday will be notified by the preceding Thursday. The Employer shall post a list of the Employees required to perform idle day work on Saturday before the end of the day shift on the Thursday prior to the Saturday on which such work is required.

(8) An Employee called to work on idle days at a rate less than his regular classified rate may decline to perform that work at lower rates on idle days.

(9) Idle day work must be equally shared in accordance with past practice and custom. An overtime roster must be kept up to date and posted at each mine for the purpose of distributing overtime on an equitable basis to the extent practicable.

(10) Work voluntarily performed in the production or processing of coal on Sundays and holidays must be shared equitably to the extent practicable among those Employees who volunteer for the work.

24

**Section (e) Standard Daily Wage Rate**

The standard daily wage rates paid for work performed under this Agreement are set forth in Appendix A, the job titles within the respective classifications are grouped in Appendix B, Part I, which includes the five grades for underground jobs in deep mines, Appendix B, Part II, which includes the five grades for jobs in strip and auger mines, and Appendix B, Part III, which includes the four grades for jobs in preparation plants and other surface facilities for deep or surface mines. The standard daily wage rate for each job classification shall be the standard daily wage rate for all job titles included in such classification. The list of job titles within each classification indicates only the rates to be paid to Employees bearing such job titles. No Employer shall have authority to introduce any job title or any classification into a mine in which it does not presently exist, except where permitted under any Skills Enhancement Program adopted by the parties pursuant to Article XVI (g).

Where an Employee believes that the duties which he is required to perform are appropriate to a job title and classification other than those which have been assigned to him, he may file and process a grievance under Article XXIII (Settlement of Disputes) to be classified under the proper job title. Should an arbitrator decide that the complaining Employee has been improperly classified, he shall order the Employer to properly classify him. If the new classification involves a higher rate, the Employer shall reimburse him for all wages he would have earned had he been properly classified, retroactive to the date he filed his grievance. The time limit for the filing of grievances imposed by Article XXIII, Section (d) (Settlement of Disputes) shall not be applicable to this section.

## Article V—HELPERS ON FACE EQUIPMENT IN UNDERGROUND MINES

**Section (a) Assignment of Helpers**

(1) Full-time Helpers to Assist Continuous Mining Machine Operators and Roof Bolting Machine Operators.

A full-time helper shall be assigned to assist each continuous mining machine operator on each continuous mining section, and a full-time helper shall be assigned to assist each roof bolting machine operator on each continuous mining section and each conventional mining section, except as provided below.

(2) Roof Bolting Machines Which Do Not Require Full-time Helpers.

These provisions do not require the assignment of a helper to assist the operator of a roof bolting machine mounted on a continuous miner; or to a stoper (except where recognized by prior practice and custom); or to a twin-boom bolting machine if that machine is manned by two (2) full-time roof bolters. Helpers shall not be required where two (2) roof bolting machines are regularly

25

assigned to work in a single working place; but when a roof bolting machine regularly assigned to work in a single place with another roof bolting machine works alone, a helper shall be assigned to assist the operator.

(3) Continuous Mining Machines Which Do Not Require Full-time Helpers.

A helper to assist the operator of a continuous mining machine shall not be required when such a machine utilizes a loading machine to load its coal, but a helper shall be assigned whenever a loading machine is not used.

## Section (b) Duties and Responsibilities of Helpers

(1) Helper-Trainee. An Employee who successfully bids for a helper position shall be a helper-trainee for a maximum period of 120 days after he is awarded a helper's job. If after 30 days, it is determined that the Employee cannot successfully complete his period of training for the machine operator's job, he shall be returned to his former job and the helper job reposted and filled in the same manner. During the 120-day period, the helper-trainee shall be trained to operate the machine to which he is assigned and shall learn to perform the duties which are essential to the safe and efficient operation of the machine. And, in addition, he shall perform the jobs normally associated with the operation of the machine as directed by Management. The helper-trainee shall be taught his duties by the machine operator and will be paid at wage grade four (4).

(2) Fully-Trained Helper. A fully-trained helper is an Employee who has successfully completed the maximum one hundred-twenty (120) day training period. The fully-trained helper shall then receive the machine operator rate and shall continue to perform his helper duties and shall relieve and spell the machine operator in the operation of the machine. And, in addition, he shall perform the jobs normally associated with the operation of the machine as directed by management until such time as a permanent vacancy arises on the machine at which time he shall be promoted to the machine operator's job except as provided in Article XVII, Section (i) (11) (Seniority). At that time a new helper job will be posted and filled under the job bidding procedures.

## Section (c) Exemption

The provisions of this Article shall not be applicable to machines at mines where by law or prior practice helpers or two (2) full-time operators are assigned to face equipment. In addition, the provisions of this Article shall not be applicable in any UMWA District where by District agreement, helpers or two (2) full-time operators are assigned throughout the District to face equipment.

26

## Article VI--SHIFTS AND SHIFT DIFFERENTIALS

### Section (a) Multiple Shifts

The Employer shall have the right to work all the mines or any one (1) or more or a portion of one (1) of them extra shifts with different crews. When the mine works only one (1) shift, it shall be in the daytime, but this shall not prevent cutting and loading at night in addition to the day shift cutting and loading.

### Section (b) Hoisting of Coal

The hoisting of coal shall be permitted on each shift.

### Section (c) Shift Differentials

Employees scheduled for and starting work on the afternoon shift, whether paid by the day or by the ton, shall be paid thirty-five (35¢) cents additional for each hour worked. Employees scheduled for and starting work on the midnight shift, whether paid by the day or by the ton, shall be paid forty-five (45¢) cents additional for each hour worked. Shift differentials shall be considered a part of the regular rate of pay in the calculations of overtime, premium rates, holiday, vacation, reporting, jury duty, military duty, bereavement pay, and personal or sick leave.

### Section (d) Working into the Next Shift

An Employee who completes his regularly scheduled shift and continues to work into the next shift shall be paid the applicable differential for all additional hours worked. When an Employee works into the day shift from the midnight shift, he shall be paid the midnight shift differential for all hours worked on the day shift in addition to all hours worked on the midnight shift.

### Section (e) Call-back

An Employee who completes his regularly scheduled shift and leaves his Employer's premises and is called out on another shift within a twenty-four (24) hour period from the beginning of his regularly scheduled shift shall be paid the applicable premium rate together with any applicable shift differential for the hours worked on the additional shift.

### Section (f) Shift Rotation

Time and one-half shall not be paid where the regular rotation of shifts requires the working of more than one (1) shift in any consecutive twenty-four (24) hour period.

27