E-FILED
Friday, 19 August, 2005  11:03:18 AM
Clerk, U.S. District Court, ILCD

Article XIX

### Section (c) Protection Against Discrimination

In no case may the Employer make a temporary assignment for the purpose of disciplining or discriminating against an Employee.

### Section (d) Compensation for Temporary Assignments

When an Employee works in another classification on a temporary basis, he shall be compensated for the entire shift at the higher of his regular rate or the rate of the classification to which he is temporarily assigned. This section shall not be construed to apply to Employees whose regular work duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

### Section (e) Classifications at Underground Mines

In addition to the classification contained in Appendix B- Part I of this Agreement, underground at bituminous coal mining operations covered by this Agreement there shall be four classifications. These four classifications shall be designated as Inby (work performed inby the coal haulage belt tailpiece) and Outby (work performed outby the coal haulage belt tailpiece), Mine Examiner and Repairman. These classifications shall contain the job titles as set forth in Section (g) below.

1.      **Pay and Skills Improvement For Inby Employees**

Unless an Employee changes jobs in accordance with Article XVII of this Agreement, notwithstanding any other provision of this Agreement, all Employees who were last classified on a face equipment job Inby during September 1998 shall maintain their job, at the same pay Grade held by such Employee during September 1998 until such Employee demonstrates his qualifications under this paragraph 1. Within sixty (60) days after the Effective Date of this Agreement the Employer shall offer the Grade 5 Inby Classification to each of those Employees currently working Inby who agree to have their skills level recognized and improved through training if necessary. Each Employee shall demonstrate as required by management that he is qualified to operate at least three (3) pieces of face equipment one of which must be a roof bolting machine or a continuous mining machine, upon successful demonstration such Employee shall be classified Inby Grade 5. Notwithstanding any other provision of this Agreement, at any time during the term of the Agreement, when a vacancy occurs Inby and it is posted for bid it shall be posted and awarded as Inby Classification Grade 5. In order to be awarded such Inby Classification, an Employee must be able to operate at least three (3) pieces of face equipment one of which must be a roof bolting machine or a continuous mining machine. Any Employee who satisfactorily demonstrates his qualifications hereunder and is therefore classified under Section (g) as Inby Operations Grade 5 is thereupon covered by Article XIX Section (c) paragraph 2.

64

Article XIX

2.      **Pay and Skills Improvement for Outby Employees**

Unless an Employee changes jobs in accordance with Article XVII of this Agreement, notwithstanding any other provisions of this Agreement all Employees who were last classified on a job Outby during September 1998 shall maintain their job, at the same pay Grade held by such Employee during September 1998 until such Employee demonstrates his qualifications under this paragraph 2. Within sixty (60) days after the Effective Date of this Agreement the Employer shall offer the Grade 3 Outby Classification to each of those Employees currently working Outby who agree to have their skills level recognized and improved through training if necessary.  Each Employee shall demonstrate as required by management that he is qualified to perform at least three (3) Outby jobs upon successful demonstration such Employee shall be Classified Outby Grade 3. Notwithstanding any other provision of this Agreement, at any time during the term of the Agreement, when a new job or permanent vacancy Outby is posted for bid it shall be posted in the Outby Classification. In order to be awarded such Outby Classification an Employee must be able to perform three (3) Outby jobs.  Any Employee who satisfactorily demonstrates his qualifications hereunder and is, therefore, Classified under Section (g) as Outby Operations Grade 3, is thereupon covered by Article XIX Section (c) paragraph 2.

3.      **Surface Jobs at Underground Mines**

Surface jobs at the Employer's underground bituminous coal mining facilities shall continue to be classified as appropriate, by the Employer in accordance with Appendix B - Part III of this Agreement.

**Section (f)  Mine Examiner, Inby Classification, Outby Classification, and Repairman**

| Grade | Job Classification |
|-------|---------------------|
| 5 | Mine Examiner |
| 5 | Inby Operations: (As defined in Section (e) above) |

| Grade | Job Classification |
|-------|---------------------|
| 3 | Outby Operations: (As defined in section (e) above). |

| Grade | Job Classification |
|-------|---------------------|
| 5 | Repairman |
| 3 | Repairman Apprentice |
| 2 | Maintenance Trainee |

65

**Section (g) Employees Hired After January 16, 2003**

After the Effective Date of this Agreement, each individual who is a New Hire, as so defined in the New Employee MOU shall be paid for classified work performed as set forth in the New Employee MOU. Notwithstanding anything in this Agreement to the contrary, each Employee who is actively employed on the Effective Date of this Agreement shall not be subject to the New Employee MOU.

## Article XX—HEALTH AND RETIREMENT BENEFITS

**Section (a) General Purpose**

This Article makes provision for pension, health and other benefits for Freeman's Employees covered by this Agreement, and for former Freeman Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

For purposes of this Article, the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund).

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the individual benefit plan referred to in Section (c). An individual that is entitled to health benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan, and not from a plan maintained pursuant to this Article. In addition, an individual that is entitled to death benefit coverage from the United Mine Workers of America Combined Benefit Fund shall not be entitled to death benefit coverage from any plan maintained pursuant to this Article.

The general purpose of the plans referred to in this Article shall be to provide health care for working and certain retired miners who are currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998 and their dependents; pensions for miners upon their retirement; financial support for eligible disabled miners; and financial support for surviving spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

Article XX

Except as otherwise specifically set forth in this Article, it is agreed that the Trusts referred to in this Article are irrevocable Trusts created pursuant to, and within the scope of, Section 302(c) of the Labor-Management Relations Act, 1947, and shall endure as long as the purposes for their creation shall exist.

## Section (b) 1950 Pension Plan and Trust

(1)  The United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust") is incorporated by reference and made a part of this Agreement. The United Mine Workers of America 1950 Pension Plan (the "1950 Pension Plan") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

(2)  Pursuant to the requirements of the Coal Act, the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust") and the United Mine Workers of America 1974 Benefit Plan and Trust (the "1974 Benefit Trust") were merged into the United Mine Workers of America Combined Benefit Fund (the "Combined Fund"). The Combined Fund is governed by the terms of the Coal Act, and is not maintained pursuant to this Article.

(3)  Upon the discharge of all its obligations, any remaining assets in the 1950 Pension Trust shall, upon termination of such Trust, be transferred to the 1974 Pension Trust.

## Section (c) 1974 Pension Plan and Trust and Employer Benefit Plan

(1)  The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are as set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement. This Plan is a continuation of the pension program of the 1950 Fund and was effective December 6, 1974.

(2)  Freeman shall establish and maintain an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other non-pension benefits for its Employees covered by this Agreement as well as certain pensioners under the 1974 Pension Plan and Trust whose last signatory classified employment was with Freeman, who are not eligible to receive benefits from a plan maintained pursuant to the Coal Act and who are currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998. Freeman shall provide such non-pension benefits for these certain pensioners until their participation in the New Freeman United Retirement Program. The benefits provided by Freeman to its eligible Participants pursuant to such plan shall be guaranteed during the term of this Agreement by Freeman at levels set forth in such plan. The plan established pursuant to this subsection is incorporated by reference and made a part of this Agreement, and the terms and conditions under which the health and other non-pension benefits will be provided under such plan is as to be set forth in such plan.

67

Article XX

The Union and Trustees shall assist and fully cooperate with Freeman in obtaining all necessary opinion letters, exemptions, or rulings from the Department of Labor, the Internal Revenue Service or other applicable federal agencies, in order to implement the provisions of this subsection so as to ensure compliance with all applicable federal laws and regulations and ensure the deductibility for income tax purposes of any and all contributions made by Freeman to the individual health plan and retirement plans referred to in this Agreement.

**Section (d) Contributions by Employer**

(1) During the life of this Agreement, for the periods of time indicated below, Freeman shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per hours worked by each of the Freeman's Employees who perform classified work under this Agreement.

