EXHIBIT FILED
Friday, 19 August, 2005 11:08:35 AM
Clerk, U.S. District Court, ILCD



# ARBITRATION
# BETWEEN

FREEMAN UNITED COAL MINING CO.,
CROWN III MINE


   and                                      Case No. 02-12-03-18
                                            Grv. #583


UNITED MINE WORKERS OF AMERICA
DISTRICT 12, LOCAL UNION 12


Appearances:

          For the Company:      Rodney Hatten, Consulting Associate
                                Eller & Associates, Inc.
                                Pittsburgh, Pennsylvania


          For the Union:        Gary R. Butler
                                Executive Board Member
                                District 12, UMWA
                                Springfield, Illinois


## OPINION AND AWARD OF THE ARBITRATOR


                                        Frank A. Keenan
                                        Labor Arbitrator

## STATEMENT OF THE CASE:

The essential facts in this case are not contested.  The case arises at the Crown III Mine of Freeman United Coal Mining Company, located in southern Illinois, where the Company operates an underground bituminous coal mine with a UNMA represented work force of approximately 216 classified bargaining unit employees.  As the Company states in its Opening Statement, "the wages, hours and other terms and conditions of employment were covered by the provisions of the Bituminous Coal Wage Agreement of 2003 (hereinafter [referred to as] as the 'BCWA of 2003' ...) and/or the Memorandum of Understanding Regarding NEW Employees (hereinafter [referred to as] the 'MOU'), which became effective on the same date as the BCWA of 2003 – ... January 16, 2003. In addition, both parties signed the following agreement, introduced into evidence as Company Exhibit No. 1:

"                                        January 7, 2003

Mr. Joseph Angleton

District President

UMWA District 12

....

        Re:    Employee Classification After Completion of the Apprentice
               Period


Dear Mr. Angleton:

This is to document our understanding and agreement that after each New Hire successfully completes his twelve (12) month period as an Apprentice, the Company shall assign him an appropriate classification.

                              Sincerely,

                              Donald H. Dame

                              Vice President of Human Resources

                              Freeman United Coal Mining Company

_____               _____1-8-03_____
Accepted and Agreed                          Date
Joseph R. Angleton

1

Mine Crown 3

Regular Grievance, Article XXIII

\* \* \*

The Grievance:     Grievant and Local #12 - et. al. demands 2 repair
                   trainee jobs be posted.  Demand made to Jerry
                   Watson.

Date:  7-22-03

At the time of the filing of the grievance, twenty-two (22) employees were in the
classification of Repairman; fifty-four (54) were classified as New Hire employees.  The
company acknowledges that since the BCWA of 2003 and the 2003 MOU became
effective January 16, 2003, when additional personnel were needed to perform repair
and maintenance work underground, classified New Hires have been assigned to assist
the employees in the Repairman classification.  On the A shift from 12:01 a.m. until 8:00
a.m. two of those New Hires are Gary Ferrari and George Kunkler, who, since July 10,
2003, have done so on a regular basis.  The Company further acknowledges that it
pays for the tuition of these two New Hires for the Electrical training they receive from a
third party on their own time and asserts it will do so for any employee who wants to
pursue such training.

And it appears that at the time of the third step meeting on the grievance the
Company informed the Union that after completing two years of employment, new hire
Ferrari and Kunkler will be assigned and classified as underground repairmen.  It also
appears that at the third step meeting on the grievance the Company contended that
the grievance was defective and improper.  Union witnesses testified to the effect that

3

Management took the position that Blaine Duty could not file a grievance because he is a member of the Mine Committee.

The record shows that the repairman classification is among the highest paid classifications at the mine, and for that reason standing alone, it is a desired classification. Additionally, in the event of a lay-off, employees who are qualified for a repairman position are more likely to be retained.

The record also reflects that in 2002 the Company posted for bid some five (5) underground repairman classification position vacancies on "A" crew, and that said vacant positions went unbid and unfilled. It appears that some bargaining unit employees were qualified for said positions, but did not bid. This latter circumstance gives rise to the inference that then qualified employees simply had no interest in bidding into the repairman classification vacancies which were posted at that time.

Other matters of note concern the testimony of the Union's Chief Negotiator at the 2003 negotiations for the Freeman United Coal Company and UMWA Bituminous Coal Wage Agreement of 2003 (the 2003 BCWA), and for the Freeman United Coal Mining Company and UMWA Memorandum of Understanding Regarding New Employees - 2003 (the 2003 MOU), to the effect that the parties never intended that the 2003 MOU's grant of authority to the Company to assign new hires to any work in any classification could be relied upon by the Company to avoid its obligation under the 2003 BCWA to _implement_ the 2003 BCWA's mandated Article XVI, Section (e) training program by way of posting repairman trainee positions for bid by non-new hire employees in order to accord said employees their Article XVI, Section (e) rights to training, which training, in turn, would provide said employees with the "ability to perform

4

the work of the [repairman] classification" component pre-requisite to become a successful bidder on permanent repairman vacancies, pursuant to the terms of Article XVII, Section (i), and more particularly, subparagraph three (3) thereof. Still further in this regard, the Company's Chief Negotiator for the 2003 BCWA and the 2003 MOU did not testify.

The record also reflects that the Union perceives that, notwithstanding the clear and unambiguous language of the first sentence of Section (e) of Article XVI to the effect that "Freeman shall establish and maintain for each mine a program for training employees (who were actively working for the Company of (sic) [on] the Effective Date of This Agreement) in maintenance jobs," Freeman has <u>not</u> done so at Crown Mine No. III. The Company contends that it <u>has</u> "established" the requisite training program at the Crown III Mine, but, for the reasons which follow and are outlined in the *Company's Position* segment of the Opinion, it need not "implement it."

**THE UNION'S POSITION**:

The Union takes the position in its Opening Statement that, assuming that the Company is obliged to <u>establish</u> at the Crown III Mine an Article XVI - Training, Section (e) Maintenance Training and Rate of Pay Program for training employees in maintenance jobs, a matter which the record reflects is the subject of another grievance, the Company is obliged to <u>implement</u> said program and post for bid two (2) underground repair trainee positions on A crew. The Company's failure to post for bid said trainee positions impacts negatively on Grievant Duty and other senior non-new hire employees at the Crown III Mine, asserts the Union. Thus, the Union contends that

5

the Company's failure to post said trainee vacancies denies the Grievant, and other senior employees the opportunity to acquire the skills necessary to bid on future underground repairman positions. These best paying positions are highly desirable. Another negative impact on the Grievant and non-new hire employees resulting from the Company's failure and unwillingness to post for bid repairman trainee positions, asserts the Union, is the circumstance that in the event of a lay off, new hires who have acquired repairman skills are more likely than non-new hire (and therefore senior) employees, to be retained.

In its Opening Statement, the Union acknowledges that while under the 2003 MOU Regarding NEW Employees (see paragraph 11. thereof), "management does have the right to assign new employees (those with less than two [2] years of employment) to work on any job on any shift," nevertheless this "new language [in the aforesaid MOU] does not allow the Company to avoid its obligation to implement an Article XVI Section (e) training program, by way of posting repairman-trainee positions, in order to accord senior non-hire employees covered by the BCWA of 2003 what the Union perceives to be their Article XVI, Section (e) rights to maintenance training, providing they bid and are determined to be "trainable." In this regard, although Section (e) refers to the definition of "trainability" in Section (g), in fact Section (g) contains no "trainability" definition. Rather, "trainability" is "defined" in Section (f), subparagraph (3), which,                reads as follows:

"Definition of Trainability – trainability shall include a job-related

determination of an Employee's ability to absorb the training to be

6

provided, the mental and physical capacity to ultimately perform the job for which he is being trained.

The job-related determination shall be based on objective standards which may be an oral, written or work demonstration of trainability for the specific job and the applicant for training may establish his trainability by either oral, written or actual work demonstration or any combination thereof as he may choose."

It thus appears clear that the reference to Section (g) is a typographical error; that the parties intended to refer to Article XVI, Section (f), subparagraph (3).

The Union also contends that while, pursuant to paragraph 11. of the 2003 MOU Regarding NEW Employees, Management has the right to assign NEW employees to work on any job on any shift, nevertheless these MOU provisions do not allow the Employer to avoid it's obligation to the Grievant, and other senior non-new hire employees, under Article XVII - Seniority, Section (i) Bidding of the 2003 Freeman United/UMWA BCWA (Joint Exhibit No. 1), which is applicable to them. And Article XVII, Section (i)(1) mandates the posting of all permanent vacancies and new jobs. The Arbitration Review Board's precedent setting Decision 78-26, further supports this mandate, asserts the Union.

The Union further contends in its Opening Statement that Management's actions clearly indicate that it anticipates a future need for at least two (2) additional repairman positions. In support of this contention, the Union points to the five (5) underground

7

repairman classification vacancies on the "A" crew posted for bid, but left unfilled in 2002. It also points to the daily assignment of new hires Gary W. Ferrari (hired 2-10-03) and George Kunkler (hired 3-17-03) to underground repairman classification work, and to the Company's financing of electrical training classes for Ferrari and Kunkler on their own time, to enable them to acquire their Federal Electric Certificate, a pre-requisite for assignment to an underground repair position. The Union further represents in its Opening Statement that at the third step meeting on the instant grievance, Management informed the Union that after completing two (2) years of employment, new hires Ferrari and Kunkler will be assigned and classified as underground repairmen.