(i) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per hour on each such hour worked;

(ii) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per hour on each such hour worked.

(iii) In addition to the contributions indicated above, during the life of the Agreement, Freeman shall, for the periods of time indicated below, contribute to the Trusts established in this Article in the amounts shown below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by Freeman for use or for sale on which contributions to the appropriate Trusts as provided for in this Article have not been made (amounts shown below include cents per hours worked contributions converted to tonnage equivalents).

(a) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per ton on each such ton; and

(b) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per ton on each such ton.

The parties hereto mutually agree that, if at any time during the term of this Agreement a court or tribunal of competent jurisdiction determines by a final decision that is not appealable that the provision appearing in paragraph (iii) just preceding is invalid or in violation of the National Labor Relations Act, 1947, as amended, or other Federal or state law, the parties shall, at the option of and upon demand by the Union, without affecting the integrity of any other provision of this Section or any other provision of the National Bituminous Coal Wage Agreement, meet and engage in good faith negotiations to agree upon a clause to be inserted into this Agreement in replacement of the provision found invalid or unlawful.

68

Article XX

(iv) At any time during the term of this Wage Agreement, the Bituminous Coal Operators' Association may reallocate the contributions to be paid under the respective Subdivisions (i) and (ii) in this Section, which reallocation will increase the cents per hour to be contributed into the 1950 Pension Trust and correspondingly will decrease the cents per hour to be contributed by Freeman into the 1974 Pension Trust, or which will decrease the cents per hour to be contributed into the 1950 Pension Trust and correspondingly will increase the cents per hour to be contributed by Freeman into the 1974 Pension Trust, provided that notice shall be given to the Union, and to the Trustees (who shall in turn notify Freeman) of the cents per hour to be allocated to each such Trust at least 30 days prior to the date the contributions become due and owing to the respective Trusts. No reallocation of the contributions to be paid to the two Trusts shall be made which will increase the total combined contributions required by this Article to be made by Freeman to those two Trusts.

(v) Hours of work for purposes of Employer contributions to the plans and trusts described in this Article shall include all hours worked, or fractions thereof, by Employees in a classified job covered by this Agreement. Hours actually worked for which a premium pay of any type is provided shall be treated for purposes of Employer contributions to the Trusts as though worked on a straight-time basis. Reporting pay for hours not actually worked shall not be included for the purpose of making Employer contributions to the Trust.

(2) The sole obligation under this Section of Freeman shall be to contribute the amounts specified in this Section.

(3) The obligation to make payments to the Trusts specified in this Article shall become effective on the dates specified in the respective Subdivisions (i) through (iii) of this Section, and the first payments are to be made on the 10th day of each month after such specified dates, and thereafter continuously on the 10th day of each succeeding calendar month.

(4) It shall be the duty of Freeman to keep current said payments due to the Trusts, and to furnish to the International Union, United Mine Workers of America and to the Trustees of those Trusts a monthly statement showing on a mine-by-mine basis the full amounts due hereunder and the tons of coal produced, procured or acquired for use or for sale and the hours worked with respect to which the amounts are payable. Payments to those Trusts shall be made by check payable, as appropriate, to:

"Trustees of the United Mine Workers of America 1950 Pension Trust"

"Trustees of the United Mine Workers of America 1974 Pension Trust"

The Trustees are hereby authorized to require Freeman to make payment of all contributions to the 1950 Pension Trust and the 1974 Pension Trust by a single check made payable in such manner as may be specified by the Trustees.

69

Article XX

(5) Payments shall be delivered or mailed to such location as designated by the Trustees of those Trusts.

(6) Failure of Freeman to make full and prompt payments to the Trusts specified in this Article in the manner and on the dates herein provided shall be deemed a violation of this Agreement. This obligation of Freeman to so pay such sums shall be a direct and continuing obligation of said Employer during the life of this Agreement and it shall be deemed a violation of this Agreement, if any mine, preparation plant or other facility to which this Agreement is applicable shall be sold, leased, subleased, assigned, or otherwise disposed of for the purpose of avoiding any of the obligations hereunder.

(7) Freeman agrees to give proper notice to the President of the appropriate local union by the 18th day of each month that the Employer has made the required payment to the Trusts for the previous month, as required by this Article, or is delinquent in such payment, such notice to set forth the amount paid to the Trusts, or the amount of the delinquency, the tonnage procured or acquired for use or for sale and the hours worked with respect to the mine or mines under the jurisdiction of such local union. Freeman agrees to give notice to the appropriate President of the Local Union by the 18th day of each month that the Employer has made the appropriate payment to the insurance carrier for the Employer benefit plan established under (c)(2) above, or is delinquent in such payment.

(8) Title to all the monies paid into and/or due and owing to the Trusts specified in this Article shall be vested in and remain exclusively in the Trustees of those Trusts. It is the intention of the parties hereto that those Trusts shall constitute irrevocable trusts and that no benefits or money payable from those Trusts shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and that any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void.

(9) It is understood that the individual Employees of Freeman agree, through their representative, the United Mine Workers of America, to surrender any personal or individual right to or interest in monies paid or required to be paid to the Trusts pursuant to this Agreement.

(10) Any judgment obtained by the Trustees of the Trusts established pursuant to this Agreement for a default giving rise to damages accruing to more than one of the Trusts established hereunder shall be allocated by the Trustees among such Trusts in proportion to the amounts owing to each which gave rise to such judgment.

(11) This section shall not apply to the Medical Reimbursement Fund or any Trust created to execute the duties of the Fund.

Article XX

**Section (e) Responsibilities and Duties of Trustees**

(1) The 1950 Pension Trust and the 1974 Pension Trust shall each be administered by a Board of four Trustees, two of whom shall be appointed by the Employers signatory to the 2002 NBCWA ("Signatory Employers") and two of whom shall be appointed by the Union. Either party may, but shall not be required to, appoint an individual to serve as a Trustee on more than one Trust. One of the Trustees appointed by the Union shall be the Chairman. Each Board of Trustees shall perform its duties in accordance with the requirements, terms and conditions of each such Trust.

(2) It is the intent and purpose of the contracting parties that full cooperation shall be given by each of them to one another, to the Trustees provided for under this Article, and to all affected mine workers, to the eventual coordination and development of policies and working agreements necessary or advisable for the effective operation of the Trusts and Plans.

(3) Action which may be required by the Signatory Employers in connection with any matter hereunder, including but not limited to the removal or appointment of a Trustee, may be taken by the BCOA.

(4) All covenants, rights and obligations accruing to the Trusts, and the Benefit Plan, and the Trustees of the Pension and Benefit Trusts and Plans, and all breaches, violations and/or defaults of any provision of this Article pertaining to the Trusts and Plans, the Trust Agreements, or Pension Plans, shall be enforced by the Trustees, at their discretion, through any and all available legal means, without first exhausting the grievance and arbitration procedures set forth in this Agreement.

(5) Disputes arising under this Agreement with regard to the Employer benefit plan established in (c)(2) above shall be referred to the Special Arbitration Process. The Special Arbitration Process will recognize as precedential the appropriate Resolutions of Disputes issued by the Trustees of the 1974 Pension Plan. Such disputes shall not be processed under the provisions of Article XXIII (Settlement of Disputes).

**Section (f) Audits, Reports and Notices**

(1) It is agreed by the contracting parties that annual independent audits of the Trusts shall be made by independent certified public accountants to be designated by the Trustees of the Trusts. A statement of the results of such audits shall be sent to the contracting parties and shall be made available upon written request to any working or retired miner or to any beneficiary either by mail or at the principal office of the Trusts, or at such other place as may be designated by the Trustees.

(2) If the Trustees determine that there is reasonable cause to question the accuracy of the sums paid under Section (d) of this Article, or of any verification thereof made by Freeman for a given monthly or annual period, Freeman shall, upon written request by the Trustees, make available for inspection and/or copying at reasonable times and places to a representative of the Trustees, those records which are necessary to verify the accuracy of the sums paid.