The Union additionally contends that, in any event, the on-the-job training that new hires Ferrari and Kunkler are receiving "does not meet the requirements of Article XVI, Section (e)."

In its Opening Statement, the Union states that it seeks the posting of two (2) repair trainee positions on "A" shift to thereby allow senior employees who desire to bid on said trainee vacancies, to acquire the maintenance skills needed by the Company.

The Union views the issue in the case as follows:

"Did the Employer violate the Contract when Management filled maintenance jobs on "A" crew with new junior employees without posting these jobs for bid? If so, what is the proper remedy?"

In it's Closing Statement, the Union notes that at the Step 3 meeting on the instant grievance, the Company argued that the grievance was improper because Blaine Duty had filed the grievance for himself and Local 12. Management, asserts the

8

Union, contended that Blaine Duty could not file a grievance because he is a member of the Mine Committee. The Union counters that the grievance is proper; that Duty filed the grievance as an employee of the mine and on behalf of other employees, when he indicated in the body of the grievance the Local and *et. al.* [i.e., "and others"] as grievants.

In support of its position, the Union points to the decision of Arbitrator Sue Olinger Shaw in *Freeman United Cole Mining Company Crow III Mine -and- UMWA, District 12, Local 12*, Case No. 98-12-00-76, which issued March 5, 2001, and quotes from said Decision at page 35, wherein Arbitrator Shaw found that: "[t]he inclusion of Local 12 on the grievance form made all its members legitimate grievants regardless of whether they were individually named or identified at any point in the grievance process." The Union additionally contends that Arbitrator Shaw's case "is precedent setting at the Crown III Mine and should be given the effect of *res judicata* according to precedent setting Arbitration Review Board Decision 78-24 ...." The Union also cites Arbitrator Thomas L. Hewitt's decision in *Freeman United Coal Mining Company -and- UMWA, District 12, Local 1969*, Case No. 93-12-94-45, which issued January 4, 1995. The Union points to page eleven (11) thereof, wherein Arbitrator Hewitt stated:

> ".... The Local Union is not an employee and, therefore, not a grievant as usually defined and accepted under the labor agreement. It normally is not eligible for any individual redress or monetary payment. In cases where the Union is not aware of all the grievants involved, they have one grievant's name or names of the known grievants with an *et. al.* addition. This is acceptable under the Freeman United/UMWA BCOA Agreement. In the grievance procedure [Article XXIII - Settlement of Disputes] under

Section (e) the Union Representatives are required to disclose who was
harmed – thus a control is in place to eliminate the fears of management.
.....*Freeman United Coal Mining Co., Crown II -and- UMWA, District 12,*
*Local Union 1969, Case No. 88-12-93-1693, Arbitrator Selby, November*
*16, 1993.*"

The Union characterizes Arbitrator Hewitt's findings in this regard, as follows:

"Hewitt clearly acknowledges that in cases where the Union may not be
aware of all the grievants involved, they should have one grievant's name
on the grievance form along with *et at*.  In the grievance here today the
local is listed as a grievant and in the body of the grievance the Local and
*et at*. are also listed."

In it's Closing Statement, the Union next takes up its contention that "there
currently exist two (2) maintenance trainee job vacancies on the 'A' shift.  The Employer
will argue that new language in the MOU allows the new hires to be assigned any work
on any shift.  While this is true, this new language can not be used to defeat the Master
Wage Agreement requirements of Article XVII Section ( i ) that requires the posting for
bid all vacancies and new jobs.  Article XVII Section ( i )(1) is specific and clear
language that should be given precedence.  This language has been in our wage
agreements for many many years and has allowed the senior employees to bid on and
be awarded preferred jobs. These repair trainee vacancies are a highly skilled and
preferred job to the members of the work force.  To allow management to avoid posting
these jobs will have the effect of eliminating the job bidding process of Article XVII ( i ).
If our grievance is denied, then management will be free to never post for bid any
vacant job.  The employer will, as the vacancies occur, assign a new hire to perform the

10

work and fill the vacancy, under the smoke screen of this new language.  The intent of the parties was not to cause this harm to the bidding process.  Union witnesses have testified to this fact."  At the hearing, the Union's advocate noted that Management did not call as a witness its Chief Negotiator for the Freeman United/UMWA BCOA of 2003 and the 2003 MOU Regarding NEW Employees.

The Union takes the position that further support for its position is to be found in *Transport, Inc., Cannelton Division -and- Local Union 8843, District No. 17, UMWA*, *ARB Decision 78-26*, a precedent-setting Decision, issued March 18, 1980.  Thus, the Union asserts that there the Board held that there are other ways to determine if a job vacancy exists other than the out right announcement by the Employer.  On page 15, the Board states:

> "The actions, direction of work duties, and administration of the work tasks by the Employer may be found to have the effect of creating the job or perpetuating the vacancy in fact without the formal announcement or posting.  If the evidence leads to a finding that the employer has, in fact, by those actions, work directions, or administrative organization of the work tasks, created a job or perpetuated a vacancy, then of course, the finding should be that the employer had made its determination of the existence of the job and should be required to post the job which the facts indicate has been created or recognized as existing."

The Union urges that the Company's "actions" in posting five (5) repair jobs and then not filling them, coupled with the fact that new hires Ferrari and Kunkler are in electrical school at the Employer's expense, to obtain the Federal Electrical Certification, clearly shows that two (2) repairman trainee positions exist.

The Union asserts that the Company "has less than a perfect record when it comes to posting job vacancies at Crown III. This Union was forced into arbitration before Arbitrator Selby (88-12-91-1458) in a dispute where this employer refused to post for bid two roof bolting jobs on the three shifts. In following ARB 78-26 on page 22, [Shelby] states:

> "The upshot of this dissertation, then is that it is concluded on this record, that, by its actions, direction of work duties, and administration of the production section work tasks, the Company has created two R/B/O/ (roof bolter operator) jobs on each of the three shifts, and the Company will be directed, then, to post for bid and award, six R/B/O/ jobs, two on each shift."

Later this local was again forced into another arbitration on this matter. Arbitrator Hewitt (88-12-92-1527) heard a dispute at Crown III where an employee grieved that he was improperly classified. On page 5:

> "Normally the Company has the right to determine the jobs at the mine; however, by its actions the Company in the assignment of work may do so on such a regular basis that it creates a job by its actions rather than through the formal procedure. Many of the skills being utilized by the Company are in deed those skills required in Grade 1 belt moving and supply classifications; however, the Company is using this grievant to cut and weld on the belt line."

He goes on to note:

"It is found that the Company created the job of Belt Repairman/Welder 4-E classification by its regular assignment of the grievant to both the skilled and unskilled duties of the job over fifty percent of the time and on a

regular basis. The grievant is entitled to Grade 4 rate in the future. The Union did not request the job be posted for bid. Since the grievant is the one on shift who has the necessary skills and has been performing the job, he shall be awarded the title of Belt Repairman/Welder Grade 4."

The Union ... takes the position that the maintenance training program is required to be in place at this time. This position is clearly supported by Article XVI Section (e). The first sentence states: "The Employer shall establish for each mine a program for training Employees in maintenance jobs." This language is so clear that it should need no clarification, but this employer believes it does. [At the time of the filing of the instant grievance there was no such program in effect at the mine, and ... there is still no program.]

Precedent setting ARB Decision 78-73 issued in 1981 gave this clarification to all parties. On page 5, the Board noted:

"Section (e) of Article XVI sets forth in generally (although as observed above, not entirely) clear language the Employer's obligation to establish training programs for each mine."

On Page 6, the Board held that:

"What is required of the Employer is a reasonable effort to anticipate maintenance needs and to train in response thereto. That is the manner in which Article XVII ( i )(1) is 'subject to the provisions of Article XVI ....' Pending the appropriate qualification of trainees or in cases where reasonable judgments nevertheless fall short, or where unanticipated needs arise, the Employer is free to hire from the outside, as is clearly suggested by Article XVII, and to later post a trainee vacancy to fill the job,

13

if necessary."

Arbitrator Feldman in 1978 (30-78-03) held that the Employer must implement a maintenance training program at the mine. He further required the Employer to look ahead to anticipate training needs.

Arbitrator Wren (82-17-KD-165) heard a case where the Employer assigned production employees to perform maintenance work 10% of their time over a 4 month period. The Union asked that a training program be re-activated so employees could bid on these preferred jobs. Wren held that the Employer is to anticipate and foresee the future needs in maintenance trainees in the future and the training program must be implemented.

Arbitrator Seidman (84-17-87-757) heard a similar dispute and ordered the Employer to establish an electrical training program and put the grievant in it. Additionally, he ordered a welding and mechanical training program be established and post one trainee job for each of these programs.

Thomas Hewitt in District 17 (84-17-86-321) held that the Employer failed to anticipate retirements of maintenance employees and plan ahead for these vacancies. He noted that this Employer had never posted a trainee job, but is required to do so by contract.

Arbitrator Parkinson (88-17-89-651) heard another similar dispute. In that case, management argued that there were qualified employees within the active work force who could bid on maintenance jobs. On page 8:

"However despite the Company's claim that it has sufficient qualified or
potentially qualified mechanics within the work force, the weight of the

14

evidence advanced by the Company to sustain its contention is questionable.