71

(3) A complete accounting, on a mine-by-mine basis, of contributions received by the Trusts under this Article shall be furnished by the Trustees, at least on a quarterly basis, to the International Union. Such an accounting will also be supplied to the District and Local offices of the Union with respect to the mine or mines under their jurisdiction. Such accounting shall include tonnages of coal procured or acquired for use or for sale, and hours worked with respect to which contributions were paid, together with an identification of any period or periods in which contributions were delinquent, showing the amounts of such delinquencies. The Trustees shall take such action as they deem appropriate to collect any such delinquencies, and shall advise the International Union and the appropriate Districts and Locals of the Union, on at least a monthly basis, of such delinquencies, as long as such delinquencies continue.

(4) Upon the written request of any International, District or Local officer of the Union, the Trustees shall make available within seven (7) days of receipt of such request an up-to-date accounting of contributions made and delinquencies outstanding, in respect to any mine or related facility with respect to which such officer has union jurisdiction.

(5) The Trustees shall furnish Freeman and the Union with such other documentation and information as provided for in each of the Trusts described herein.

## Section (g) Administration of Trusts

(1) Freeman shall make available to the Trustees within a reasonable time such information as the Trustees may determine to be reasonably required for the purpose of administering the Trusts and Plans.

(2) The Trustees shall respond to all written requests for information, applications, and other communications from beneficiaries within 15 working days from their receipt at the office of the Trusts. A response from the Trustees may be either a telephonic communication or a letter acknowledging receipt of such communication from the beneficiary. A pension application must be initially approved or denied within 12 weeks of the receipt of the application. The foregoing shall not apply in the event of delays caused by conditions beyond the control of the Trustees.

(3) The Trustees shall police and monitor the rolls of those entitled to benefits from the Trusts. On at least a quarterly basis, the Trustees shall have available a complete listing of current beneficiaries, identified by UMWA district and local union jurisdiction, if applicable. The Trustees shall promptly investigate and determine the eligibility or ineligibility of any beneficiary whose right to receive benefits from the Trusts has been challenged by an Officer of the International, District or Local Union or by Freeman. In the event that a beneficiary or beneficiaries shall be determined to be ineligible for health care or other benefits, the Trustees shall take prompt action to correct the situation.

(4) The Trustees are authorized, upon prior written approval by the Signatory Employers and the Union, to make such changes in the 1950 and 1974 Pension Plans and Trusts hereunder as they may deem to be necessary or appropriate.

They are also authorized and directed, after adequate notice and consultation with the Signatory Employers and Union, to make such changes in the 1950 and 1974 Pension Plans and Trusts hereunder, including any retroactive modifications or amendments, which shall be necessary:

(a) to obtain all necessary determination letters or rulings from the Internal Revenue Service or other applicable federal agencies so as to ensure compliance with all applicable federal laws and regulations and ensure the continued qualification of the 1950 and 1974 Pension Plans and Trusts and the deductibility for income tax purposes of any and all contributions made by Signatory Employers to such Trusts as paid or incurred;

(b) to conform the terms of each Plan and Trust to the requirements of ERISA, or any other applicable federal law, and the regulations issued thereunder;

(c) to obtain determination letters from the Internal Revenue Service that the two Pension Plans will each meet the requirements of Section 401 of the Internal Revenue Code and the Trusts thereunder will be exempt under Section 501(a) of such Code;

(d) to establish the deductibility for income tax purposes of any and all contributions made by the signatory operators to the Pension Trusts as paid or incurred; or

(e) to comply with all applicable court or government decisions or rulings.

## Section (h) Guarantee of 1950 and 1974 Plans and Trusts

Notwithstanding any other provisions in this Agreement the Employers participating in the 1950 Pension Fund and the 1974 Pension Fund hereby agree to fully guarantee the pension benefits provided by these Funds during the term of this Agreement.

In order to fully fund these guaranteed benefits, the BCOA may increase, not decrease (except as provided in Section (d)(1)), the rate of contributions to be made to the 1950 Pension Fund and the 1974 Pension Fund during the term of this Agreement. These contributions, which may be adjusted from time to time, shall be made by Freeman during the term of this Agreement.

In addition, Freeman hereby agrees to fully guarantee the health benefits provided under its own Employer Plan described in Section (c)(2) of this Article XX during the term of this Agreement.

73

Article XX

**Section (i) Medical Reimbursement Fund**

For the period of time beginning with the Effective Date of this Agreement and ending ten years subsequent to the Effective Date of this Agreement, the Employer agrees to contribute to the Medical Reimbursement Fund amounts as needed to pay only the claims as approved by the Fund's Trustees up to a maximum of $2,500,000 in total during the time period specified in this sentence. The sole purpose of this Fund shall be to pay allowable medical expenses for Employees who retire and commence a pension during the term of this Agreement. This Fund shall be established and contributed to by the Company beginning with the Effective Date of this Agreement, and the disbursement of money shall continue in accordance with the Medical Reimbursement Fund Agreement and Declaration of Trust and the Medical Reimbursement Fund Summary Plan Description and Plan of Benefits with the required Financial Means Test and a minimum level of health insurance that the retiree must maintain.

The Fund shall be trusteed by two (2) Management Trustees designated by the Company and two (2) Union Trustees designated by the Union. The Trustees shall meet no less frequently than each calendar quarter to authorize payments under the Trust.

The Fund shall pay Eligible Medical Expenses only for excess expenses as incurred on a calendar year basis for eligible retirees and their dependents. For purposes of this Fund, an "Eligible Medical Expense" shall be a medical expense that is both "reasonable and customary" and exceeds a "Financial Means Test" established by the Trustees. The Financial Means Test shall take into consideration the retiree's Company-provided pension payment, the health insurance purchased by the retiree, and the level of insurance (including deductibles and co-insurance) provided thereunder. A retiree may not submit any expenses to this Fund, and the Trustees shall be prohibited from paying, a retiree's medical expenses if such retiree has not purchased a minimum level of health insurance as determined by the Trustees. The minimum level of health insurance and Financial Means Test shall be established by the Trustees.

The Union hereby waives its right to bargain with the Company during the term of this Agreement over the language and investment of such Fund. The Union's rights in such Fund shall only involve payment of benefits from the Fund.

**GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS**

The following is a general description of certain information contained in the UMWA 1950 Pension Plan and Trust, the UMWA 1974 Pension Plan and Trust, and the Freeman's Employer Benefit Plan. This description is intended merely to highlight certain information; it is not a complete statement of all of the provisions of the Plans and Trusts, nor is it intended to be a Summary Plan Description as defined in the Employee Retirement Income Security Act of 1974, and is qualified in its entirety by, and subject to the more detailed information contained in the Plans and Trusts, copies of which are on file and available for inspection at the offices of the UMWA Health & Retirement Funds, 2121 K Street, N.W., Washington, D.C. 20037. The specific provisions

74

of the plans will govern in the event of any inconsistencies between the general description and the plans.

Under no circumstances will Freeman be responsible to provide benefits, contribute toward the provision of benefits or be a participant in any other plan, trust or mechanism, to former Employees and retirees (or their spouses, surviving spouses or dependents) of any other Employer. Additionally, Freeman shall not be liable in any manner to such other plan, trust or mechanism as described above.

The following general description does not apply to plans maintained pursuant to the Coal Act.

### (1) PENSIONS FOR MINERS RETIRED UNDER THE 1950 PENSION PLAN:

Beginning on the Effective Date, pension benefits are according to the following schedules:

(a) For pensioners with at least twenty (20) years of credited service who retired on other than a disability pension, the pension is $405 per month. Any such pensioner whose pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1950 Pension Plan, a one-time single sum payment of $550. Any such pensioner whose pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1950 Pension Plan, a one-time single sum payment of $550. Any such pensioner whose pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1950 Pension Plan, a one-time single sum payment of $565. Any such pensioner whose pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1950 Pension Plan, a one-time single sum payment of $565.