Of the four qualified mechanics now working in other classifications, the Company has simply not presented any evidence that these four employees would have any interest in bidding on a mechanic's vacancy in the near future. Nor has the Company established that any of the other employees who have bid on mechanic's vacancies are in any way qualified for the positions. The Company makes a determination on qualification by testing an employee. Those tests are not administered until the employee is listed as the senior bidder. Based on all of these observations, it must be concluded that the Company cannot determine if it has sufficient qualified mechanics within its work force to anticipate its future needs."

The Union contends that the 5 repairman job postings that have gone unbid clearly show that no qualified Employee within the work force has any interest in bidding into the repair classification. ... [T]rainee jobs should [therefore] be posted.

Arbitrator Boals (88-17-90-964) heard a training issue. Boals held that the Employer is required to anticipate its' needs for maintenance personnel and post jobs accordingly .... [H]e found the Employer [was] in violation of the agreement and ordered a Maintenance Training posting.

Arbitrator Tranen (88-17-1275) found that qualified Employees within the work force would not bid the posted repair jobs and ordered the Employer to implement a maintenance training program per Article XVII (e) and ARB 78-73. He also ordered the Employer to post for bid a mechanic trainee job."

15

In conclusion, the Union urges that, based on all the foregoing facts and argument, the grievance should be granted and hence the Company should be directed to post for bid two (2) maintenance trainee positions on "A" shift, thereby implementing the maintenance training program required by Article XVI Section (e), allowing the successful bidder to be properly trained.

## THE COMPANY'S POSITION:

In its Opening Statement, the Company takes the position that the provision of the BCWA of 2003 found at Article XIX - CLASSIFICATION, Section (b) - Temporary Assignments, are "superceded and modified" by the provisions of the MOU at paragraph 11., more particularly Section (b), sub-paragraphs (1), (3) and (4).

These MOU provisions provide as follows:

".... Section (b) Classification Requirement That Shall Apply to All New Hires - Probationary Trainee, New Hire and Apprentice

(1) The initial ninety day period of active work by each new employee shall be that employee's Probationary Period; and such employee shall be designated as a Probationary Trainee. Each Probationary Trainee may be assigned to perform the work of any classification on any shift.

\* \* \*

(3) Subsequent to ninety (90) days of his active work, each Probationary Trainee – unless prohibited by law – shall be classified as a New Hire for the next nine (9) calendar months that he actively performs work. Each New Hire may be assigned to perform the work of any classification on any shift.

(4) Subsequent to the first twelve (12) months that a New Hire actively performs work for the Employee (which twelve months shall include their Probationary Period), then such New Hire shall be classified as an Apprentice and shall remain in such Apprentice Classification for the subsequent twelve (12) months that he actively performs works as an Apprentice. Each Apprentice may be assigned to perform the work of any classification on any shift. Subsequent to completion of active work for twelve (12) months as an Apprentice, each employee may bid on another classification as provided for in Article XXII of the 2003 Collective Bargaining Agreement."

It can thus be seen that, pursuant to paragraph 11. of the MOU, all of the New Hires currently employed at Crown III will be in training for the first two (2) years of their employment as a Probationary Trainee, or New Hire, or an Apprentice.

The Company takes the position that the aforesaid provisions of the MOU specifically authorize Crown III Mine Management to assign New Hires such as ... Ferrari and Kunkler to perform the work of the Repairman classification (while in the New Hire Classification) when all three (3) of those [sub]paragraphs state:

'Each Probationary Trainee (or) New Hire (or) Apprentice may be assigned to perform the work of any classification ....'"

The Company argues that "the words 'any classification' is all encompassing, and includes Repairman, and Repairman Apprentice, and Repairman Trainee as specified in Article XIX, Section (e) and (f) of the BCWA of 2003 and Appendix B - Part I of the MOU Regarding NEW Employees." In this regard, Appendix B, Part I of the MOU provides as follows:

17

"APPENDIX B, PART I

UNDERGROUND AT DEEP MINES

| CLASSIFICATION | JOB TITLE WITHIN CLASSIFICATION |
| --- | --- |
| 5-A    Inby | |
| 5-B    Mechanic Repairman | |
| 5-C    Fireboss/Examiner | |
| 3-A    Outby | |
| 3-B    Repairman Apprentice | |
| 2-A    Repairman Trainee" | |

Article XIX - CLASSIFICATION, Section (e) and (f) of the BCWA of 2003, provides as follows:

"ARTICLE XIX - CLASSIFICATION

* * *

Section (e) Classification at Underground Mines.

In addition to the classifications contained in Appendix B - Part I of this Agreement, underground at bituminous coal mining operations covered by this Agreement there shall be four classifications. These four classifications shall be designated as Inby (work performed inby the coal haulage tailpiece) and Outby (work performed outby the coal haulage belt

tailpiece), Mine Examiner and Repairman.  These classifications shall contain the job titles set forth in Section (g) below.

1.                    Pay and Skills Improvement For Inby Employees

* * *

2.                    Pay and Skills Improvement For Outby Employees

* * *

Section (f)    Mine Examiner, Inby Classification, Outby Classification, and Repairman

| GRADE | JOB CLASSIFICATION |
|---|---|
| 5 | Mine Examiner |
| 5 | Inby Operations: [As defined in Section (e) above.] |

| GRADE | JOB CLASSIFICATION |
|---|---|
| 3 | Outby Operators: [As defined in Section (e) above.] |

| GRADE | JOB CLASSIFICATION |
|---|---|

| 5 | Repairman |
| 3 | Repairman Apprentice |
| 2 | Maintenance Trainee |

In its Opening Statement the Company notes that the last sentence of the first paragraph of the "Memorandum of Understanding Regarding New Employees 2003," (the MOU), provides that "in the event of a conflict between the terms and conditions of the 2003 Collective Bargaining Agreement or any terms and conditions of employment, and this MOU, this MOU shall prevail."

The Company also points out that as the MOU's definition of a New Hire indicates, New Hires have very little, if any, underground coal mining experience, and hence undergo two years of training in order to learn how to perform the work of one or more classifications. The Company notes that, pursuant to a Letter Agreement dated January 7, 2003, following two years of training, Mine Management can assign said New Hires an appropriate classification. Reading sub-paragraphs one and two of paragraph 11. of the MOU together, until a New Hire has completed two (2) years of active work, only Section ( c ), General Retraining Programs, of Article XIX - Training, of the BCWA of 2003, applies to New Hires. The first and third sub-paragraphs of paragraph 11. of the 2003 MOU effectively eliminates Section (b) of Article XIX of the BCWA of 2003 and establishes a new and different Section (b) applicable to New Hires.

20

The Company asserts that Article XIX, Section (f) of the BCWA of 2003, and Appendix B - Part I of the 2003 MOU Regarding NEW Employees provide that the classification of Repairman is one of the classifications which exist at Crown III (as are Repairman Trainee and Repairman Apprentice if and when the Company elects to post and fill any Maintenance-Trainee classification).

The Company takes the position that since paragraph 11. of the MOU authorizes the Company to assign New Hires to work with employees in the Repairman classification and to perform the work of the Repairman classification (or any other classification), Crown III Management anticipates that it will be able to fill its future Repairman job vacancies with qualified non-New Hire employees from the Crown III work force bidding; or from Crown II bidders per Article XVII, Section (d)(5) and Article XVII, Section (o) of the BCWA of 2003; or with qualified New Hires such as Messrs. Ferrari and Kunkler. The Company contends that since it anticipates that it will be able to fill its Repairman job vacancy needs in the future as noted just above, it does not anticipate the need to develop repair and maintenance skills by way of the maintenance training program contemplated and described in "Article XVI - Training, Section (e) - Maintenance Training and Rate of Pay, "of the Freeman United/UMWA BCWA of 2003, and, accordingly, asserts the Company, Management is not required to post repairman trainee jobs as referenced in Article XVI, Section (e) of the Freeman United/UMWA BCWA of 2003.

In both its Opening Statement and in its Closing Statement, the Company states that the issue in the case is:

"Did the Employer violate any of the terms of the Bituminous Coal Wage

21

Agreement of 2003 or the January 16, 2003 Memorandum of
Understanding Regarding NEW Employees when it did not post two (2)
Repairman - Trainee (or Maintenance - Trainee) vacancies for bidding?"

In its Closing Argument, the Company reiterates its contention to the effect that,
pursuant to paragraph 11. of the MOU, during the two (2) year period following the hire
of New Hires, said New Hires will receive on-the-job training and learn how to perform
the work of whatever classification Mine Management assigns to said New Hires,
including the classification of Repairman.  Indeed, argues the Company "[t]hat is what
[paragraph] 11. of the MOU is all about."  Further in this regard, the Company contends
that "one of the primary reasons the [Company] employs fifty-four (54) New Hires is for
the express purpose of training them to be able to step into and perform all of the duties
of the various classifications at the Mine to allow for attrition, or, said differently, to have
trained and qualified New Hires on hand and available to be assigned to fill
classifications which are not filled by the regular job bidding procedure at the end of
their first two (2) years of employment (as provided for in the January 7, 2003, Letter of
Agreement), or to be qualified to bid on and be awarded one of those classifications
after those first two (2) years of employment.