(b) For pensioners who retired on a disability pension, the pension is $247.50 per month. Any such disability pensioner whose pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any such disability pensioner whose pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any such disability pensioner whose pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any such disability pensioner whose pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Such pensioner who is currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998 will be entitled to retain his Health Services card for life or until participation in the New Freeman United Retirement Program. Upon his death, his widow will retain a Health Services card until her death or remarriage, unless, prior to his death, he became a participant in the New Freeman United Retirement Program.

Any pensioner who is currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998 and who is receiving a disability pension or a pension with at least twenty (20) years of credited service under this Plan is entitled to receive health benefits until death in accordance with the above paragraph except during any month in which he is regularly employed at an earnings rate equivalent to at least $1800 per month, increased to $2000 per month on January 1, 2005 or until participation in the New Freeman United Retirement Program. A widow is entitled to receive health benefits until her death or remarriage in accordance with the above paragraph subject to the same $1800 per month, increased to $2000 per month on January 1, 2005 earnings limit unless, prior to her spouse's death, her spouse became a participant in the New Freeman United Retirement Program.

(c) For all other pensioners and future pensioners, the benefit is increased by $15 per month. Any such pensioner whose pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any such pensioner whose pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any such pensioner whose pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any such pensioner whose pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440.

**(1A)    1950 Widows' Pension:**

A Widow's Pension is provided through the 1950 Pension Plan to widows of miners who were receiving a 1950 pension at the time of their death. The benefit is $155 per month. Existing as well as future widows of 1950 Pensioners will receive this benefit.

Any widow whose 1950 pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any widow whose 1950 pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any widow whose 1950 pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any widow whose 1950 pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440.

**(2)    Pensions for Miners Who Retired under the 1974 Pension Plan Prior to the Effective Date:**

Pension benefits for pensioners who retired prior to the Effective Date are according to the following schedules:

76

(a) For pensioners who retired on other than a minimum disability pension, the pension is increased by $15 per month. Only such pensioner who is currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998 will be entitled to retain his Health Services card for life, subject to the $1800 ($2000 on January 1, 2005) earnings limit or participation in the New Freeman United Retirement Program. Upon his death, his widow, if she is currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998, will retain a Health Services card until her death or remarriage, subject to the $1800 ($2000 on January 1, 2005) earnings limit unless, prior to his death, he became a participant in the New Freeman United Retirement Program.

(b) For pensioners who retired on a minimum disability pension, the pension is $230 per month. Only such pensioner who is currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998 will be entitled to retain his Health Services card for life or until participation in the New Freeman United Retirement Program. Upon his death, his widow, if she is currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998, will retain a Health Services card until her death or remarriage, subject to the $1800 ($2000 on January 1, 2005) earnings limit unless, prior to his death, he became a participant in the New Freeman United Retirement Program.

(c) Any pensioner who retired on other than a disability pension and whose pension is in pay status as of the Effective Date shall receive an increase in his pension of $15 per month. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565.

Any pensioner whose disability pension is in pay status as of the Effective Date shall receive an increase in his disability pension of $15 per month. Any pensioner whose disability pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any pensioner whose disability pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any pensioner whose disability pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any pensioner whose disability pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

(d) For surviving spouses of 1974 pensioners, the benefit is increased by $15 per month. A surviving spouse whose survivor pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. A surviving spouse whose survivor pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. A surviving spouse whose survivor pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. A surviving spouse whose survivor pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Only such surviving spouse who is currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998 will retain a Health Services card until her death or remarriage, subject to the $1800 ($2000 on January 1, 2005) earnings limit unless, prior to his death, he became a participant in the New Freeman United Retirement Program.

### (3)    Pensions for Miners Who Retire on or after the Effective Date:

A working miner who retires on or after the Effective Date and who is eligible for a pension under the terms of this Agreement will receive pension benefits based upon the 1974 Pension Plan. Subject to (4) below, full credit is provided for years worked as a classified Employee in mines of signatory Employers.

The earliest retirement age is 55. A miner may retire at 55 with ten (10) or more years of signatory service.

Pension benefits are increased as a miner accumulates years of signatory service. Benefits are also increased based upon a miner's age at the time of retirement with maximum benefits payable to miners who retire at the age of 62 or more.

In order to calculate the amount of a retirement benefit, it is necessary to add:

(1) the benefit amount for signatory service earned prior to February 1, 1989 ("Pre-1989 signatory service");

(2) the amount for signatory service earned between February 1, 1989, and January 31, 1990 ("1989 signatory service");

(3) the amount for signatory service earned on or after February 1, 1990 and before December 16, 1993 ("Post-1989 signatory service"); and

(4) the amount for signatory service earned on or after December 16, 1993 ("Post-1993 signatory service").

78

The retirement benefit for signatory service earned prior to February 1, 1989, is the following:

$38.50 per month multiplied by the years of Pre-1989 signatory service for the first 10 such years, plus

$39.00 per month multiplied by the years of Pre-1989 signatory service for the second 10 such years, plus

$39.50 per month multiplied by the years of Pre-1989 signatory service for the third 10 such years, plus

$40.00 per month multiplied by the years of Pre-1989 signatory service for each such year over 30.

The retirement benefit for signatory service earned from February 1, 1989, to January 31, 1990, is $46.00 for a year of 1989 signatory service.

The retirement benefit for signatory service earned from February 1, 1990, to December 16, 1993, is $50.50 per year of Post-1989 signatory service.

The retirement benefit for signatory service earned on or after December 16, 1993 is $53.50 per year of Post-1993 signatory service.

For a working miner who retires on or after January 1, 2004, and who is eligible for a pension under the terms of this Agreement, each dollar amount specified above is increased by $2.00. For a working miner who retires on or after January 1, 2006, and who is eligible for a pension under the terms of this Agreement, each dollar amount specified above is increased by $4.00.

To estimate your pension, use the tables on pages 116 and 117.

Any pensioner whose pension (other than a disability pension) is in pay status as of the Effective Date shall receive an increase in his pension of $15 per month. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2006 shall be issued by

November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565.

(4)    **Signatory Service:**

Effective as of the calendar year 1978, each miner who works at least 1,000 hours in a calendar year as a classified Employee with Freeman or a signatory Employer will receive credit for a full year of signatory service for the purpose of determining the amount of the pension under the 1950 or 1974 Pension Plans.  Time spent performing contractual obligations (such as safety inspections, mine committee work, etc.) shall be considered as hours worked in the schedule below. Time spent performing work for the UMWA, its districts and local unions in lieu of regular scheduled classified work for the Employer shall be considered as hours worked in the schedule below.  A person who is eligible to receive sickness and accident benefits will receive credit as hours worked in the schedule below, for the period of eligibility.  Each miner who works less than 1,000 hours in a calendar year as a classified Employee with Freeman or a signatory Employer will receive credit for the above purpose for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked | Percentage of a Year of Signatory Service |
|---|---|
| less than 250 | 0 |
| 250-499 | 25% |
| 500-749 | 50% |
| 750-999 | 75% |
| 1,000 or more | 100% |

For the purpose of calculating benefits and/or determining vesting, employment with the United Mine Workers of America, following classified employment with an Employer, shall be treated as signatory service, provided that the Employee does not receive a pension from the United Mine Workers of America Pension Plan based on such service.

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew as provided in Appendix C shall receive credit for a percentage of a year calculated in accordance with the following schedule:

Article XX

| Hours Worked | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

Special Rule for 1993 – For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

The description of signatory service as contained in this Subsection (4) shall not apply to the New Freeman United Retirement Program.

(5)     **Pensions and Health Care for Disabled Miners:**

**Pensions for Disabled Miners**

A miner who becomes permanently and totally disabled as a result of a mine accident occurring after the Effective Date will become eligible for pension benefits in accordance with the following schedule:

(a) If a miner has less than ten (10) years of signatory service at the time of retirement, the miner will receive a $230 per month pension.