The Company refers to Article XXIII - Settlement of Disputes, Section (k), Prior
Agreement, more particularly to the terms of the last sentence thereof, which sentence
states that::

"…. All decisions of the Arbitration Review Board rendered prior to the
expiration of the National Bituminous Coal Wage Agreement of 1978, shall
continue to have precedential effect under this Agreement to the extent
that the basis of such decisions have not been modified by subsequent

22

changes in this Agreement."

In its written Closing Argument, the Company characterizes and/or paraphrases this last sentence of Article XXIII - <u>Settlement of Disputes</u>, Section (k), <u>Prior Agreement</u>, of the BCWA of 2003, asserting that it provides that:

"... [A]ll decisions of the Arbitration Review board (hereinafter 'ARB' or 'Board') rendered prior to [the expiration of] the NBCWA [i.e., the National Bituminous Coal Wage Agreement] of 1978, shall continue to have precedential effect under the BCWA of 2003 <u>providing</u> <u>that</u> the basis for any such Board Decisions have not been modified by subsequent changes in the BCWA of 2003 (as compared to previous collective bargaining agreements) or by another current collective bargaining agreement such as the 2003 MOU Regarding NEW Employees." [Emphasis in original.]

The Company acknowledges that the Board's decision in <u>Bethlehem Steel Corp.</u> <u>and Local Union 2059, District 31, UMWA</u>, ARB Decision 78-73, decided March 3, 1981, is a "precedential effect" type ARB Decision within the intendment of the last sentence of Section (k) of Article XXIII of the parties' 2003 BCWA. Additionally, the Company perceives that in ARB Decision 78-73 "the ARB found that an employer could not hire '... a new applicant who has the ability to perform the work ...' of electricians (or other maintenance jobs) off the street without complying with the terms of Article XVI - Training, Section (e) Maintenance Training and Rate of Pay, by posting and filling maintenance training vacancies to meet its future 'actual anticipated needs' for qualified maintenance employees. Quoting from pages 3, 5 and 6 of ARB Decision #78-73, the

Company asserts that "[e]ssentially, the Board stated that an employer ... had to make a good-faith effort to anticipate its future needs for maintenance jobs, and if it determined that it could not fill those jobs via Article XVII - Seniority, Section ( I ) Bidding, ... it must post training vacancies in accord with the terms of Article XVI, Section (e) in order to fill those future jobs with current employees, rather than to hire new already qualified individuals off-of-the-street [since XVI - Training, Section (e) Maintenance Training and Rate of Pay was then the only agreed upon provision for training employees for maintenance jobs.]. As the Company otherwise put it, at the time of the Board's ARB Decision #78-73, "there was only one contractually authorized method for training employees for maintenance jobs ..., and that method was spelled out in Article XVI, Section (e)."

The Company next notes that approximately one year after the Board's decision in ARB #78-73, Arbitrator Thomas M. Phelan issued his decision in *The Pittsburgh and Midway Mining Company and UMWA Local Union 2395, District 23*, *Case No. 81-23-82-23, issued July 20, 1982* (Company Exhibit No. 2). The Company points to certain observations and findings made by Arbitrator Phelan in said case, including, among others, his observation at page 6 thereof in the first paragraph of his "Analysis," that:

"[Article XVI, Section (e), provides that] vacancies for trainees ... are to be posted in accordance with actual anticipated needs for developing maintenance skills, and when skills are presently available within the classified work force, the Company does not have to post trainee jobs .... The maintenance jobs can be filled with Employees who already have the ability to step into and perform the work of the job. Article XVI, Section (e) thus indicates two ways in which the Employer may take care of its

24

maintenance needs. It can use the regular bidding procedure to fill the jobs with qualified Employees and, if it does not have Employees in the workforce with the necessary skills, the Employer is to train Employees for the jobs." (Emphasis in original.)

Here, however, asserts the Company, the 2003 MOU Regarding NEW Employees (Joint Exhibit No. 2), within the intendment of Article XXIII. Section (k), has "modified the basis of ARB #78-73 when it comes to requiring the Employer to apply the terms of Article XVI, Section (e) as those (sic) [the] sole method for training employees to become qualified to step into and perform all of the duties of a Repairman in the future when vacancies in the Repairman [classification] are not filled via the regular job bidding procedure." Now, asserts the Company, by entering into the 2003 MOU Regarding NEW Employees, in the context of the first paragraph of Arbitrator Phelan's decision in *Pittsburgh & Midway Coal Mining Co., supra*, quoted just above, "we submit that there are now three (3) ways that Crown III Management can fill future Repairman classification vacancies or take care of its maintenance needs – in the words of [Arbitrator] Phelan: via the regular job bidding procedure contained in Article XVII, Section ( i ) of the BCWA of 2003; or, via the provisions of Article XVI, Section ( c ) (sic) [(e)]; or, via the procedure outlined in the MOU Regarding NEW Employees, since [paragraph] 11. (b) (1), (3), & (4) of that MOU now specifically authorizes the Employer to assign New Hires such as Messrs. Ferrari and Kunkler to perform the work of the Repairman classification, and while performing such work to be trained to perform all of the duties of a Repairman in a safe and efficient manner. Doing so [i.e, the latter], does not constitute a violation of the BCWA of 2003 or the 2003 MOU Regarding NEW

Employees, and will result in training current Crown III employees to be Repairman rather than hiring new employees off-the-street in the future to fill vacancies in the Repairman classification. The Company anticipates that in the future "it will be able to fill ... Repairman classifications with individuals (such as Messrs. Ferrari and Kunkler) who are now New Hires after they complete their first two (2) years of employment."

Then too, the Company points to the last sentence of the first paragraph, page one (1), of the MOU Regarding New Employees 2003, and contends that this sentence "makes it extremely clear that whenever there is a conflict between the terms of the BCWA of 2003 and the MOU ..., the terms of the MOU '... shall prevail ....'"

On the basis of all the foregoing, the Company contends that "the current matter represents a 'case of first impression' in the portion of the coal industry which is signatory to a collective bargaining agreement with the UMWA. In this regard, the Company asserts that "neither the NBCWA of 1978 [nor] (... any subsequent NBCWA) [nor the] BCWA of 1998 contained any of the applicable provisions of the 2003 MOU Regarding NEW Employees, nor were any of [the aforesaid collective bargaining agreements] superceded or modified by a similar MOU or other (type of) collective bargaining agreement." The Company asserts that "[t]he provisions of [the 2003 MOU Regarding NEW Employees] are dramatically different from any other collective bargaining agreement that has ever been in effect at the Crown III Mine, or any other Mine of Freeman Coal (or any other coal company signatory to a collective bargaining agreement with the UMWA."

In any event, argues the Company, it does not anticipate that the Mine will expand thereby creating a need for additional employees in the Repairman

26

classification. If anything, contends the Company, the amount of production unit shifts may be reduced if additional coal sales are not obtained to take the place of the one million tons of coal sales which were lost in late 2003. In the absence of replacing the loss with new sales, there will be a need for less, not more, Repairman.

By way of conclusion, the Company "respectfully submits that the grievance ... is without merit, and as a result, must be denied."


## DISCUSSION & OPINION:

The parties have entered into and executed two separate documents to govern the terms and conditions of the bargaining unit employees. One such document is the Freeman United Coal Company -and- UMWA Bituminous Coal Wage Agreement of 2003 and the other is the Freeman United Coal Mining Company -and- UMWA Memorandum of Understanding Regarding New Employees [of] 2003. Both are complex documents. Moreover, the parties have cited and relied upon numerous provisions within one or another or both of these documents in support of their respective contentions. Additionally, the parties have set before the undersigned for his consideration a substantial record of testimony, documentary evidence, and argument. Furthermore, much of the documentary evidence consists of numerous arbitration decisions from District Arbitrators, both for the parties, and for other Companies and Districts of the UMWA, as well as precedential decisions of the Arbitration Review Board. Many of these decisions are also complex. Then too, as the Company points out, the principle issue presented is a novel one, and a case of first impression, both for the parties and for that segment of the bituminous coal industry which has been

organized by the UMWA. Suffice it to say, therefore, in all these circumstances, the Arbitrator's task is an especially challenging one.

In my judgment, certain well established arbitral principles have application here. The well-known labor arbitration treatise *How Arbitration Works*, *Elkouris & Elkouris (5th Edition, 1997)* succinctly states said principles, and typically cites reported labor arbitration decisions in support of its summary statements of arbitral principle. Thus, at page 498, the Elkouris cite Arbitrator Jonathan Dworkin's correct observation in *Airco Carbon, 86 LA 6, at 9 (1986)* to the effect that "[a] broadly observed principle of contract interpretation, acknowledged in both courts of law and arbitration, holds that specific language prevails over general language." The Elkouris further correctly observe that "[w]here two contract clauses bear on the same subject, the more specific should be given precedence," citing *Coca-Cola Foods, 88 LA 129, 131 (Naehring, 1986)*. The Elkouris also cite Arbitrator Elvis C. Stephens' opinion in *City of Houston, 86 LA 1068, 1072 (1986)* to the effect that "where there may be a conflict between two contract provisions, the specific will govern over the general."