(b) If a miner has ten (10) years or more of signatory service at the time of retirement, the miner will receive the greater of the minimum pension payable to a miner with less than ten (10) years of signatory service or a pension based upon the years of signatory service which the miner has accumulated at the time of retirement calculated in accordance with the benefit schedule in (3) above.

(c) Any miner whose disability pension under this section is in pay status as of the Effective Date shall receive an increase in his disability pension of $15 per month. Any pensioner whose disability pension under this section is in pay status as of October 31, 2003 shall be issued by November 1, 2003 by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any pensioner whose disability pension is in pay status as of October 31, 2004 shall be

81

Article XX

issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any pensioner whose disability pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any pensioner whose disability pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

### Health Care Benefits For Disabled Miners

Health benefits under Freeman's Employer Benefit Plan shall be provided to any Employee who, only subsequent to the Effective Date of this Agreement:

(1)    is currently enrolled and receiving medical coverage under Freeman's Employer Benefit Plan, and

(2)    has either (a) completed 20 years of credited service (including the required number of years of signatory service pursuant to Article IV C(6) of the 1974 Pension Plan or any corresponding paragraph of any successor thereto), or (b) is disabled as a result of a mine accident, and

(3)    has not attained age 55, and

(4)    became disabled after the Effective Date of this Agreement while in classified employment with the Employer, and

(5)    is held to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

If a miner does not satisfy the above criteria he will not be eligible for health care benefits under this subsection.

(6)    **Pensions for Surviving Spouses:**

The 1974 Pension Plan provides for Surviving Spouse pensions. Benefits for an eligible surviving spouse will be payable in accordance with the following:

(a) If, on or after the Effective Date, a working miner dies (regardless of cause) and would have been eligible for an immediate pension had the miner retired on the date of death, the surviving spouse will be eligible for a pension equal to 75% of the pension the miner would have received, and will receive this pension until death.

(b) Upon the death of a pensioner, other than a deferred vested pensioner with less than twenty (20) years of service, the surviving spouse of such pensioner will receive a pension equal to 75% of the pensioner's pension until death. Only such surviving spouse who is currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998, will retain a Health Services card until her death or remarriage, subject to the $1800 ($2000

82

on January 1, 2005) earnings limit unless, prior to her spouse's death, her spouse became a participant in the New Freeman United Retirement Program

(c) If a miner working on or after the Effective Date becomes eligible for a pension, other than a deferred vested pension with less than twenty (20) years of service, at any time thereafter, upon his death after age 55, the surviving spouse will be entitled to receive a Surviving Spouse pension equal to 75% of the miner's pension until death.

(d) If a miner had completed ten (10) years of credited service, died as a result of a mine accident during the term of the 1978 or 1981 Wage Agreement, and was not covered by a Surviving Spouse pension (or by any other monthly benefit payable to a surviving spouse under a Wage Agreement), the surviving spouse, if she has never remarried and is surviving on the first day of the month following the Effective Date, will be entitled to receive a lump sum in the amount of $10,000, plus $100 for each month beginning with the first month following the Effective Date and continuing until her remarriage or death.

(e) Any surviving spouse whose survivor pension is in pay status as of the Effective Date shall receive, an increase in her survivor pension of $15 per month. Any surviving spouse whose survivor pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any surviving spouse whose survivor pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any surviving spouse whose survivor pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any surviving spouse whose survivor pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

### (6A)    Pre-retirement Survivor's Pension:

The Plan also provides a 75% survivor's pension for the spouse of a working miner with 10 years of vested pension rights who dies before retirement age. The pension benefit will be payable to the surviving spouse at the time the miner would have attained age 55.

Any surviving spouse whose survivor's pension is in pay status as of the Effective Date shall receive an increase in her survivor's pension of $15 per month. Any surviving spouse whose survivor pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any surviving spouse whose survivor pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any surviving spouse whose survivor pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any surviving spouse whose survivor pension is in pay status as of October 31,

2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

(7)    **Deferred Vested or Special Pensions:**

(a) If after the Effective Date a working miner ceases working for any reason, except as provided in (b) below, after completing at least ten (10) years of signatory employment, and before age 55, the miner will be eligible to receive a pension at age 62, or an actuarially reduced pension at any time after 55. This pension will be calculated in accordance with (3) above.

(b) If after the Effective Date a working miner ceases working and meets the following criteria:

(i) had twenty (20) years of signatory service on date last worked;

(ii) had attained the age of 50 on the date last worked; and either

(iii) had been laid off and had not refused a recall to the mine from which he was laid off; or

(iv) had been terminated under Article III, Section (j) of the Wage Agreement (or if the miner had not been terminated, there had been a deterioration in physical condition which prevented the miner from performing his regular work as determined by a panel of three physicians, if the degree of such physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter; then the miner will be eligible to receive a pension at age 62, or a pension at any time after age 55, reduced by one-quarter of one percent for each full month between the date on which pension benefits begin and the date the miner attains age 62.

(c) Any miner who ceased work prior to the Effective Date, is eligible to receive a deferred vested pension under the 1974 Pension Plan and satisfies the criteria in (b) above shall have his pension recomputed using the ¼ of one percent reduction based on the formula in effect at his retirement. Such pensioner shall have his pension increased by any increases applicable to Age 55 Retirement which occurred after the date of his retirement and application for pension. Any increase under this paragraph shall be applied prospectively only.

(d) If on or after January 1, 2003, a working miner ceases performing classified work and meets the following criteria:

(i)     he had twenty (20) years of signatory service on his date last worked;

(ii)    he had been laid off and had not refused a recall to the mine from which he was laid off; or

84

(iii)      he had been terminated under Article III, Section (j) of the Wage Agreement (or if the miner had not been terminated, there had been a deterioration in physical condition which prevented the miner from performing his regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter; and

(iv)      his pension is not in pay status on or before August 16, 1996;

then the miner will be eligible to receive a pension at age 62, or a pension at any time after age 55, reduced by one-quarter of one percent for each full month between the date on which pension benefits begin and the date the miner attains age 62.

(e)  Special Permanent Layoff Pension--If on or after January 1, 2003, a working miner ceases performing classified work and meets the following criteria:

(i)  he had 20 years of signatory service on his date last worked and was less than age 55; and

(ii)      (A) he has been permanently laid off under circumstances in which his Employer has permanently closed the mine, or

(B)      he has been permanently laid off;

then the miner will be eligible to receive a pension computed under the provisions of (3) above, calculated as if he were then age 55.  In the case of a layoff described in (ii)(A) above, the pension will be effective on the first day of the first month following both the layoff and the filing of a pension application.  In the case of a layoff described in (ii)(B) above, the pension will be effective on the first day of the first month following both a period of 180 days after the layoff and the filing of a pension application.  A miner will be considered to have been "permanently laid off" under (ii)(B) if he has been on layoff status for at least 180 days, and has not refused a recall to the mine from which he was laid off.  A miner who receives this special permanent layoff pension benefit, or any other pension benefit under this Article, forfeits all seniority, panel, and recall rights.

(f) Special 30-and-Out Layoff Pension - If a working miner meets the following criteria:

(i) his last day of credited service under the 1974 Pension Plan is on or after January 1, 2002; and

(ii) he had at least 30 years of signatory service on such last day of credited service; and

(iii) he has been laid off and has not refused a recall to the mine from which he was laid off;

85

(iv) if, because of a layoff, he was not actively at work as of December 31, 2001:

(I) he earned at least 250 hours of credited signatory service following his return to work, or

(II) he returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this Special 30-and-Out Layoff Pension benefit;

then the miner will be eligible to receive a pension computed under the provisions of (3) above, but with no actuarial reduction on account of age.