As the Elkouris further note at page 492, a Collective Bargaining Agreement is to be construed as a whole. In support of this proposition, the Elkouris quote Arbitrator Stanley Dobry's correct observation in *Hemlock Public Schools, 83 LA 474, at 477 (1984)* to the effect that "[t]o the greatest extent, the Arbitrator must ascertain and give effect to the parties' mutual intent. That intent is expressed in the contractual language, and the disputed portions must be read in light of the entire agreement."

Another well established arbitral principle holds that clear and unambiguous contract language must be enforced. As the Elkouris put it at page 482 of their learned

arbitration treatise: "[i]f the language of an agreement is clear and unequivocal, an arbitrator generally will not give it a meaning other than that expressed, citing among many reported arbitration cases that of Arbitrator Roger I. Abrams in _National Linen Service_, 95 LA 829, 834 (1990). In that case, Arbitrator Abrams held that certain unambiguous provisions in a written agreement were binding, even though the Union contended that the written contract included terms upon which the parties had not agreed. The Elkouris go on to note that "[a]s Arbitrator Fred Witney has stated, an arbitrator cannot "ignore clear-cut contractual language." _Clean Coverall Supply Co._, 47 LA 272 277 (1966).

The Elkouris further note, at page 483, that "[e]ven though the parties to an agreement disagree as to its meaning, an arbitrator who finds the language to be unambiguous will enforce the clear meaning." In support of this proposition, the Elkouris cite, among other reported decisions, Arbitrator Israel Ben Scheiber's decision in _Board of Education of The City of New York_, 44 LA 883, 887 (1969), and _John Deere Tractor Co._, 2 LA 469, 472-473 (1945). Concerning the _Bd. Of Ed. Of NYC_ case, _supra_, it is noted that Arbitrator Scheiber, in support of his rationale for his interpretation of the parties' Contract, quotes certain "legal" principles of contract interpretation, which principles have long since been adopted in Labor Arbitration as well. Thus, Arbitrator Scheiber noted in the _NYC Bd. Of Ed._ case, _supra_, at page 887, as follows:

"Since the problem before the arbitrator is one of interpretation and application of the Parties' Agreement, the following time tested rules of contract interpretation are of interest.

In attempting to ascertain from the language used by the Parties what their intent was, the courts have consistently followed the rule that they should not resort to construction where the language used by the Parties expresses their intent clearly and without ambiguity [citations omitted].

The mere fact that the Parties advance different and inconsistent contentions as to the meaning of the language in dispute is not of itself conclusive evidence of ambiguity.  Thus, we find in 12 A.M. JUR. Sec. 227, pp. 740-748:

> 'The law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.'
>
> * * *
>
> We have, too, the statement in Weiner's Law & Practice of the Labor Contract that 'no matter what the Parties may have intended, the language of the contract is controlling.'"

In the _John Deere_ case, _supra_, Arbitrator Updegraf cogently observes at pages 472-473, that:

> "To the undersigned arbitrator there is no ambiguity here [i.e., in the Contract's vacation provision].
>
> * * *
>
> It was stated by the Union Representatives at the hearing that they intended no such change [as the Company claims], and were surprised when the Company indicated its belief that such change had taken place under the new wording of the contract ....
>
> * * *
>
> All of the discussion which must have been necessary to agree upon an

30

entirely new type of phrasing for a vacation plan with a new type of
agreement [such as the 2003 MOU Regarding NEW Employees involved
here] must have received thoughtful scrutiny by Union Representatives.

* * *

Local Union spokesmen insisted at the hearing that they had no intention
of exchanging the vacation privileges of those who had worked for the
Company for 40 weeks and less than 52 for a higher rate of vacation pay
for older employees [as the Company claims].  The arbitrator thoroughly
credits this intention and attitude on their part but feels forced to conclude
that the terms of the Contract are so clear and the evidence is so lacking
in specific proof of any fraud or improper practice as might invalidate such
terms that the award must confirm the Company's interpretation and
application of the portion of the contract in issue [i.e., the vacation plan]."

The Elkouris at page 484 note that "[a]rbitrators apply the principle that parties to

a contract are charged with full knowledge of its provisions and of the significance of its

language."  As the Elkouris therefore note at page 484, it follows that "the clear meaning

of language may be enforced even though the results are harsh and contrary to the

original expectations of one of the parties.  In such cases, the result is based upon the

clear language of the contract, not upon the equities involved," citing, among other

decisions, _Commonwealth of Pennsylvania Department of Corrections_, 86 LA 978, 981

_(Kreitler, 1986)._

If the language the parties use in their Contract is determined to be "ambiguous,"

then, as the Elkouris correctly observe at page 501, "pre-contract negotiations

frequently provide a valuable aid in the interpretation of ambiguous provisions."  In this

regard, it is important to note that "it is the manifested intent of the parties during

31

negotiations that is to be considered by the arbitrator and not the undisclosed intent," as the Elkouris note at page 502, citing Arbitrator John Murphy's decision in *Kahn's & Co.*, *83 LA 1205, 1229-30 (1984)*. In other words, it is only what one party expressly states to the other party at the negotiating table concerning their understanding of what the language they are proposing or counter-proposing means to them, that aids in the interpretation of the language the parties ultimately agree upon and put into their written collective bargaining agreement. As Arbitrator Murphy put it in the *Kahn's* case, *supra*, at page 1230:

> "[the] intent manifested by the parties to each other during negotiations by
> their communications and their responsive proposals – rather than
> undisclosed understandings and impressions – is considered by the
> arbitrators in determining [i.e., interpreting] contract language."

Both parties cite to the undersigned the Arbitration Review Board's Decision in *Bethlehem Steel Corp., Bethlehem Mines Corp., Mine No. 81 -and- Local Union 2059, District 31, U.M.W.A., ARB Decision 78-73, March 3, 1981.* The following excerpts from said Board's Decision are significant here:

> "The District Arbitrator weighed the opening clause of Article XVI heavily,
> noting management's obligation to abide by the training provisions which,
> in unequivocal language, require that the Employer 'shall establish,' for
> each mine, a training program for maintenance jobs. He found the
> Company had erred in failing to do so and thus required establishment of
> such programs and the filling of future anticipated vacancies by means of
> those programs.

The Employer contends the Arbitrator overlooked management's prerogative to decide whether, in a given case, a 'permanent vacancy' or 'new job' as opposed to a 'training vacancy' would be required in a given instance. So long as there were no qualified electricians within the work force and there were trained individuals on the street, it was within its discretion under the terms of Article XVI to hire from outside. Only in the event fully trained personnel from outside were unavailable, says the Employer, would it be necessary to implement the training program.

The Board finds that this approach misconstrues the overall intent of the Wage Agreement. For the reasons that follow, and with the specific caveats to be noted, the District Arbitrator's opinion is affirmed.

It is possible to read Article XVI and XVII in harmony with one another. And, in so doing, the true intent of the parties became apparent. In various areas in the Wage Agreement, the parties codified their joint endorsement of training programs. ....

* * *

Section (e) of Article XVI sets forth in general (although as observed above, not entirely) clear language the Employer's obligations to establish training programs for each mine. Significantly, at this location, a grievance was settled on the basis that the Employer would, indeed, proceed with implementation of such a program. Even without such settlement, the Employer was to train employees in response to 'actual anticipated needs.' While one may quarrel over the particular meaning to be ascribed to this phrase, it is at least clear that when the need for more electricians was reasonably anticipated, it was management's obligation to begin training them. Management says its ability to hire from the outside in these positions obviates obligation to train from within. But precisely the opposite is true. The outside hiring proves that the need exists and,

33

moreover, suggests that it may not have been properly anticipated.

The [District] Arbitrator correctly required, in light of the evidence in this particular case that the training program go forward so that future vacancies could be filled from within instead of outside.

Several words of caution are appropriate, however, .... Nothing herein should be interpreted as requiring all vacancies in maintenance jobs to be posted as trainee positions. The language relevant to helper jobs, which does require that approach, is significantly different, as was suggested in ARB 78-7.

What is required of the Employer is a reasonable effort to anticipate maintenance needs and to train in response thereto. That is the manner in which Article XVII (j) is 'subject to the provisions of Article XVI ....' Pending the appropriate qualification of trainees or in cases where reasonable judgments nevertheless fall short, or where unanticipated needs arise, the Employer is free to hire from the outside, as is clearly suggested by Article XVII, and to later post a trainee vacancy to fill the job, if necessary.

In this way, managerial prerogatives with respect to the establishment of needed positions co-exist reasonably with the contractual obligation to attempt to train the existing workforce to meet foreseeable needs.

The Board does not read the District Award as requiring all electrician vacancies to be filled either by qualified workers in the existing work force or by trainees. What it does require is that management implement the training program so that it, in due course, will fill the obvious needs of the Employer."

Then too, there is District Arbitrator Thomas M. Phalen's decision in *The Pittsburgh & Midway Coal Mining Co., Pleasant Hill Mine -and- U.M.W.A., District 23, Local Union 2395*, Case No. 81-23-82-83, decided July 20, 1982, involving Article XVI Section (e), cited and relied upon by the Company.