(g) 30-and-Out Pension - If a working miner meets the following criteria:

(i) his last day of credited service under the 1974 Pension Plan is on or after January 1, 2003; and

(ii) he had at least 30 years of signatory service on such last day of credited service;

(iii) if, because of a layoff, he was not actively at work as of December 31, 2001:

(I) he earned at least 250 hours of credited signatory service following his return to work, or

(II) he returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this 30-and-Out Pension benefit;

then the miner will be eligible to receive a pension computed under the provisions of (3) above, but with no actuarial reduction on account of age.

(h) The Surviving Spouse pension described in paragraph (6) does not apply to the surviving spouse of a miner receiving a deferred vested pension with less than 20 years of service.

(i) Any such miner whose pension is in pay status as of the Effective Date shall receive an increase in his pension of $15 per month. Any such pensioner whose pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any such pensioner whose pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any such pensioner whose pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any such pensioner whose pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565.

(j) The surviving spouse of such miner whose survivors pension is in pay status as of the Effective Date shall receive an increase in her survivors pension of $15 per month. Any such surviving spouse whose survivors pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any such surviving spouse whose survivors pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any such surviving spouse whose survivors pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any such surviving spouse whose survivors pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

(7A)    **Pension Bonuses:**

(a) The one-time single sum pension payments set forth in this Article are not intended as an ongoing feature of either the 1950 or 1974 Pension Plan, and the Plans shall have no obligation to provide payments of this type other than those expressly provided for in this Article and in the Plans.

(b) Non-Duplication -- No individual shall be entitled to receive a single sum pension payment on any given date under more than one provision of this Article.

(8)    **Life and Accidental Death and Dismemberment Benefits:**

Life and Accidental Death and Dismemberment Insurance benefits are provided by the Employer for working miners in accordance with the following schedule:

(a) Upon the death of a working miner due to other than violent, external and accidental means on or after the Effective Date, life insurance benefits in the amount of $70,000 will be paid to the miner's named beneficiary.

(b) Upon the death of a working miner due solely to violent, external and accidental means on or after the Effective Date, life insurance in the amount of $140,000 will be paid to the miner's named beneficiary.

(c) If a working miner should lose two (2) or more members due to violent, external and accidental means on or after the Effective Date, the miner shall receive a $80,000 dismemberment benefit. If a working miner shall lose one member due solely to violent, external and accidental means on or after the Effective Date, the miner shall receive a $40,000 dismemberment benefit. A member for the purpose of the above is (i) a hand at or above the wrist, (ii) a foot at or above the ankle or (iii) total loss of vision in one eye.

87

(d) Accidental death or dismemberment benefits are not payable if caused in whole or in part by disease, bodily or mental infirmity, ptomaine or bacterial infection, hernia, suicide, intentional self-inflicted injury, insurrection or acts of war or is caused by or results from committing or attempting to commit a felony.

**(9)    Pensioner's Death Benefits:**

(a) Upon the death on or after the Effective Date of a pensioner who has retired under the 1950 Pension Plan, and who is not a participant in the Combined Benefit Fund, a $7,000 death benefit will be paid by the 1950 Pension Plan to his widow, or, in the absence of a widow to his dependents, if any; otherwise a $6,000 death benefit will be paid by the 1950 Pension Plan to his nearest survivor.

(b) Upon the death on or after the Effective Date of a pensioner under this Agreement who retired under the 1974 Pension Plan, with other than a deferred vested pension based on less than 20 years of credited service, a $7,000 death benefit will be paid by the 1974 Pension Plan to the named beneficiary of the deceased retiree if such named beneficiary is a surviving spouse or dependent relative; otherwise, a death benefit of $6,000 will be paid by the 1974 Pension Plan to the named beneficiary of such deceased retiree.  For purposes of this paragraph, "a pensioner under this Agreement" means a pensioner who is not entitled to benefits from the Combined Fund, is not entitled to death benefit coverage from a plan maintained by his Employer, and who meets one of the following conditions:

i)      the pensioner is a participant in the 1992 Benefit Plan;

ii)     the pensioner is a participant in an individual employer plan maintained pursuant to the Coal Act and whose last signatory employer ceased producing and/or processing coal prior to December 16, 1993;

iii)    the pensioner was entitled to death benefit coverage from the 1974 Pension Plan on February 1, 1993 (or would have been had he been retired or eligible to retire on that date); or

iv)     the pensioner's last signatory employer (the employer for whom such pensioner last worked in signatory classified employment) is a current 1974 Pension Plan contributor signatory to the 2002 NBCWA or to an agreement (including prior agreements, where applicable) requiring a contribution obligation with respect to the 1974 Pension Plan that is identical to the contribution obligation set forth in the 2002 NBCWA (or prior NBCWAs, where applicable).

88

**(10)    Health Care:**

Health care benefits provided under Freeman's Employer Benefit Plan are guaranteed during the term of this Agreement subject to the terms of this Agreement at the level of benefits provided in Freeman's Employer Benefit Plan.

(a) Employees actively working or on a panel of the Employer on the Effective Date of this Agreement will be provided health benefits through Freeman's Employer Benefit Plan maintained pursuant to this Article.  All individuals who are New Hires or individuals who are hired after the Effective Date of this Agreement shall have their health benefits provided through the New Freeman Medical Plan.

(b) Pensioners who are currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998 will be provided health benefits through Freeman's Employer Benefit Plan except where, at the request of Freeman, such Pensioner has agreed to participate in the New Freeman United Retirement Program.  Pensioners entitled to benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan.

(c) Pensioners receiving a Special Permanent Layoff Pension, a Special 30-and-Out Layoff Pension, or a 30-and-Out Pension shall participate in the New Freeman United Retirement Program upon reaching age 55, if they are otherwise qualified for this Program.

(d) Pregnancy benefits will be provided in the same manner as for any other disability.

(e) Only benefits for prescription drugs (only those drugs requiring a prescription for dispensing) are provided.

(f) Surviving spouses of working miners who die may be eligible (provided all Program requirements are satisfied) for benefits under the New Freeman United Retirement Program.

(g) Deferred vested pensioners with less than twenty (20) years of service under the 1974 Pension Plan and miners who will receive a pension with less than twenty (20) years of service under the 1950 Pension Plan are ineligible for health care. Disability pensioners under both the 1950 and 1974 Pension Plans, who are currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998, will continue to receive their Health Services card unless such a disability pensioner participates in the New Freeman United Retirement Program.

(h) Disabled or retarded children of Health Services cardholders will be covered for life, so long as a surviving parent holds the card.

Article XX

**Explanatory Note on Employer Provided Health Plans**

Active miners and their spouses and dependents, and certain pensioners who are currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998, their dependents who are currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998, and surviving spouses receiving pensions from the 1974 Pension Plan who are currently enrolled and receiving retiree medical coverage under Freeman's Employer Benefit Plan as of December 19, 1998, and disabled miners under the age of 55 and their spouses and dependants (in accordance with Article XX (5) Health Care Benefits for Disabled Miners) will receive health care provided by Freeman through insurance carriers until participation in the New Freeman United Retirement Program. A health services card identifying the Participant's eligibility for benefits under the health plan shall be provided by Freeman.

The Special Arbitration Process shall resolve any disputes to assure consistent application of the health plan provisions in the Employer Benefit Plan and of the managed care programs authorized by this Agreement.