As seen above, in "The Company's Position" section of this Opinion & Award, in addition to the excerpt from Arbitrator Phalen's decision at page 6 set forth therein, Arbitrator Phalen went on to observe as follows:

"Article XVI, Section ( e ), however, cannot be read in isolation from the rest of the contract, especially Article XVII, which clearly suggests that the Employer may hire from the outside if the bidding procedure does not produce a qualified Employee from within, including the panels. The Employer is not required to postpone needed maintenance work while someone is being trained for it or if qualified Employees choose not to bid for the maintenance jobs. What is required is a reasonable effort to anticipate the maintenance needs at the mine and some type of plan to fill those needs from within the workforce, by training if necessary. While the training is going on or in a situation where unanticipated needs arise or where an otherwise reasonable judgment on the maintenance needs falls short, the Employer may hire from the outside to get the maintenance work done. [1]

In the present case, it appeared that there was, in fact, a maintenance training program, but no trainees had ever been put into the program and the Employees were not even aware that the training program existed. That problem has now been corrected. There still remains, however, the question of whether the training program should be

_____

[1] [Citing in footnote one (1) ARB 78-73.]

35

implemented by requiring that one or more trainees be selected for the program and trained for maintenance work. The answer to that question depends on an assessment of the actual anticipated needs of the Employer for developing maintenance skills. Obviously, if the Company has an oversupply of qualified Employees who can do the maintenance work and are just waiting for an opportunity to bid into a maintenance job, there is no need to train anyone for the jobs and training is not required under those circumstances. On the other hand, if there are no qualified Employees in the workforce outside of the maintenance jobs who could fill a vacancy in the maintenance category and the Employer knows, for example, that three new vacancies will be coming up in maintenance jobs in the next year, then the Employer would be contractually obligated to train someone for those jobs. The further you move away from those two end positions, however, the less certain it becomes as to whether or not a maintenance training program must be implemented by the posting of trainee positions. What is called for is a reasonable judgment as to whether a classified Employee with the necessary skills will be there to step into and perform a maintenance job if and when a vacancy occurs.

The required judgment cannot just be made once and then forgotten since the circumstances are continually changing and a new judgment is called for under the new circumstances. The needs of the Employer change over time as the mine develops and as turnover occurs in the workforce and those factors have a direct bearing on the judgment as to how the Employer is going to meet its maintenance needs. With the benefit of hindsight, a prior judgment may be shown to have been wrong, but if it was reasonable at the time that it was made, then it does not result in a contractual violation. It just necessitates taking other factors into consideration in making the next judgment.

The fact that, in the past, the Company was required to hire from the outside to meet some of its maintenance needs indicates that it may

not have been properly anticipating those maintenance needs. That occurred at a time when the mine was still staffing up to its full complement and before the large number of Employees from other mines paneled for the Pleasant Hill Mine. Whether the Company's judgments as to its needs were reasonable when they were made is difficult to determine at this point as there is really no evidence in that regard. The fact that the judgments proved to be wrong, however, suggests that care should be taken in future assessments of the maintenance needs of the Company so that if and when vacancies do occur in maintenance jobs, they can be filled from within the existing workforce. If training is necessary to do that, then training is required.

Based on the evidence that the mine has now completed its staffing and that there are no anticipated vacancies in maintenance jobs for the foreseeable future and the additional fact that there are Employees on the panel who could be easily trained for maintenance positions if they are not already fully qualified and there are Employees in the workforce who could be temporarily assigned to any unexpected vacancies while training is taking place, I do not consider it contractually required at this point in time for the Company to post and fill trainee positions in its maintenance training program. It does not appear that there is an actual need at this time to have someone who is fully qualified and available and willing to take a maintenance job within the next 12 months because no more permanent vacancies are planned to be established within that period and no further turnover in the maintenance jobs is expected. Some turnover in the future, however, will have to be expected and, when that can be reasonably anticipated, the Company will have to plan for filling the vacancy from within. That will require training if there is not someone who is already qualified for the job and willing to bid on the job. For the present, however, a trainee position does not have to be posted and filled.

<u>Decision</u>

The grievance is denied."

Also to be noted is the Arbitration Review Board's Decision in *Transport, Inc.,*
*Cannelton Division and Local Union 8843, District No. 17, U.M.W.A.,* ARB Decision 78-
*26,* which issued March 18, 1980.  In that case, the Board made the following cogent
observation:

> "Although it is basic and elementary, it is instructive for purposes of
> analysis to recall the nature of the labor-management agreement.  We
> have quoted District Arbitrator Stephen B. Goldberg on the point before,
> and there are other just as apt observations made by other arbitrators in
> the coal industry, but it suites the purpose to quote an excerpt from Mr.
> Goldberg's opinion in *Westmoreland Coal Company, Wining Gulf Division,*
> *and United Mine Workers of America, District 29, Local Union 5770,*
> decided September 11, 1973, once again, wherein he says:

>> '... Such a contract is not a complete catalogue of the
>> specific powers, rights and duties of the parties. ... The
>> collective bargaining agreement is thus more realistically
>> regarded as setting out a series of broad principles to govern
>> the relationship of the parties during the contract term, along
>> with some specific provisions to deal with specific problems.
>> ....'

> Moreover, the collective bargaining agreement is also interpreted
> and applied on the background that, although the philosophy and purpose
> of collective bargaining in the law is to foster the establishing of wages,
> hours, and terms and conditions of employment by mutual agreement of

the parties, it is nevertheless done from a point of departure that except
where limited by law, the Employer has full inherent power and discretion
to operate and manage the business, direct the working force, and hire,
discharge and discipline the employees. Thus, the labor-management
agreement which results from collective bargaining is viewed as a code
agreed between the parties to regulate and limit the discretion of the
Employer in the operation of its business as it is exercised in regard to
wages, hours, terms and conditions of employment. As such, then, the
recognition of the 'residual rights' or 'inherent rights' of management
results in the view that even with respect to those things which are treated
in the agreement, except where specifically governed by the terms, either
expressly or by necessary implication, the discretion of the Employer
remains exclusively with the Employer, limited only by reasonable and
non-arbitrary exercise thereof."

The Elkouris also correctly note at page 493, as follows: "If an arbitrator finds
that alternative interpretations of a clause are possible, one of which would give
meaning and effect to another provision of the contract, while the other would render the
other provision meaningless or ineffective, the inclination will be to use the interpretation
that would give effect to all provisions," citing in support of this conclusion Arbitrator
Updegraf's decision in *John Deere Tractor Co.*, 5 LA 631, 632 (1946) to the effect that:

"It is axiomatic in contract construction that an interpretation which tends
to nullify or render meaningless any part of the contract should be avoided
because of the general presumption that the parties do not carefully write
into a solemnly negotiated agreement words intended to have no effect."

Yet another cogent observation by the Elkouris is made at page 495. There they
observe:

39

"When one interpretation of an ambiguous contract would lead to harsh, absurd or nonsensical results, while an alternative interpretation, equally consistent, would lead to just and reasonable results, the latter interpretation will be used. [Citing _Schalmont Cent. School District_, 87 LA 151, 152 (Babiskin, 1986) among many other reported labor arbitration decisions.]"

First addressed is the Union's argument in its Closing Statement addressing a contention made by the Company at the parties' pre-arbitration third step grievance meeting to the effect that the grievance is defective and improper; that, as the Union paraphrased the Company's position, "Blaine Duty could not file a grievance because he is a member of the Mine Committee." The Union counter-argues that, to the contrary, the grievance is neither defective nor improper. Thus, the Union contends that Duty filed the grievance both on behalf of himself as an employee of the mine, and, as Mine Committeeman, on behalf of "other" employees allegedly adversely affected by the Company's failure to post for bid two (2) repair trainee positions. On this latter point, the Union contends that when Duty indicated in the body of the grievance "Local #12 - et. al.," that is, "Local #12 - and others," Duty grieved on behalf of "other" employees who, as he, were allegedly adversely affected by the Company's allegedly contractually improper failure to post for bid two (2) repair trainee vacancies. In support of its position in this regard, the Union cites: Arbitrator Sue Olinger Shaw's decision for the parties dated March 5, 2001, in Case No. 98-12-00-76, on the need, pursuant to Arbitration Review Board Decision 78-24, to regard Shaw's decision as _res judicata_ of the issue of whether or not the "inclusion on the grievance form made all its [affected] members

40

legitimately grievants ....," more fully discussed hereinabove; and Arbitrator Thomas L. Hewitt's decision of January 4, 1994 in _Freeman United Coal Company -and- UMWA District 12, Local 1969_, Case No. 93-12-94-45, which in turn cites Arbitrator Paul Selby's decision of November 16, 1993 in _Freeman United Coal Mining Company, Crown II -and- UMWA District 12, L.U. 1969_, Case No. 88-12-93-16, also more fully discussed hereinabove. However, directly to the point, neither in its Opening Statement, nor in its Closing Statement, nor at any other time during the course of the arbitration hearing, did the Company contend that the instant grievance was defective and/or improper, and, to the contrary, the Company proceeded to challenge the substantive "merits" of the instant grievance. Hence, in my judgment it must be found, as I do, that the Company has simply abandoned its contention that the grievance is defective and/or improper. And while this finding that the Company has abandoned the aforesaid position is dispositive, I note that in the event the issue of whether or not the grievance is defective and improper were before me for disposition (which it is not), I find persuasive the Union's arguments as to how and why the grievance is _not_ defective and improper. Accordingly, were the issues of the propriety of the grievance before me, I would find that the grievance is _not_ defective and improper; that, to the contrary, the grievance is properly before the undersigned as Arbitrator for disposition of its merit, or lack thereof.