**Enhanced Cost Containment Program**

In an effort to address the problems generated by the ever-increasing cost of health care, while maintaining a high level of benefits, the parties have mutually agreed to adopt managed care and cost containment programs.

a.  Coordination of Benefits

If an individual is eligible for health insurance coverage under both the Employer Benefit Plan and another source, Freeman shall not be deemed to be liable for primary coverage for such individual but rather shall be considered subject to providing secondary coverage. The "birthday rule" shall apply only where dual coverage of the Employee exists. In no event will the Employer Benefit Plan be required to pay more than it otherwise would have paid without regard to this provision.

b.  Drug Substitution and Freeman Formulary

If a Beneficiary purchases any drug ("Purchased Drug") where a lower cost substitute drug is available, the Beneficiary is responsible for the difference in cost between the substitute drug and the Purchased Drug. A substitute drug shall be considered available when it is approved under the Illinois State Formulary. A substitute drug shall be considered unavailable only if it is not approved under the Illinois State Formulary. Further, as an additional part of the Freeman Employer Benefit Plan, no earlier than 90 days after the Effective Date of this Agreement,

90

Article XX

Freeman shall implement a Drug Formulary Plan and Program ("Freeman Formulary") substantially similar to the most current version of the United Mine Workers of America Health and Retirement Funds Drug Formulary ("UMWA Formulary"). The Freeman Formulary may be periodically revised by the company to reflect changes in drugs, drug designations and drug substitutions, and to reflect modifications to the UMWA Formulary.. The Freeman Formulary shall provide for all substitutions as approved under Illinois State law as set forth in the Illinois Formulary for the Drug Product Selection Program as updated from time to time. Freeman may designate a third-party to administer the Freeman Formulary; and in any event shall designate a contact person(s) for the purpose of responding to questions regarding the Freeman Formulary.

c. $1,000 Annual Payment/Deductible

On January 1 of each year during the term of this Agreement (or such later date an individual first becomes an eligible Participant), each eligible participant will receive a lump sum payment of $1,000.00. For purposes of this provision, "eligible participants" means active Employees, laid-off Employees, and disabled Employees prior to eligibility for Medicare benefits, who are participants in the Freeman Employer Benefit Plan maintained pursuant to this Article. Notwithstanding the foregoing, a laid-off Employee shall receive a pro-rata payment that reflects the number of calendar quarters during which he is entitled to Employer-provided health care under the plan during the calendar year. A health care payment shall not be paid to any individual who is not then entitled to Employer-provided benefits under the Employer Plan.

During the term of this Agreement, 1974 Pension Plan Pensioners who are not eligible for unreduced Social Security benefits, and surviving spouses who are not eligible for unreduced Social Security benefits, whose last Employer was Freeman will receive a $1,000 lump sum payment from the 1974 Pension Plan. Each pensioner and surviving spouse shall receive a pro-rata payment for the calendar year in which he or she will attain eligibility for Medicare that reflects the number of calendar quarters during such year prior to the month in which he or she attains such eligibility. Notwithstanding the foregoing, no payment shall be made to any individual who is not then entitled to Employer-provided benefits under the Employer Plan, benefits under the New Freeman United Retirement Plan, or to any disabled individual eligible for Medicare benefits.

All health benefits provided under the Employer Plan will be subject to a $750 deductible per family per calendar year. The first $750 of all covered medical expenses incurred by any covered family member will be counted toward satisfying the deductible. Vision care and prescription drug expenses are not subject to the deductible. The deductible requirement only applies to benefits provided to covered

91

active, laid-off, disabled and retired Employees (and spouses, surviving spouses and dependents) under the Employer Plans maintained pursuant to this Article. Notwithstanding the foregoing: (i) the deductible for a laid-off Employee for a calendar year shall be the pro-rata portion of $750 that reflects the number of calendar quarters during which he is entitled to Employer-provided health care under the plan during such year; (ii) the deductible for a pensioner or a surviving spouse for the calendar year in which he or she will attain eligibility for unreduced Social Security benefits shall be the pro-rata portion of $750 that reflects the number of calendar quarters during such year prior to the month in which he or she attains such eligibility; (iii) the deductible for a disabled Employee, or a disabled pensioner under age 65, will cease to be in effect beginning with the first calendar year following his or her eligibility for Medicare benefits; and (iv) a newly-hired Employee, an Employee recalled from layoff, or any other individual subject to a health care payment and deductible who commences coverage after January 1 of a year, shall receive a pro rata health care payment, and be subject to an annual deductible, that reflects the number of calendar quarters remaining in the year. A family shall not be required to pay a deductible in any calendar year that exceeds 75 percent of the amount of the Health Care payment paid for that year.

d. Health Care Participating Provider Lists (PPL)

The Employer may implement Participating Provider Lists (PPLs) of physicians, hospitals, pharmacies and other providers, subject to the following requirements.

1.    Initial Certification—All Participating Provider Lists (PPLs) must be certified prior to their implementation to ensure that they meet the required standards, except for those PPLs currently participating in the Freeman Employer Benefit Plan as of the Effective Date, in accordance with a procedure to be agreed-to between the UMWA and Freeman. The costs of certification will be borne by the Employer.

2.    Ongoing review--Continued compliance of each PPL with the required standards will be subject to ongoing review.

3.    Criteria--A PPL established by an Employer must meet the necessary criteria. The following is a general statement of the required elements:

4.    Choice--Each covered individual will have the freedom to select any provider within the PPL, regardless of whether that provider is a generalist or specialist.

5.    Reduction of Paperwork and Prohibition on Prepayment--Eligible individuals utilizing PPL providers shall, to the extent possible, not be required to fill out

92

or submit claims forms. In addition, such individuals shall not be required to pay a PPL provider any amount other than the copayment and any outstanding annual deductible permitted under this Agreement.

6.  Quality Certification--All providers must meet quality standards.

7.  Accessibility

    a.  Providers will be available within a reasonable distance. Where possible, this means that a covered individual will not have to travel more than 20 to 30 minutes to receive general medical care.

    b.  There will be adequate numbers of providers in the different specialties to ensure that each member will have a sufficient choice.

    c.  Providers must be available to see covered individuals within a reasonable period, depending upon the nature of the problem.

8.  Breadth of Scope--The PPL shall include adequate diversification of specialties and facilities.

9.  Additional Specialties--The program must have provision for going outside the PPL for necessary specialties and/or facilities that are not contained within the PPL, at no additional cost to the covered individual.

10. Other Outside Referrals--The program must have provision for referral outside the PPL where particular medical services can be better provided elsewhere in the opinion of the referring PPL provider, at no additional cost to the covered individual.

11. Emergencies--Emergency treatment is covered in full (subject to applicable deductibles and copayments) whether or not provided within the PPL.

12. Beneficiaries Outside PPL Area—A Beneficiary who lives outside an area served by the PPL shall be permitted to utilize non-PPL providers without incurring additional deductibles and copayments. For purposes of determining the Beneficiary's deductibles and copayments, utilization of such non-PPL providers shall be considered to be within the PPL.

13. Transition--Out of PPL—If a beneficiary has begun to undergo a course of treatment with a non-PPL provider prior to the establishment of the PPL (or with a PPL provider that leaves the PPL), completion of that course of treatment will not be considered "out of PPL" as follows:

93

Article XX

    a.    for an acute condition (including pregnancy, treatment for cancer, etc.), for the duration of the specific course of treatment.

    b.    for a chronic condition, for up to six (6) months.

14.    Viability--A PPL must be viable, both financially and otherwise, in order to ensure that it will continue to be able to appropriately serve the participant population.

15.    Internal Review--Each PPL must have internal mechanisms (including physician peer review) to resolve member complaints and to ensure that the highest quality standards are maintained.

16.    Precertification--Precertification for services (including hospitalization) performed by PPL providers are the responsibility of the provider, and not the covered individual. In addition, precertification in the event a covered individual is referred to a provider outside the PPL is the responsibility of the PPL provider making the referral.

    Failure to precertify a non-emergency hospital admission to a non-PPL hospital (other than by referral from a PPL provider) or certain other specified inpatient and out-patient procedures performed by a non-PPL provider, will subject the Beneficiary to an additional $300 deductible.

17.    Out of PPL Costs

    a.    Hospitalization--Benefits for inpatient treatment by a non-PPL hospital are paid at 90% of the in-PPL rates following exhaustion of the annual deductible. The Beneficiary is responsible for the remainder of the charges.

    b.    Doctor Visits--Each office visit to a non-PPL physician is subject to a $20 copayment.

    c.    The maximum total out-of-pocket expense under a and b above is $1600 per family per year in addition to the annual deductible and the precertification penalties.