Next addressed is the circumstance that in addition to its reliance on Article XVI, Section (e) of the parties' 2003 BCWA document, the Union also points to, and relies upon Article XVII, Section (i)(1) of said document. Thus, as noted hereinabove, the Union contends that: the language and terms of the 2003 MOU cannot be used to

41

defeat the provisions of the parties BCWA of 2003 document at Article XVII, Section (i)(1) thereof, requiring the posting for bid of all vacancies and new jobs; that Article XVII, Section (i)(1) is clear and should be given precedence. Moreover, asserts the Union, the language of Article XVII, Section (i)(1) has been in the parties' wage agreements for many years and has allowed the senior employees to bid on and be awarded preferred jobs. Concerning this latter point, the Union asserts that for non-new hire employees, repair trainee position vacancies are very desirable. The Union further contends that to allow Management to avoid posting these jobs will have the effect of eliminating the job bidding process of Article XVII, Section (i) and will create a managerial right to never post for bid any vacant jobs. Rather, as vacancies occur, Management will simply assign a new hire to perform the work of a vacancy under the smokescreen of the 2003 MOU's language. It is unclear to the Arbitrator whether this argument by the Union is intended to assert that the Company's failure to post two repairman trainee vacancies is violative of Article XVII, Section (i)(1), as well as Article XVI, Section (e), or whether the Union is just arguing that its contentions with respect to Article XVI, Section (e), which clearly is in issue here, given the remedy the Union seeks, namely, the posting of two (2) repairman trainee positions for bid by non-new hire employees, is bolstered by the purportedly adverse consequences and impact on non new-hire employees bidding rights under Article XVII, Section (i)(1); or whether the Union is seeking to make yet some other point. In any event, to the extent that the Union seeks a ruling to the effect that the Company's failure to post two (2) repairmen trainee positions is violative of Article XVII, Section (i)(1) of the 2003 BCWA document, in my view such a contention raises a scope-of-the-grievance issue. Directly to the

42

point, neither the grievance itself, nor any evidence of what transpired in the pre-arbitration steps of the grievance procedure, reveals that the Company was on notice, prior to the arbitration hearing, that it would have to defend an allegation that its failure to post for bid two (2) repairman trainee positions was violative of the Grievant's and certain "other" bargaining unit employees rights under Article XVII, Section (i)(1). In these circumstances, it is well established in arbitration that the Union is estopped from seeking to establish such a violation for the first time in arbitration because said allegation is simply beyond the scope of the grievance. Moreover, insofar as the record made before me demonstrates, such an allegation is also beyond the scope of the parties' discussions during the pre-arbitration grievance steps, which arguably might have been relied upon to expand the scope of the grievance by mutual agreement. Still further in this regard, as heretofore noted, where two contract clauses in the same document bear on the same subject, such as Article XVI, Section (e) and Article XVII, Section (i)(1) of the parties 2003 BCWA, namely, the subject of non new-hire employees bidding rights, the more specific clause is to be given precedence. _Coca-Cola Foods, supra;_ and _City of Houston, supra._ Here it is clear that Article XVI, Section (e) is the more specific inasmuch as it expressly and specifically addresses repairman trainee positions, the very position the grievance seeks to have posted for bid by non new-hire employees. Accordingly, Article XVI, Section (e) takes precedence. It follows, therefore, that the issue of whether or not the Company's actions of failing to post two (2) repairman trainee positions for bid by non new-hire employees is violative of Article XVII, Section (i)(1) is simply not before the Arbitrator for disposition.

Turning to the substantive merits of the grievance, or the lack thereof, as the

Parties' Positions, hereinabove set forth, amply demonstrate, it is clear that the Union's arguments and contentions are based on and rely on, virtually exclusively, the terms of the parties' 2003 BCWA document executed on January 16, 2003. Equally clear is the fact that the Company's argument and contentions are based on and rely on, virtually exclusively, the terms of the parties 2003 MOU document, also executed on January 16, 2003. But the parties' 2003 BCWA document, and the parties' 2003 MOU document are both, and each, only a segment or component of the parties' Collective Bargaining Agreement. This is made manifest in Article XXIX of the parties' 2003 BCWA, which expressly, clearly, unequivocally, and unambiguously provides that "[t]he 1998 MOU and this Agreement shall become effective on the date ... that this Agreement and the New Employee Memorandum of Understanding, all of which are incorporated herein as if set forth in full, all of which constitute the Collective Bargaining Agreement between the Parties, is ratified and approved by the membership covered hereby, and shall not be subject to termination by either party hereto and shall remain in effect until January 16, 2008, provided, however, that either party ... may terminate the Collective Bargaining Agreement, only on or after 11:59 a.m., January 16, 2008 .... (Emphasis supplied.) It is clear, therefore, that both the 2003 BCWA document and the 2003 MOU document read together constitute the terms and conditions of employment of the bargaining unit; that is, constitute the parties' Collective Bargaining Agreement. Put another way, the two documents are fully integrated. This being so, presumably, all of the terms of both documents were meant to be effective and have meaning. *John Deere Tractor Co.*, 5 LA 631, 632 (Updegraf, 1946). It appears, however, that the Company is challenging that presumption here. Thus, it will be recalled that the

Company points to the last sentence of the first paragraph, page one (1) of the MOU Regarding New Employees 2003 document, which provides that "[i]n the event of a conflict between the terms and conditions of the 2003 Collective Bargaining Agreement or any terms and conditions of employment, and this MOU, this MOU shall prevail." It is clear from the preceding sentence that the reference to "the 2003 Collective Bargaining Agreement" is a reference to the "Freeman United Coal Company and United Mine Workers of America Bituminous Coal Wage Agreement of 2003." In this preceding sentence, the parties have simply shortened the description of said BCWA, and described it as "('the 2003 Collective Bargaining Agreement')." In sum, therefore, the last sentence of the first paragraph of the 2003 MOU in effect reads as follows:

> "In the event of a conflict between the terms and conditions of the [Freeman United Coal Mining Company and United Mine Workers of America Bituminous Coal Wage Agreement of 2003] or any terms and conditions of employment, and this [Freeman United Coal Company and United Mine Workers Memorandum of Understanding Regarding New Employees 2003], shall prevail."

The Company argues that this last sentence of the first paragraph, page (1) of the 2003 MOU "makes it extremely clear that whenever there is a conflict between the terms of the BCWA of 2003 and the MOU ..., the terms of the MOU ... shall prevail." In turn, implicit in this contention is the contention that there indeed is a "conflict" between the terms of XVI Section (e) of the parties' BCWA of 2003, applicable to non-new-hires, and the 2003 MOU, the thrust of which, as the Company contends, is "all about" training relatively inexperienced "new hires," defined as employees having not actively worked

45

in a coal mining job for a coal company for at least 24 consecutive months during the 10 years immediately prior to the date of hire of such by Freeman. Accordingly, goes the Company's argument and contention, it is clear that in the last sentence of the first paragraph on page 1 of the 2003 MOU, the parties expressed their intent that the terms of the 2003 MOU simply "prevail" over any "conflicting" terms of the parties BCWA of 2003, such as, arguably, Article XVI, Section (e) thereof. For the reasons which follow, however, I find this contention to be without merit.

    As noted hereinabove at Article XXIX of the parties' 2003 BCWA document, the 2003 MOU, while a separate document from the parties' 2003 BCWA, is nonetheless an integral and integrated part of the parties' overall "Collective Bargaining Agreement." Thus a plausible inference is that, as the Company contends, any MOU provisions, such as the last sentence of the first paragraph of page 1 of the 2003 MOU, which provides that the MOU "prevails" over any "conflicting" provisions of the 2003 BCWA, could serve to render the allegedly conflicting terms of Article XVI, Section (e) of the parties' 2003 BCWA simply no longer meaningful and effective.

    On the other hand, the 2003 MOU makes clear that it applies only to new hires, and further, that the 2003 MOU does not govern the terms and conditions of employment of non-new-hires. Thus it will be recalled that at paragraph numbered "2.," page 1 of the 2003 MOU, last sentence thereof, it is provided that: "This MOU shall cover all New Hires." And at paragraph numbered "3.," at page 1, the 2003 MOU provides that: "All Employees actively employed as of the Effective Date of the 2003 Collective Bargaining Agreement [i.e., all non-new-hire employees] are not covered by the terms and conditions of this MOU; such employees are covered by and subject to

the Freeman United Coal Mining Company and United Mine Workers of America

Bituminous Coal Wage Agreement of 2003."  (Emphasis supplied.)  In designing the

contractual provisions spelling out the terms and conditions of employment of "New

Hires," the parties, in paragraph number 1., of page 1 of the 2003 MOU document, have

adopted the terms and conditions of employment expressly set forth for non-new-hires

in the parties' 2003 BCWA "unless specifically modified herein," that is, the parties have

relied upon the provisions of the parties' 2003 BCWA for the terms and conditions of

employment of New Hires, except to the extent that the 2003 MOU specifically modifies

certain provisions of the parties' 2003 BCWA.  Further in this regard, the body of the

MOU specifically identifies the Articles and Sections thereof of the parties' 2003 BCWA

which, as the MOU itself puts it, "shall be superceded and modified as follows:..."