18.    Prescription Drugs--Prescription drugs will be provided through the PPL at a reduced copayment of $5.00. Prescriptions bought out of PPL are subject to a $10.00 copayment. Mail order prescription drugs, where available, will be provided at no copayment. (See chart below.)

94

Article XX

e.  Freeman agrees to provide the Union with information sufficient to evaluate the effectiveness of the cost containment programs adopted pursuant to this Article. Such information will be provided no less than annually, and shall include a detailed statement of utilization and costs associated with Freeman's Employer Benefit Plan.

After satisfying the annual deductible, the following co-payments are required under Freeman's Employer Benefit Plan:

|  | **In PPL** | **Out of PPL** |
|---|---|---|
| Prescription Drugs | $5.00 per prescription | $10.00 per prescription |
| Prescription Drugs--Mail Order (where available) | $0 per prescription | Not Applicable |
| Prescription Drugs--Brand Name Where a Lower Cost Substitute is Available | $5.00 Plus Additional Cost of Brand Name Drug | $10.00 Plus Additional Cost of Brand Name Drug |
| Physician Charges | $12.00 per office visit | $20.00 per office visit |
| Hospital -- and Related Charges | $0 | Balance over 90% of PPL Charges |

In addition to the annual deductible:

a.  No family will have to pay more than $240 for In-PPL Physician office visits in any year.

b.  No family will have to pay more than $1,600 in combined Out of PPL Hospital and Related Charges and Out of PPL Physician office visits.

95

For out-of-PPL services, and for services provided prior to the establishment of PPLs, claim forms will be available at most hospitals, clinics, and physician offices. Generally, nothing more is required than signing the forms authorizing the hospital, clinic, or physician to bill the insurance carrier for the services rendered. The insurance carrier will keep individual records for each Participant and dependent and will notify the Participant of the co-payments credited to his account. The hospital, clinic, or physician will bill the Participant for the co-payment amount until the maximum is reached. In some instances, when the Employee pays for services or drugs, the bills should be obtained and submitted with the claim form according to the instructions on the form. If the annual co-payment maximum has been reached, the carrier will remit to the Participant the full payment for covered benefits.

Where possible, for in-PPL services, no claim forms will be required. The PPL provider will generally be responsible for the submission of claims and other paperwork to the insurance carrier. However, Beneficiary may be required to submit claim forms and bills paid to verify that the annual deductible has been satisfied. Although a PPL provider may require payment by the Beneficiary of permitted copayments and deductibles, such a provider may not require payment by a Beneficiary of amounts that exceed the permitted copayments and deductibles.

Covered drug prescriptions may be filled at drugstores, clinics and hospital prescription offices.

Each Participant will receive a "Summary Plan Description" booklet. Each year a financial report of the Plan will be provided to each Participant.

**(11)    Vision Care:**

Vision care is provided for Employees, disabled Employees, Pensioners, surviving spouses, and their dependents, covered with a Health Services card through the Freeman Employer Benefit Plan. Coverage under the plan is identical to that provided in the Freeman/UMWA Agreement of 1998, increased by ten (10%) percent on the Effective Date of this Agreement, and by ten (10%) percent effective January 1, 2005.

**(12)    Health Care Cost Containment:**

The Union and the Employers recognize that rapidly escalating health care costs, including the costs of medically unnecessary services and inappropriate treatment, have a detrimental impact on the health benefit program. The Union and the Employers agree that a solution to this mutual problem requires the cooperation of both parties, at all levels, to control costs and to work with the health care community to provide quality health care at reasonable costs. The Union and the Employers are, therefore, committed to fully support appropriate programs designed to accomplish this objective. This statement of purpose in no way implies a reduction of benefits or additional costs for covered services provided miners, pensioners and their families.

96

3:05-cv-03227-JES-BGC # 1-5 Page 34 of 35

In any case in which a provider attempts to collect excessive charges or charges for services not medically necessary, as defined in the Plan, from a Beneficiary, the Plan Administrator or its agent shall, with the written consent of the Beneficiary, attempt to resolve the matter, either by negotiating a resolution or defending any legal action commenced by the provider. Whether the Plan Administrator or its agent negotiates a resolution of a matter or defends a legal action on a Beneficiary's behalf, the Beneficiary shall not be responsible for any legal fees, settlements, judgments or other expenses in connection with the case, but may be liable for any services of the provider which are not provided under the Plan. The Plan Administrator or its agent shall have sole control over the conduct of the defense, including the determination of whether the claim should be settled or an adverse determination should be appealed. The protections of this paragraph shall not apply until the deductible is met in full for the year, and shall not apply in the case of any service or supply obtained from a non-PPL source, until the out-of-pocket maximum is reached.

**(13)    National Health Care:**

Notwithstanding any other provision of this Article or Article XX-C, in the event the United States Government or the relevant state(s) enacts a system of comprehensive health care that provides an alternative means of providing benefits required under this Article, and/or a means of providing health care benefits for Freeman's retirees, then either the UMWA or Freeman may, without affecting the integrity of any other provision of this Agreement, reopen this Agreement for the purpose of negotiating modifications to the Employer Plan and/or the New Freeman United Retirement Program.

<h3 align="center">Article XXA -- DENTAL PLAN</h3>

See separate Dental Plan Booklet for Dental Plan Provisions. The Dental Plan provisions shall provide for an increase of 10% in appropriate dental benefits beginning on the Effective Date of this Agreement and another 10% increase in appropriate dental benefits effective January 1, 2005.

<h3 align="center">Article XXB--UMWA CASH DEFERRED SAVINGS PLAN OF 1988</h3>

**Section (a)  General Purpose**

This Article provides for the maintenance of a pension plan and trust for Employees covered by this Agreement, separate and apart from those maintained pursuant to Article XX of this Agreement known as the United Mine Workers of America Cash Deferred Savings Plan of 1988. This Savings Plan shall provide additional retirement income to Employees and their dependents, and shall be funded by voluntary wage deferrals and, as necessary, Employer contributions to pay the cost of administration.

Article XX-B

## Section (b)  Trust

The Savings Plan shall be maintained through an irrevocable trust, created pursuant to Section 302(c) of the Labor Management Relations Act of 1947, and qualified under Section 501(a) of the Internal Revenue Code of 1986 ("IRC"), or any successor statute.

## Section (c)  Plan

The Savings Plan shall be maintained in accordance with the requirements of Section 401(k) of the IRC, and is intended to be qualified under Section 401(a) of the IRC.

## Section (d)  Funding

1. Each Employee covered by this Agreement shall be permitted to elect to have the Employer pay any portion of his or her wages to the Trustees of the Savings Plan, except that the percentage of wages so deferred may not exceed 25%, or any smaller amount imposed as a maximum limitation under the IRC.

In addition, above and beyond any other limitations, each employee who is at least age 50 during any Plan year may contribute additional amounts during that and any subsequent Plan year as follows:

| Year | Additional Limit |
|------|------------------|
| 2002 | $1,000 |
| 2003 | $2,000 |
| 2004 | $3,000 |
| 2005 | $4,000 |
| 2006 | $5,000 |

2. Each Employee shall have the opportunity to change the percentage of wages so deferred four times per year, subject to reasonable rules and regulations adopted by the Trustees.

3. All deferred amounts shall be paid to and held by the Trustees of the Savings Plan, who shall maintain separate accounts for each such Employee.

## Section (e)  Administration

The Savings Plan and Trust shall be jointly administered by a Board of four (4) Trustees, two (2) of whom shall be appointed by the UMWA and two of whom shall be appointed by the BCOA. The Trustees shall be responsible for all action necessary for the proper and efficient operation of the Plan. In the absence of any other specific direction in the Trust document, the Trustees shall, to the extent practicable, contract for administrative and investment services with independent entities in the business of and experienced in the administration and/or investment of 401(k) plans.

98