Thereafter the particular modification of the parties' 2003 BCWA is set forth in the 2003

MOU.  And it is in the "preamble," as it were, of the 2003 MOU, first paragraph, page 1.,

that the parties provided that, in the event of a "conflict" between the terms of the 2003

Collective Bargaining Agreement (which is a clear reference to what is in the preceding

sentence of the first paragraph is the short description given to the "Freeman United

Coal Mining Company and United Mine Workers of America Bituminous Coal Wage

Agreement of 2003)" and "this MOU, this MOU shall prevail."  In my judgment, the

foregoing observations with respect to the parties' 2003 MOU gives rise to the plausible

inference that the last sentence of the first paragraph of page 1 of the 2003 MOU was

simply intended to be a safety net, as it were, in the event the parties overlooked and

failed inadvertently to specifically identify in the body of the MOU a provision in the

parties' 2003 BCWA which they intended to modify and supercede by the modifying

language of the 2003 MOU.  The fact is that, contrary to the fact that some of the provisions of the parties' 2003 BCWA document clearly apply to New Hires, as paragraph numbered "3." of page 1 of the 2003 MOU makes clear, none of the provisions of the 2003 MOU document apply to the non-new-hires.  This circumstance standing alone is very supportive of the inference that the last sentence of the first paragraph of page 1 of the 2003 MOU was simply intended to be a safety net, and not a vehicle to render allegedly "conflicting" terms of Article XVI, Section (e) of the parties' 2003 BCWA no longer meaningful and effective.

In any event, it is well established in labor arbitration that whenever, as here, two plausible interpretations exist for the same contract language, here the last sentence of the first paragraph of page 1 of the 2003 MOU, it must be found that the language in question is ambiguous.  And this determination that the language is ambiguous warrants resort to taking a look at the parties' past practices in applying said language; and/or the collective bargaining history of said language; and/or the established rules of construction and interpretation of contract language, in order to ascertain what the parties most likely intended by the ambiguous language.  The issue at hand being a case of first impression, by definition no "past practice" with respect to the parties application of said language exists to furnish guidance as to what the parties intended.  And while the record does contain, as noted hereinabove, some testimonial evidence as to what the parties intended, or more accurately, testimony that the parties did not intend that the language of the MOU in question would, as the Company contends, nullify the meaning and effectiveness of Article XVI, Section (e) of the parties' 2003 BCWA, this testimony from Union witnesses, while "thoroughly credited" as to the

48

Union's intentions, as Arbitrator Updegraf put it in _John Deere Co., 2 LA 469, 472-473 (1945)_ cited herein previously, was nevertheless conclusionary in nature and hence not the kind and type of evidence necessary to establish, either directly, or by inference, what the parties more likely than not intended. Rather evidence of precisely what was said by whom at the bargaining table and the opposing party's response, or the parties written proposals and revisions thereto exchanged at the bargaining table is required to establish either directly or by inference what the parties most likely intended. _Kahn's & Co., supra._ That kind of evidence is lacking here.

Turning to the established rules of construction and interpretation, as noted hereinabove, where alternative interpretations are possible, one of which would give meaning and effect to another provision of the contract, while the other interpretation would render the other provision meaningless or ineffective, the finding will be that the interpretation which gives meaning to all provisions was more likely than not to have been intended. _John Deere Tractor Co., 5 LA 631, 632 (Updegraf, 1946)._ Here, the Company-urged interpretation would render meaningless and nullify Article XVI, Section (e) of the parties' 2003 BCWA, and the quasi-judicial gloss thereon of ARB Decision 78-73, and hence should be avoided since, as Arbitrator Updegraf noted, the general presumption is that the parties do _not_ carefully write into a solemnly negotiated agreement language such as Article XVI, Section (e) of the 2003 BCWA document, only to simultaneously intend that such language have no effect. This is especially so here in the UMWA organized sector of the bituminous coal mining industry, where the parties have an established interpretation for the language of Article XVI, Section (e) of the parties' 2003 BCWA in ARB Decision 78-73, and where a long tradition of protecting the

rights of senior employees exists. In these circumstances only the clearest of contract language could serve to establish that, nonetheless, the parties have simultaneously agreed that pursuant to the last sentence in the first paragraph of page 1 of the 2003 MOU, the parties have expressed their clear intent to nullify said Article XVI, Section (e). But, as found above, the aforesaid provision of the 2003 MOU is "ambiguous" and not therefore "the clearest of contract language." In sum, I find it more likely than not that the parties intended the "safety net" interpretation described above and that they did not intend the nullification interpretation urged by the Company. In my judgement, for the reasons set forth hereinafter, both Article XVI Section (e) of the parties' 2003 BCWA document applicable to non-new hires, and the 2003 MOU applicable to new hires, can and do co-exist compatibly.

I turn now to the Company's core contention, and rationale therefore, commencing with the first full paragraph on page twenty-two (22) of this Opinion and Award and culminating at line five (5) on page twenty-six (26) of this Opinion and Award. Add to this contention and rationale the lack of any evidence of record to counter the Company's representation commencing at the bottom of page twenty-six (26) to the effect that "it does not anticipate that the Mine will expand thereby creating a need for additional employees [over and above Kunkler and Ferrari] in the Repairman classification, and in my judgment the Company's core contention is made out. I find that for the reasons advanced by the Company, the 2003 MOU serves to modify the basis of ARB Decision 78-73, such that, as the Company essentially puts it, there are now three (3) ways Crown III Management can fill future Repairman classification vacancies or take care of its maintenance needs - in the words of Arbitrator Phalen: via

50

the regular job bidding procedure contained in Article XVII, Section (i) 1 of the parties' 2003 BCWA; or via the provisions of Article XVI, Section (e) of the parties' 2003 BCWA; or via the procedure outlined in the 2003 MOU, since paragraph 11.(b)(1)(3) and (4) of that MOU now specifically authorizes the Company to assign New Hires such as Messrs. Ferrari and Kunkler to perform the work of the Repairman classification, and while performing such work to be trained to perform all the duties of a Repairman in a safe and efficient manner. This conclusion is fully supported by the overarching teaching of ARB Decision 73-73, namely, that Article XVI, Section (e) is intended to insure that the Company fill vacancies from within the bargaining unit workforce, before hiring off-the-street. And here, both New Hires and non-new-hire employees are within the bargaining unit workforce.

In my judgment, the Company must continue to make a good faith effort to anticipate its repairman classification needs in the future. However, now, as pointed out above, it has more options, instead of just one prior to the 2003 MOU, as to how it meets these future needs. Article XVI, Section (e) in my view very much remains a viable option. Thus, for example, (and I am confident there are many other examples), the record reflects that non-new hire employees are very likely to complete their training in a repairman training vacancy sooner than a New Hire's two years of training under the terms of the 2003 MOU, with the consequence that anticipated needs for Repairmen in less than the two years required to train a New Hire would likely result in the need to post a trainee vacancy for bid by a non-new-hire employee pursuant to the guidelines of ARB Decision 78-73, and as that decision was so ably elaborated upon by Arbitrator Phalen in his decision in *The Pittsburgh & Midway Coal Mining Co., Pleasant Hill Mine -*

*and- UMWA District 23, Local Union 2395, supra.*

To be sure the undersigned's interpretation likely serves to diminish the number of opportunities available for non-new-hire employees to bid on repairman trainee vacancies, as conpared to the number of likely opportunities to do so before the parties agreed to the terms of the 2003 MOU. However, the clear meaning of the terms of the 2003 MOU, an integral part of the parties' overall Collective Bargaining Agreement, as Article XXIX of the parties' 2003 BCWA document makes manifest, must be enforced, "even though the results [of doing so] are...contrary to the ... expectations of one of the parties," here, the Union. Commonwealth of Pennsylvania, Department of Corrections, supra. See also: John Deere Tractor Co., 2 LA 469, 472-473 (Updegraf, 1946), previously cited, and Board of Education of City of New York, supra.

As noted hereinabove, the Company contends that the issue in the case is:

"Did the Employer violate any of the terms of the Bituminous Coal Wage Agreement of [January 16,] 2003 or the January 16, 2003 Memorandum of Understanding Regarding NEW Employees when it did not post two (2) Repairman Trainee (or Maintenance-Trainee) vacancies for bid [by non-new-hire employees]?"

I agree with this statement of the issue. In my judgment, on the factual record made before me, and for the reasons noted above, the issue must be answered in the negative.

There remains for consideration the Union's contention that in any event New Hires Ferrari and Kunkler are not being trained properly and in accordance with the Contract. Once again, however, this contention is clearly beyond the scope of the

instant grievance. There is no mention of such in the grievance itself, and no other

evidence in the case presented to me would warrant the conclusion that, nonetheless,

the parties in the course of discussing the grievance, mutually agreed to expand the

grievance and cover this alleged contractual violation. In these circumstances, as

previously indicated in similar circumstances discussed above, I find I have no

jurisdiction to determine this new issue.


## AWARD:

For the reasons more fully set forth above, the grievance is denied.



Dated: May 5, 2005


_____

Frank A. Keenan
Arbitrator