EXHIBIT FILED
Friday, 19 August 2005  11:09:36 AM
Clerk, U.S. District Court, ILCD

## IN THE MATTER OF ARBITRATION

| | |
|---|---|
| Between | ) |
| | ) Re:  Kenny Violet, et al |
| International Union | ) Case Number:  ARB 02-12-05-07-FMC |
| United Mine Workers of America | ) Grievance Number:  3024 |
| District 12 | ) Issue:  Contract Interpretation, |
| | ) Classification, Vacancy/Job |
| And | ) Posting/Bidding, |
| | ) Training, Past Practice |
| Freeman United Coal Mining | ) Heard:   June 15, 2005 |
| Company | ) Record Closed:  June 23, 2005 |
| Crown II Mine | ) Award Issued:  August 3, 2005 |

## APPEARANCES FOR THE PARTIES

Union:

Gary R. Butler                                                   Advocate
Kenneth Violet                                                  Witness
Greg Mahan                                                      Witness

Employer:

Rodney Hatten                                                   Advocate
Adrian K. Fritzsche                                             Witness

## GRIEVANCE STATEMENT

...

Grievance No. 3024

Name of Grievant(s)  Kenny Violet          Name of Employer Freeman United Coal

UMWA Local Union  1969       District  12    Mine Crown II

...

The Grievance:  Grievant believes Company has not posted Repair Trainee Bid.  Instead Company has put someone as a "Repair Helper" which is not a classification.  This is a supposedly a Temporary Job Title.  Occurred on 11-15-04 Grievant wishes to be made whole.

Signature of Grievant(s)  /s/ Kenneth Violet          Date 11-22-04

...

## APPLICABLE CONTRACT PROVISIONS

Article I—ENABLING CLAUSE

THIS AGREEMENT, effective this 16th day of January, 2003 between Freeman United Coal Mining Company ("Freeman" or "the Employer"), as part of the first part and the International Union, United Mine Workers of America (hereinafter called "Union"), on behalf of each member thereof as part of the second part, covers all of the bituminous coal mines described in Article IA, Section (f), owned or operated by said first party.  This Agreement carries forward and preserves the terms and conditions of all the various District agreements executed between the United Mine Workers of America and the various operators and coal associations subject to the terms and conditions of this Agreement and as amended, modified and supplemented by this Agreement as herein set out.
…

WITNESSETH:  It is agreed that this contract is for the exclusive joint use and benefit of the contracting parties, as defined and set forth in this Agreement.  It is agreed that at operations covered by this Agreement the United Mine Workers of America is recognized herein as the exclusive bargaining agency representing the Employees of the party of the first part.  It is further agreed that as a condition of employment all Employees at operations covered by this Agreement shall be, or become, members of the United Mine Workers of America, to the extent and in the manner permitted by law, except in those exempted classifications of employment as hereinafter provided in this Agreement.  This provision does not change the rules or practices of the industry pertaining to management.  The Mine Workers intend no intrusion upon the rights of management as heretofore practiced and understood.  It is the intent and purpose of the parties hereto that this Agreement will promote and improve industrial and economic relationships in the bituminous coal industry and to set forth herein the basic agreements covering rates of pay, hours of work and conditions of employment to be observed between the parties, and shall cover the employment of persons employed in the bituminous coal mines covered by this Agreement.  Management will not abridge the rights of the Employees as set forth in this Agreement.

*(Emphasis Added)*

Article IA—SCOPE AND COVERAGE

Section (a) Work Jurisdiction

The production of coal, including removal of overburden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway, or rail not owned by Employer), repair and maintenance work normally

performed at the mine site or at a central shop of the Employer and maintenance of gob piles and mine roads, <u>and work of the type customarily related to all of the above shall be performed by classified Employees</u> of the Employer covered by and <u>in accordance with the terms of this Agreement,</u> except during "neutral periods" as defined in Section (j) of this Article.  Contracting, subcontracting, leasing and subleasing and construction work, as defined herein, will be conducted in accordance with the provisions of this article.

Nothing in this section will be construed to diminish the jurisdiction, express or implied, of the United Mine Workers.

…

Section (d) Management of the Mines

<u>The management of the mine, the direction of the working force</u> and the right to hire and discharge <u>are vested exclusively in the Employer.</u>

…

Section (f) Application of This Contract the Employer's Coal Lands

<u>As part of the consideration for this Agreement, the Employers agree that this Agreement covers the operation of all the coal lands, coal producing and coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement,</u> or acquired during its term which may hereafter (during the term of the Agreement) be put into production or use.  This section will immediately apply to any new operations upon the Union's recognition, certification, or otherwise properly obtaining bargaining rights.  Notwithstanding the foregoing, the terms of this Agreement shall be applied without evidence of Union representation of the Employees involved to any relocation of an operation already covered by the terms of this Agreement.

*(Emphasis Added)*

Article II—JOB OPPORTUNITY AND BENEFIT SECURITY (JOBS)

The parties hereto recognize and agree that the production of bituminous coal involves, by its very nature, the depletion of resources at work locations.  The parties agree further that varied mining arrangements and technological advances can adversely impact on job security and that their mutual goals of mining coal safely and efficiently can best be achieved by the use of experienced miners who are knowledgeable of the Employer's standards of operation.

As a result of the special nature of the bituminous coal mining industry and the parties' desire to develop a relationship in which the Employees as well as the Employers gain from a growth in productivity, the parties agree to establish the Job Opportunity and Benefit Security (JOBS) Program.  <u>The JOBS Program is designed</u>

to achieve, to the fullest extent allowed by law, job security for classified employees through extended panel rights and new training opportunities. Nothing in the JOBS Program shall be construed to diminish any rights of the Employees or the Union established in any other provision of this Agreement including, but not limited to, the successorship clause, Article IA(h) and Article XVII.

...

G.    UMWA-Freeman Labor Management Local Circumstances

The parties recognize that market, mining, economic, and competitive conditions in the coal industry vary greatly from one part of the country to the other and even from mine to mine and over the life of individual mines or facilities. As a result and since the Parties' desire to develop a relationship in which the Employer and the Employees retain the ability to provide and retain work, and to enhance job security, the parties agree that modifications to the 2003 UMWA/Freeman Coal Wage Agreement (The Agreement), may be reasonable and necessary during the term of the Agreement. Furthermore, the Union and the Employer recognize that modifications may be necessary in areas where other employers maintain either higher or lower labor standards for their employees. Therefore, either the Union or the Employer may request modification of the Agreement or development of a new labor agreement as applicable to a specific operation. Any such modifications or a new agreement shall be applied to that operation, only if both the applicable Local Union and the Employer consent to the modifications or new agreement.

...

*(Emphasis Added)*


Article V—HELPERS ON FACE EQUIPMENT IN UNDERGROUND MINES

Section (a) Assignment of Helpers

(1)    Full-time Helpers to Assist Continuous Mining Machine Operators and Roof Bolting Machine Operators.

A full-time helper shall be assigned to assist each continuous mining machine operator on each continuous mining section, and a full-time helper shall be assigned to assist each roof bolting machine operator on each continuous mining section and each conventional mining section, except as provided below.

...

Section (b) Duties and Responsibilities of Helpers

(1)    Helper-Trainee. An Employee who successfully bids for a helper position shall be a helper-trainee for a maximum period of 120 days after he is awarded a helper's job. If after 30 days, it is determined that the Employee cannot successfully complete his period of training for the machine operator's job, he shall

be returned to his former job and the helper job reposted and filled in the same manner.  During the 120-day period, <u>the helper-trainee shall be trained to operate the machine to which he is assigned and shall learn to perform the duties which are essential to the safe and efficient operation of the machine.</u>  And, in addition, <u>he shall perform the jobs normally associated with the operation of the machine</u> as directed by Management.  <u>The helper-trainee shall be taught his duties by the machine operator and will be paid at wage grade four (4).</u>

   (2) Fully-Trained Helper:  A fully-trained helper is an Employee who has successfully completed the maximum one hundred-twenty (120) day training period.  <u>The fully-trained helper shall then receive the machine operator rate</u> and shall continue to perform his helper duties and shall relieve and spell the machine operator in the operation of the machine.  And, in addition, <u>he shall perform the jobs normally associated with the operation of the machine as directed by management until such time as a permanent vacancy arises on the machine at which time he shall be promoted to the machine operator's job except as provided in Article XVII, Section (i) (11) (Seniority).</u>  At that time a new helper job will be posted and filled under the job bidding procedures.
…

<em>(Emphasis Added)</em>

Article XVI—TRAINING

Section (a) Priority

   The parties agree that the establishment of effective training programs for Employees is essential to safe and efficient production of coal…

Section (e) Maintenance Training and Rate of Pay

   <u>Freeman shall establish and maintain for each mine a program for training Employees (who were actively working for the Company of the Effective Date of this Agreement) in maintenance jobs.</u>  Training vacancies may be posted as Maintenance-Trainee or Electrician-Trainee according to the custom in the mine, <u>but in any event the training program shall include training in mechanical, welding and electrical skills.  Management shall select such Employees for training on the basis of seniority and trainability as defined in Section (g) [sic (b)] of this Article.  The method of training shall be accomplished in consideration of local variations from mine to mine but should in general employ techniques such as progressive job tasks, on-the-job training and classroom training.  Each program shall also include a definitive progression of wages and a time schedule which shall be applied on the basis of satisfactory performance.</u>

   <u>Vacancies for trainees shall be posted in accordance with actual anticipated needs for developing maintenance skills.  Where such skills are presently available</u>

<u>within the classified work force, vacancies shall be posted for the job, as the case may be, and not for a trainee.</u>

When an underground Employee (who is actively working for the Company on the Effective Date of this Agreement) <u>is awarded a maintenance trainee job,</u> the starting rate of a trainee shall be at <u>Wage Grade 2.</u>  The trainee <u>shall progress to Wage Grade 4</u> in a maximum <u>of six (6) months</u> if he meets the job standards for the maintenance job.  The trainee shall remain at this rate <u>for a maximum of twelve (12) months</u> at which time <u>he progresses to Wage Grade 5</u> if his progress is such as to meet the standards for the highest rated maintenance job.  When a maintenance trainee job is awarded for an outside or surface job (covered by Appendix A, Part II and Part III), the applicable progression shall be Wage Grades 2, 3, and 4.

<u>For each individual who is actively employed on the Effective Date of this Agreement only,</u> if such individual becomes a trainee and makes more rapid progress by meeting the standards of the program and fully qualifies for the maintenance job before the end of the maximum training period, that fact shall be recognized and if the Employee is assigned to and does perform the highest rated maintenance job and the work associated therewith, <u>he shall be so classified and paid at such highest rate.</u>

...

Section (g) Skills Enhancement Program

<u>Freeman has the option to establish on a mine-to-mine basis,</u> a program to enhance the skills of its Employees to reduce, where appropriate, the number of job classifications, job grades and job titles set forth in Appendices A and B. Furthermore, Employees could be assigned to work within any job classification or title developed as part of the program.

Any Skills Enhancement Program must be ratified by a majority vote of those Employees covered by the program before it becomes effective.  The International Union and Freeman each pledge to cooperate in good faith to support the implementation of these programs which improve skill levels and allow Freeman to fully utilize all of the skills of its Employees.

*(Emphasis Added)*

Article XVII—SENIORITY

Section (a) Definition of Seniority

Seniority at the mine shall be recognized on the following basis:  length of service and the ability to step into and perform the work of the classification at the time the classification is awarded.

In awarding bids on classification postings, the parties agree that management will not show favoritism or discrimination.  To help senior Employees achieve promotion, they shall be given preference to the extent practicable in the filling of temporary vacancies as set out in Section (c) of Article XIX (Classification). ...

Section (i) Bidding

Filling of all permanent vacancies and new classifications created during the term of this Agreement will be made on the basis of mine seniority as set forth in the following procedure:

(1)     The classification or vacancy shall be posted by management in a conspicuous place at all portals of the mine for a period of five (5) calendar days, but no less than three (3) production days, and will be properly identified as to portal (underground mines), classification, wage rate, at non-rotating mines as to shift, and the most recent measurement of respirable dust in the work place (underground mines).  If the new classification or vacancy does not yet exist, the estimated date when the classification or vacancy will exist will also be posted. ...

Section (j) Training for Vacancy Not Filled by Bidding

Subject to the provisions of Article XVI (Training), a permanent vacancy and new classification which remains unfilled after having been posted in accordance with the provisions of Section (i) of this Article may be filled by hiring a new applicant who has the ability to perform the work.  If no such applicant is available, and the vacancy is to be filled, a training opportunity for such vacancy shall be posted for a period of seven calendar days, but no less than five (5) production days, and will be identified as a training opportunity for the specific classification involved.  The Employee who is to be trained shall be selected from the applicants in accordance with the provisions of Article XVI, Section (g) (Training).

The successful applicant shall be offered such on-the-job training or other more formal training opportunities and instruction as determined by management, taking into consideration the complexity, skill and knowledge required for successful performance of the specific classification in question. ...

Section (o) Potential Job at Crown III

Notwithstanding anything to the contrary in this Agreement, the Parties hereto agree that the terms and conditions applicable to permanent vacancies and new jobs at the Employer's Crown III operations shall be as follows:

(1)     Once a permanent vacancy or new job at the Crown III Mine has been posted under Article XVII of this Agreement and such vacancy or job is not filled by either an active Employee at Crown III or by a member of the Crown III mine panel (mother panel), then prior to any other action, the Employer may post such vacant or new job for bid by active Employees at the Employer's Crown II Mine and it shall be awarded to the successful bidder under the provisions of Article XVII of this Agreement.  Notwithstanding anything in regard to the foregoing provision or its implementation no Common Seniority Unit and no Common Bargaining Unit shall exist between the Crown II Mine and the Crown III Mine.

*(Emphasis Added)*

## Article XIX—CLASSIFICATION

Section (a) Working in Classification

An Employee <u>shall normally be assigned to</u> duties customarily involved with his regular classification in accordance with the following principles.
...

Section (e) Classifications at Underground Mines

In addition to the classification contained in Appendix B- Part 1 of this Agreement, underground at bituminous coal mining operations covered by this Agreement <u>there shall be four classifications.  These four classifications shall be designated as Inby (work performed inby the coal haulage belt tailpiece) and Outby (work performed outby the coal haulage belt tailpiece), Mine Examiner and Repairman.  These classifications shall contain the job titles as set forth in Section (g) *[sic (f)]* below.</u>

1.      Pay and Skills Improvement for Inby Employees

Unless an Employee changes jobs in accordance with Article XVII of this Agreement, notwithstanding any other provision of this Agreement, all Employees who were last classified on a face equipment job Inby during September 1998 shall maintain their job, at the same pay Grade held by such Employee during September 1998 until such Employee demonstrates his qualifications under this paragraph 1. Within sixty (60) days after the Effective Date of this Agreement the Employer shall offer the Grade 5 Inby Classification to each of those Employees currently working Inby who agree to have their skills level recognized and improved through training if necessary.  Each Employee shall demonstrate as required by management that he is qualified to operate at least three (3) pieces of face equipment one of which must be a roof bolting machine or a continuous mining machine, upon successful demonstration such Employee shall be classified Inby Grade 5.  Notwithstanding any

other provision of this Agreement, at any time during the term of the Agreement, when a vacancy occurs Inby and it is posted for bid it shall be posted and awarded as Inby Classification Grade 5. In order to be awarded such Inby Classification, an Employee must be able to operate at least three (3) pieces of face equipment one of which must be a roof bolting machine or a continuous mining machine. Any Employee who satisfactorily demonstrates his qualifications hereunder and is therefore classified under Section (g) *[sic (f)]* as Inby Operations Grade 5 is thereupon covered by Article XIX Section (c) paragraph 2 *(sic).*

2.    Pay and Skills Improvement for Outby Employees

Unless an Employee changes jobs in accordance with Article XVII of this Agreement, notwithstanding any other provisions of this Agreement all Employees who were last classified on a job Outby during September 1998 shall maintain their job, at the same pay Grade held by such Employee during September 1998 until such Employee demonstrates his qualifications under this paragraph 2. Within sixty (60) days after the Effective Date of this Agreement the Employer shall offer the Grade 3 Outby Classification to each of those Employees currently working Outby who agree to have their skills level recognized and improved through training if necessary. Each Employee shall demonstrate as required by management that he is qualified to perform at least three (3) Outby jobs upon successful demonstration such Employee shall be Classified Outby Grade 3. Notwithstanding any other provision of this Agreement, at any time during the term of the Agreement, when a new job or permanent vacancy Outby is posted for bid it shall be posted in the Outby Classification. In order to be award such Outby Classification an Employee must be able to perform three (3) Outby jobs. Any Employee who satisfactorily demonstrates his qualifications hereunder and is, therefore, classified under Section (g) *[sic (f)]* as Outby Operations Grade 3, is thereupon covered by Article XIX Section (c) paragraph 2 *(sic).*

3.    Surface Jobs at Underground Mines

Surface jobs at the Employer's underground bituminous coal mining facility shall continue to be classified as appropriate, by the Employer in accordance with Appendix B – Part III of this Agreement.

Section (f) Mine Examiner, Inby Classification, Outby Classification, and Repairman

| Grade | Job Classification |
|---|---|
| 5 | Mine Examiner |
| 5 | Inby Operations:  (As defined in Section (e) above) |

| Grade | Job Classification |
|---|---|
| 3 | Outby Operations:  (As defined in Section (e) above) |

| Grade | Job Classification |
|-------|--------------------|
| 5 | Repairman |
| 3 | Repairman Apprentice |
| 2 | Maintenance Trainee |

Section (g) Employees Hired After January 16, 2003

After the Effective Date of this Agreement, each individual who is a New Hire, as so defined in the New Employee MOU shall be paid for classified work performed as set forth in the New Employee MOU. Notwithstanding anything in this Agreement to the contrary, each Employee who is actively employed on the Effective Date of this Agreement shall not be subject to the New Employee MOU.

*(Emphasis Added)*

## Article XXIII—SETTLEMENT OF DISPUTES

...

Section (c) Grievance Procedure
...

In cases in which the parties have agreed that there is no question of fact involved in the grievance, the arbitrator may decide the case upon the basis of a joint statement of the parties and such exhibits as they shall submit. The hearing shall be recorded by the arbitrator and shall be closed upon the completion of testimony. The arbitrator shall render his decision as soon after the close of the hearing as may be feasible. To avoid delays in the issuance of decisions, post hearing briefs will not be permitted except in cases where the arbitrator determines that such briefs are necessary for a full understanding of the matter before him. If the arbitrator is unable to make his decision within 30 days of the close of the hearing, he shall promptly advise the parties of the reasons for the delay and the date when his decision will be submitted. The arbitrator's decision shall be final and shall govern only the dispute before him. Expenses and fees incident to the service of an arbitrator shall be paid equally by the Employer affected and by the UMWA district affected.
...

*(Emphasis Added)*

## Article XXVI—DISTRICT AGREEMENTS

...

Section (b) Prior Practice and Custom

This Agreement supersedes all existing and previous contracts except as incorporated and carried forward herein by reference; and all local agreements,

<u>rules, regulations and customs heretofore established in conflict with this Agreement</u> <u>are hereby abolished.</u>  Except where abolished by mutual agreement of the parties, including the provisions of Article II G (10) of this Agreement, <u>all prior practice and</u> <u>custom not in conflict with this Agreement shall be continued,</u>...<u>Whenever a conflict</u> <u>arises between this Agreement and any District or local agreement, this Agreement</u> <u>shall prevail.</u>

...

*(Emphasis Added)*


### Article XXIX—RATIFICATION AND TERMINATION OF THIS AGREEMENT

<u>The Memorandum of Understanding and all attachments thereto between the</u> <u>International Union, United Mine Workers of America and Freeman United Coal</u> <u>Mining Company dated December 14, 1998 (the 1998 MOU) and this Agreement</u> <u>shall become effective on the date (the Effective Date) that this Agreement and the</u> <u>New Employee Memorandum of Understanding, all of which are incorporated herein</u> <u>as if set forth in full, all of which constitute the Collective Bargaining Agreement</u> <u>between the Parties,</u> is ratified and approved by the membership covered hereby, and shall not be subject to termination by either party signatory hereto and shall remain in effect until January 16, 2008, provided, however, that either the party of the first part or the party of the second part may terminate the Collective Bargaining Agreement, only on or after 11:59 p.m. January 16, 2008 by giving at least sixty (60) days prior written notice to the other party of such desired termination date.

...

IN WITNESS WHEREOF, each party signatory hereto has caused this Agreement and the MOU to be signed this 16th day of January, 2003 to become effective only upon the condition that they are ratified and approved by the membership covered hereby.

...

*(Emphasis Added)*


### Memorandum of Understanding
### Regarding NEW Employees

This Memorandum of Understanding Regarding New Employees ("New Employee MOU" or "this MOU") is entered into by and among the International Union, United Mine Workers of America, hereinafter referred to as the "UMWA" or "Union"; and Freeman United Coal Mining Company, hereinafter referred to as "Freeman" or the "Employer," both of which are sometimes jointly referred to as the "Parties."  The Parties have simultaneously herewith entered into the Freeman United Coal Mining Company and United Mine Workers of America Bituminous Coal Wage Agreement of 2003 ("the 2003 Collective Bargaining Agreement") that, in regard to individual hired after the Effective Date of this MOU, shall be modified and

superceded *(sic)* by the provisions of this MOU.  <u>In the event of a conflict between the terms and conditions of the 2003 Collective Bargaining Agreement or any terms and conditions of employment, and this MOU, this MOU shall prevail.</u>

WHEREAS, the Parties recognize that the Employer operates its mines and facilities with its employees in the high sulfur Illinois Basin ("Basin").  The market conditions and opportunities in the Basin present the Parties with unique and difficult challenges;

THEREFORE, <u>in consideration of the difficult market conditions confronting the parties and the desire of the parties that Freeman hire New employees to work at its mines and facilities covered by a collective bargaining agreement with the UMWA it is mutually agreed as follows:</u>

1.    This New Employee MOU constitutes the terms and conditions of employment, as set forth herein, for all New Hires as that term is defined in this MOU.  <u>Unless specifically modified herein, the terms of the 2003 Collective Bargaining Agreement shall apply to the employees covered by this MOU.</u>  The terms of this MOU are mutually agreed upon by the Parties as set forth below.

2.    The term "New Hire" shall mean an individual who:  a) is hired by the Employer on or after the Effective Date of the 2003 Collective Bargaining Agreement; and b) has not actively worked in a coal mining job for a coal company for at least twenty-four (24) consecutive months during the ten (10) years immediately prior to the date of hire of such New Hire by Freeman.  Throughout this MOU, where appropriate, New Hire(s) will also be referred to as "employee" and "employees."  <u>This MOU shall cover all New Hires.</u>

*3.*    <u>All Employees actively employed as of the Effective Date of the 2003 Collective Bargaining Agreement are not covered by the terms and conditions of this MOU;</u> such Employees are covered by and subject to the Freeman United Coal Mining Company and United Mine Workers of America Bituminous Coal Wage Agreement of 2003.

…

6.    Article X

Article X of the 2003 Collective Bargaining Agreement shall be superceded *(sic)* and modified as follows:

Each New Hire/employee covered by this MOU and the 2003 Collective Bargaining Agreement who is a classified Apprentice or has completed his twelve (12) month period of work as an Apprentice <u>shall receive a wage increase in accordance with the schedule below:</u>

| Effective Date | Wage Increase |
|---|---|
| January 16, 2004 | $0.40 per hour |
| January 16, 2005 | $0.40 per hour |
| January 16, 2006 | $0.30 per hour |

The above wage increases are already included in the standard hourly and daily wage rate set forth in Appendix A and AA. There shall be no duplication of the annual wage increase for any employee.

...

9.    Article XVI

Article XVI Section (e) and (f) of the 2003 Collective Bargaining Agreement shall be superceded (sic) and modified as follows:

A.    Section (e) Maintenance Training and Rate of Pay

When any underground employee is awarded a Repairman trainee classification, the starting rate of a trainee shall be at Wage Grade 2. The trainee shall progress to Repairman Apprentice Wage Grade 3 in a maximum of twelve (12) months if he meets the classification standards for the maintenance classification. The Repairman Apprentice shall remain in Wage Grade 3 for a maximum of twelve (12) months at which time he progresses to Wage Grade 5 if his progress is such as to meet the standards for the highest rated maintenance job. When a maintenance trainee classification is awarded for an outside or surface classification (covered by Appendix AA, or Appendix B), the applicable progression is described above in this paragraph shall be Wage Grades 1 and 2.

Notwithstanding any other provision of the 2003 Collective Bargaining Agreement or this MOU, a New Hire shall not be eligible to bid on a Maintenance-Trainee or Electrical-Trainee job or vacancy until such New Hire has completed his twelve (12) month period of work as an Apprentice.

B.    Section (h) New Inexperienced Employees

Subsequent to receipt of the required safety and job training, each new employee in an underground and/or surface mine hired after the date of the 2003 Collective Bargaining Agreement shall be permitted to operate as appropriate, as designated by management, any mining machines at the face,

or work on or operate any transportation equipment or mobile equipment. During the ninety (90) calendar day period from his first date of active work ("the probationary period") the new employee shall be classified as a Probationary Trainee in order to permit him to gain maximum familiarity with the work of the mine as a whole, but to minimize exposure to hazards until more extensive experience in mining is achieved. At the end of the ninety (90) day working day period, he shall be assigned by the Employer to be a classified New Hire as set forth in Article XIX Section (b). Nothing in this section shall authorize any practice more permissive than that established by any applicable law. Probationary Trainees shall be subject to the provisions of Article XIX Section (b) Paragraphs 1 and 2 as set forth below.

10.  Article XVII

Article XVII of the 2003 Collective Bargaining Agreement shall be superceded *(sic)* and modified as followed:

Within Article XVII Sections (b)(1) and (2)(a); (c); (d) the first paragraph and subparagraphs 1 and 2; (e); (f); (g); (h) provided that a New Hire may only list on a panel form the classifications of Trainee or Apprentice as appropriate; (k); (l) and (m) shall apply to all New Hires immediately upon hire; all remaining sections of Article XVII shall apply to New Hires when each such new Hire completes his twelve (12) month period as an Apprentice.

11.  Article XIX

Article XIX of the 2003 Collective Bargaining Agreement shall be superceded *(sic)* and modified as follows:

Sections (a); (b); (d); (e) and (f) shall apply to a New Hire when each such New Hire completes his twelve (12 month period of work as an Apprentice. All remaining sections of Article XIX shall apply to New Hires immediately.

Section (b) Classification Requirement That Shall Apply to All New Hires -- Probationary Trainee, New Hire and Apprentice

(1)  The initial ninety (90) day period of active work by each new employee shall be that employee's Probationary Period; and such employee shall be designated as a Probationary Trainee. Each Probationary Trainee may be assigned to perform the work of any classification on any shift.

(2)    In the event that the Probationary Trainee, in Management's sole discretion, does not perform his assigned tasks safely, productively and efficiently, and/or is absent from work or commits a dischargable *(sic)* offense such employee <u>may be discharged without any recourse under the 2003 Collective Bargaining Agreement.</u>

(3)    Subsequent to ninety (90) days of his active work each Probationary Trainee—unless prohibited by law—shall be classified as a New Hire for the next nine (9) calendar months that he actively performs work.  <u>Each New Hire may be assigned to perform the work of any classification on any shift.</u>

(4)    Subsequent to the first twelve (12) months that a New Hire actively performs work for the Employer (which twelve (12) months shall include their Probationary Period), then such New Hire shall be classified as an Apprentice and shall remain in such Apprentice Classification for the subsequent twelve (12) months that he actively performs work as an Apprentice.  <u>Each Apprentice may be assigned to perform the work of any classification on any shift.  Subsequent to completion of active work for twelve (12) months as an Apprentice, each employee may bid on another classification as provided for in Article XVII of the 2003 Collective Bargaining Agreement.</u>

12.    Article XIX

Article XIX of the 2003 Collective Bargaining Agreement shall be superceded *(sic)* and modified by adding a new Section (g) as follows:

Section (g) Employees Hired After January 16, 2003

After the Effective Date of the 2003 Collective Bargaining Agreement, each individual who is a New Hire, as so defined in paragraph No. 2 of this MOU <u>shall be paid for classified work performed only as established and set forth in this MOU.</u>

...

13.    Article XXI

Article XXI Section (e) of the 2003 Collective Bargaining Agreement shall be superceded *(sic)* and modified as follows:

(1)    <u>During his first 45 working days a new inexperienced employee shall be given adequate instruction by his Employer on the work</u>

practices and mining conditions in the mine in which he is working. At surface mines, the initial ninety (90) day period of active work by each New Hire/employee shall be the employee's Probationary Period; and such employee shall be designated as a Probationary Trainee. Each Probationary Trainee may be assigned to perform the work of any classification on any shift.

...

This Memorandum of Understanding contains all the agreements of the Parties and the same may be amended or altered only by agreement in writing, signed by the Parties.

IN WITNESS WHEREOF, the Parties hereto have caused this Memorandum of Understanding to be signed, this 16th day of January, 2003 to become effective upon the date that the 2003 Collective Bargaining Agreement (including this MOU) is ratified and approved ("Effective Date") by the membership employed by Freeman on the Effective Date.

...

*(Emphasis Added)*

## BACKGROUND

The Employer in this matter is the Freeman United Coal Mining Company.

The Company operates two mines pursuant to the Bituminous Coal Wage

Agreement of 2003 and the Memorandum of Understanding Regarding New

Employees 2003, which together constitute the Agreement, entered into on January

16, 2003, with the International Union, United Mine Workers of America. The

Company's mines are: The Crown II Mine, located outside of Virden, Illinois, and the

Crown III Mine, located outside of Farmersville, Illinois. Both mines are located

within the UMWA District 12. The bargaining unit employees working at the Crown II

Mine are represented by Local Union 1969, and those working at the Crown III Mine

are represented by Local Union 12; so that the terms and conditions of employment

of the bargaining unit employees working at both mines are governed by the singular

Collective Bargaining Agreement.

The grievant in this matter, Kenneth (Kenny) Violet, is a Belt Repairman, who has been employed by the Company at the Crown II Mine since November, 1978.

During November, 2004, there were three (3) vacant Repairman positions at the Crown II Mine. These positions remained vacant when qualified employees failed to bid and they were filled by then "New Employees". The actions of the Company in filling the vacant Repairman positions by assigning "New Employees" to perform the Repairman job duties, rather than posting the positions for bid as a Repairman Apprentice job gave rise to the matter before me now.

## ISSUE

Did the Employer violate the grievant's rights vested through Article XVI, Section (e); Article XVII, Sections (i) and (j); Article XIX, Sections (e), (f) and (g); Article XXVI, Section (b) when it failed to post the Repairman Apprentice positions; and, if so, what should the remedy be?

## ARGUMENTS OF THE PARTIES

Union:

1.  The dispute between the parties concerns the Employer's refusal to post for bid three Repairman Trainee vacancies that currently exist at the Crown II Mine within the underground Repairman classification.

2.  The three Repairman Trainee vacancies exist as a result of the failure of the Employer to fill three Repairman vacancies through the bid procedure. These vacancies existed because of increased production demands.

3.  Rather than post the Repairman Trainee vacancies for bid, the Employer assigned New Hires to perform the work of the Repairman Classification and/or the Repairman Trainee Classification. The action of not posting these Repairman Trainee jobs, the assignment of New Hires to the vacancies, and the failure of the Employer to provide the

Page 17 of 66 pages.

required maintenance training to the successful bidders is the scope of the grievance 3024.

4. The Employer argues that the language of the <u>Bituminous Coal Wage Agreement 2003</u> and the <u>Memorandum of Understanding Regarding New Employees 2003</u> grants the Company the right to assign New Hires, those with less than two years employment in the coal industry in the last ten years, to perform the work of any classification on any shift, and the Union agrees. However, the new language contained within the MOU does not grant the Company the right to avoid the provisions of Article XVI Section (e) Maintenance Training and Rate of Pay or Article XVII Section (i) Bidding.

5. Article XVI (e) requires that a maintenance training program be established at each mine—Freeman Crown II Mine has such a program, since 1976. Section (e) further requires that maintenance trainee vacancies shall be posted in accordance with actual anticipated needs.

6. Article XVII Section (i) requires the posting of all permanent vacancies and new jobs. Arbitration Review Board Decision 78-26, which is precedent setting through Article XXIII section (k) further supports this requirement.

7. The new employee MOU, which accompanied the Master Wage Agreement, provides a different, reduced wage rate for New Hires who bid into a Maintenance trainee job.

8. The past practice, well established since 1976, provides that when qualified bidders were not available to bid on vacant Repairman jobs, such jobs were then posted for bid as Maintenance or Repairman Trainees.

9. The successful bidders then entered the established <u>Maintenance Training Repairman Training Program</u> and were trained in electrical, mechanical, and hydraulic skills. To date, over one hundred-forty employees have completed this program.

10. The Union has maintained throughout the processing of this grievance that Article XVI (e) requires that Repairman Trainee jobs be posted in accordance with actual anticipated manpower needs; and Article XVII Section (i) with ARB 78-26 and Article XXIII section (k) further support this mandate.

11. The record establishes that the Company has the required training programs in place, as referenced in 8 and 9 above.

12.  Management is telling you that any job vacancy can be given to a New Hire employee and not even posted for bid. They will simply assign it to a New Hire. This would, if upheld, render the job bidding requirements of Article XVII section (i) meaningless. Such a position, if upheld, would lead to a harsh, absurd or nonsensical result.

13.  Although a similar issue was arbitrated at the Crown III Mine before Arbitrator Keenan, in a previous award on a dissimilar matter, Arbitrator Sass held that consistency between the Employer's two mines was not a sufficient reason to follow a previous award on an analogous matter. Therefore, the Keenan award is not precedent setting in the instant matter.

14.  Additionally, the first situation before Arbitrator Keenan was different. At Crown III, the record established there was no evidence of expansion, Award at page 50; but the testimony in this matter establishes expansion in production through 2006.

15.  ARB 78-26 held that there are other ways to determine the existence of a vacancy other than the outright pronouncement of the Employer. The history of this matter establishes that three Repairman vacancies or Repairman Trainee vacancies did and do exist.

16.  The Union further cites the following in support of its position:

   a)  Arbitrator Selby (88-12-91-1468)
   b)  Arbitrator Hewitt (88-12-92-1527)
   c)  ARB 78-73
   d)  Arbitrator Feldman (30-78-03), 1978
   e)  Arbitrator Wren (82-17-KD-165)
   f)  Arbitrator Seidman (84-17-87-757)
   g)  Arbitrator Parkinson (88-17-89-651)
   h)  Arbitrator Boals (88-17-90-964)
   i)  Arbitrator Tranen (88-17-92-1275)


CONCLUSION

The Union asks that the Employer be ordered to post for bid three Maintenance Trainee/Repairman Trainee jobs on the "A" shift; and order the Employer to implement the maintenance training programs as required by Article XVI (e) and to allow the successful bidder(s) to be properly trained.[1]

---

[1] Edited and summarized from the Union's extensive arguments.

<u>Management</u>:

1.    The issue is "did the Employer violate any of the terms of the <u>Bituminous Coal Wage Agreement of 2003</u> or the January 16, 2003, <u>Memorandum of Understanding Regarding New Employees</u> when it did not post a Repairman-Trainee (or Maintenance-Trainee) vacancy for bid by non-new-hire employees.

2.    The parties' Collective Bargaining Agreement is composed of the <u>Bituminous Coal Wage Agreement of 2003 (BCWA)</u> and the <u>Memorandum of Understanding Regarding New Employees 2003 (MOU)</u>.  The terms and conditions contained in the MOU are new and unique to any other agreement in the industry.

3.    The MOU provides that, if there is a conflict between it and the BCWA, the provisions of the MOU shall prevail.

4.    In a previous award under this agreement at the Crown III Mine, Arbitrator Keenan held that the Employer had the right to assign New Hire employees, commonly referred to as trainees, to perform the work of any classification on any shift, including the work of the Repairman Classification.

5.    The Company has had a Maintenance Training Program as provided in Article XVI, Section (e), of the <u>BCWA of 2003</u> for many years, but the Company has not posted any Maintenance-Trainee jobs for bid since before September 14, 1981.  When an Employee is awarded a Maintenance-Trainee job in accord with the program, he/she was a trainee for up to eighteen months before progressing to a Repairman Classification at Wage Grade 5.

6.    The Union contends that Article XVII, Section (i) and Article XVI, Section (e) of the <u>BCWA of 2003</u> require that the Repairman-Trainee or Maintenance-Trainee jobs be posted for bidding since that is the only way the Company is permitted to develop maintenance skills in order to fill anticipated vacancies in the Repairman Classification.  The Company contends that posting Repairman-Trainee jobs for bidding is not the sole contractually provided for method for the Employer to utilize to develop maintenance skills in order to fill future Repairman Classification vacancies or to take care of any other future maintenance needs.  That is so because 11.  Article XIX, Section (b), paragraphs (1), (3), and (4) of the <u>MOU Regarding New Employees</u> specifically authorizes the Employer to assign New Hires to perform the work of the Repairman Classification, while they are assigned to the New Hire Classification.

7. The Company submits that the words "any classification" is all encompassing, and includes Repairman, and Repairman Apprentice, and Repairman Trainee, as specified in Article XIX, Sections (e) and (f) of the BCWA of 2003 and Appendix B—Part I of the MOU Regarding New Employees.

8. The Company contends that it is not required to post "Repair Trainee" jobs for bidding if it can develop sufficient maintenance skills in order to fill future anticipated Repairman Classification vacancies by assigning New Hires to perform the work of the Repairman Classification, and while performing such work, to train them to perform all the duties of a Repairman in a safe and efficient manner.

9. Facts that Matter:

a) Employees that are classified as New Hires have very little, if any underground coal mining experience. As a result, for the first two (2) years of their employment, they are in training in order to learn how to perform the work of one (1) or more of the classifications which exist at the Crown II Mine (in order that the Employer can "…assign him an appropriate classification…" at the end of their first two (2) years of employment as provided for in the Letter Agreement which became effective on January 8, 2003)

b) The negotiated and agreed upon terms of 11. Article XIX, Section (b), paragraphs (1), (3), and (4) of the MOU Regarding NEW Employees provide that "(E)ach Probationary Trainee", and/or "(E)ach New Hire", and/or "(E)ach Apprentice" (collectively referred to as "New Hires" per 2. on page 1 of the NEW Employee MOU) "…may be assigned (by the Employer) to perform the work of any classification on any shift…" for the first two (2) years of his employment.

c) Article XIX, Section (f) of the BCWA of 2003 and Appendix B – Part I of the 2003 MOU Regarding NEW Employees provide that the classification of Repairman is one of the classifications which exist at the Crown II Mine (as are Repairman Trainee and Repairman Apprentice if and when the Employer elects to post and fill any Maintenance – Trainee classifications).

d) Since April 5, 2004 Crown II Mine Management has been assigning one (1) or more classified New Hires to perform the work of the Repairman classification on a regular every-day basis, on an open and well-known basis – an act which the Union had authorized the Employer to do in negotiations for

what became the 2003 NEW Employee MOU — without any restrictions or qualifications.

e)    At the time the instant grievance was filed, New Hire Larry Sinks was being assigned to perform the work of the Repairman classification, on the Midnight or "A" Shift, as provided for in 11. Article XIX, Section (b), paragraphs (1), (3), and (4) of the 2003 MOU Regarding NEW Employees.

f)    Since 11. Article XIX, Section (b), paragraphs (1), (3), and (4) of the 2003 MOU Regarding NEW Employees specifically authorizes the Employer to assign New Hires to work with employees in the Repairman classification and/or "…to perform the work of …" the Repairman classification (or any other classification), Crown II Management anticipates that it will be able to fill all of its future Repairman job vacancies with qualified (non-New Hire) bidders from the Crown II work force, or with then qualified New Hirers as was the case with Mr. Riggs effective June 2, 2005 (as provided for in the Letter Agreement which became effective on January 8, 2003) and such will also undoubtly *(sic)* be the case with Mr. Sinks and other New Hires when they complete their second year of employment [or upon completion of their twelve (12) month period as an Apprentice].

g)    Since the Employer anticipates it will be able to fill all of its Repairman job vacancy needs in the future as described in 6. above, it does not anticipate the need to develop maintenance skills via a maintenance training program in the manner provided for and described in Article XVI, Section (e) of the BCWA of 2003, and therefore Management submits it is not required to post a "Repair Trainee Bid" as requested by Mr. Violet via the instant grievance.

h)    The Employer did not violate any of the terms of the BCWA of 2003 or the 2003 MOU Regarding NEW Hires in the matter before you here today Mr. Arbitrator.

10.    ARB 78-73 established precedent.  Essentially, the Board stated that an employer who was signatory to the NBCWA of 1978 had to make a good-faith effort to anticipate its future needs for maintenance jobs, and if it determined that it could not fill those jobs via the Article XVII, Section (i) Job Bidding procedures it must post training vacancies in accord with the terms of Article XVI, Section (e) in order to fill those future jobs with current employees rather than to hire new already qualified applicants off of the street [since Article XVI, Section (e) was

then the only agreed upon collective bargaining agreement provision for training employees for maintenance jobs].

A little over a year later Arbitrator Phelan reviewed ARB 78-73 and the same applicable contract provisions reviewed and considered by the Board.

11.    Since the two (2) previous citations were written, the Union and Freeman Coal entered into the BCWA of 2003 and the 2003 MOU Regarding NEW Employees. We respectfully submit that 11. of that MOU modified the basis of ARB Decision 78-73 when it comes to requiring the Employer to apply the terms of Article XVI, Section (e) as those *(sic)* sole method for training employees to become qualified to step into and perform all of the duties of a Repairman in the future when vacancies in the Repairman classification are not filled via the regular job bidding procedures – and it represents an additional negotiated "...type of plan to fill those (maintenance) needs from within the work force, by training..." New Hires to do so (in the context of the second paragraph of the above quoted Phelan decision).

In the context of the first paragraph of Mr. Phelan's decision quoted above, we submit that there are now three (3) ways that Crown II Management can fill future Repairman classification vacancies (or take care of its maintenance needs – in the words of Mr. Phelan): via the regular job bidding procedure contained in Article XVII, Section (i) of the BCWA of 2003; or, via the provisions of Article XVI, Section (e); or, now via the procedure outlined in the MOU Regarding New Employees since 11. Article XIX, Section (b) (1), (3), and (4) of that MOU specifically authorizes the Employer to assign New Hires such as Larry Sinks (or Michael Riggs) to perform the work of the Repairman classification, and while performing such work to be trained to perform all of the duties of the Repairman in a safe and efficient manner. Doing so, does not constitute a violation of the BCWA of 2003 or the 2003 MOU Regarding NEW Hires, and will result in training current Crown II employees to be Repairman, rather than hiring new employees off the street in the future to fill vacancies in the Repairman classification.

12.    Mr. Arbitrator. As we have stated previously, the matter before you here today is essentially identical to a previous grievance that arose at the Crown III Mine. That matter was heard in arbitration by Arbitrator Frank A. Keenan on January 22, 2004, and was decided by him on May 5, 2005. During todays *(sic)* hearing we have provided you with a copy of they *(sic)* Employer's Opening Statement and Closing Statement in the matter before Arbitrator Keenan and we have put an additional copy of each of them in the loose-leaf binder which contains

these (*sic*) closing statement for your easy reference immediately following our Company Exhibit #3 (which is a copy of Arbitrator Keenan's decision in that matter.

As in the instant case, the issue in the case before Arbitrator Keenan involved whether the Employer was required to post Repair – Trainee (or Maintenance Trainee) vacancies for bidding by non-new Hires, or Traditional employees (in order to train the successful bidders) as opposed to assigning employees in the New Hire classification to perform the work of the Repairman classification (and while doing so to be trained to perform all of the duties of the Repairman classification in a safe and efficient matter).

13.    The Employer does not anticipate that the Crown II Mine will expand in the future creating a need for additional employees in the Repairman classification, nor does it anticipate that it will be unable to fill future vacancies in the Repairman classification that are caused by attrition with current employees at the time those vacancies occur. As a result, in the considered opinion of the Employer, it is not necessary for Mine Management to post any "repair Trainee" jobs at the present time in order to meet future anticipated needs for Repairmen.

In addition, it is important to remember that one of the primary reasons the Employer currently employs forty-four (44) New Hires is for the express purpose of training them to be able to step into and perform all of the duties of the various classifications at the Mine to allow for attrition, or said differently to have trained and qualified New Hires on hand and available to be assigned to fill various classifications which are not filled by the regular job bidding procedure at the end of their first two (2) years of employment (as provided for in the Letter Agreement which became effective on January 8, 2003), or to be qualified to bid on and be awarded one of those classifications after those first two (2) years of employment. In any event, the Employer does not anticipate that it will have a need to consider hiring additional Repairmen applicants off the street a year or two (2) from the present time after exhausting prospective bidders from the Crown II work force. Rather, the Employer anticipates that it will be able to fill those Repairman classifications with individuals (such as Messrs. Riggs and/or Link) who are or were New Hires after they complete their first two (2) years of employment.

14.    The Company further cites the following in support of its position:

a)    ARB 78-2
b)    ARB 78-19
c)    ARB 78-20
d)    ARB 78-26

## CONCLUSION

With these precedent setting ARB Decisions in mind, we are confident that you will conclude that the Employer did not violate any of the terms of the collective bargaining agreements in effect at the Crown II Mine when it elected to assign the work of the Repairman classification to New Hires, as opposed to posting and filling Repair – Trainee vacancies for bid, and then assigning the successful bidders to perform the work of the Repairman classification.[2]

## DISCUSSION

The history of this matter establishes that the Crown II Mine began operation sometime in 1976; and, from that time until December 9, 1988, it and other Company mines were operated under the terms and conditions of the National Bituminous Coal Wage Agreement (NBCWA).  Prior to the expiration of the NBCWA of 1993, the Company and the Union entered into negotiations for an independent agreement solely between Freeman United Coal Mining Company and The International Union, United Mine Workers of America.  As a result, the Company and the Union negotiated and executed the Bituminous Coal Wage Agreement of 1998 (BCWA of 1998) and the Memorandum of Understanding of 1998 (MOU of 1998), effective December 19, 1998.  Significantly, the Memorandum of Understanding of 1998 contains various attachments which contained provisions that modified and superseded the provisions of the NBCWA of 1998; and the language of the NBCWA of 1998, as modified by the MOU of 1998, together are the foundation for the

---

[2] Edited and summarized from the Employer's extensive arguments.

Parties' independent <u>BCWA OF 1998</u>.  Included therein is Attachment D, which

provides, in significant part, for the establishment of a consolidated job classification

system, whereby all underground jobs were consolidated into five Job

Classifications, while grandfathering all employees who were employed during

September, 1998, into the pay grade held at that time, until such time as they

qualified for or they bid into the new Job Classifications.  The Job Classifications and

pay grades so established through Attachment D are:

Mine Examiner/Grade 5; Inby Operations/Grade 5; Outby Operations/Grade

3; Repairman/Grade 5; and Maintenance Trainee/Grade 2.  These modifications to

the <u>NBCWA OF 1998</u> were then incorporated into the Parties' <u>BCWA of 1998</u>.

During the life of the <u>BCWA OF 1998</u> and the <u>MOU of 1998</u>, the parties

entered into negotiations for successor agreements; and they negotiated and

executed the <u>Bituminous Coal Wage Agreement of 2003</u> (BCWA OF 2003) and the

<u>Memorandum of Understanding Regarding New Employees of 2003</u> (MOU of 2003),

effective January 16, 2003.  It is noteworthy that these agreements were preceded

by various letters of intent executed under the Parties' date of January 7, 2003.

Significantly, the <u>Memorandum of Understanding Regarding New Employees</u>

contains various provisions which modify and supersede the provisions of the <u>BCWA</u>

<u>of 2003</u> relative to the terms and conditions of employment and the provision of

training for employees hired after January 16, 2003.  The <u>BCWA of 2003</u> and the

<u>MOU of 2003</u> together constitute the Parties' Agreement.

During the life of the Parties' current Agreement, the relationship of the

Parties relative to the administration of the <u>MOU Regarding New Employees</u> has

been contentious; and the Parties, thus far, have arbitrated three disputes relative to the application of the MOU of 2003. The first case was arbitrated at the Crown III Mine before Arbitrator Frank A. Keenan, who issued an Award, under date of May 5, 2005; the second case, relative to temporary assignments, was argued before Arbitrator Black, and the Award was pending on the date of the hearing in the instant matter; and the third case is the instant matter.

In the instant matter, the record establishes that during the life of the Parties' current Agreement, forty-seven (47) new employees have entered the underground work force at the Crown II Mine, and three of that number have completed their Apprentice period and have been assigned to classified jobs. In November, 2004, at the filing of the grievance in this matter, twenty-five new employees were in the underground work force.

The specific incident which gave rise to the instant matter resulted as the aftermath of the Company posting bids for the Repairman Job Classification on October 8, 2004; two positions on A Shift, one position on B Shift, and one position on C Shift. During the bid process, one employee bid the B Shift and an A Shift Repairman bid the C Shift; thus, leaving three (3) Repairman jobs vacant on the A Shift.

When the Company was unsuccessful in its attempts to bid the Repairman jobs out, and while they remained vacant, the grievance was filed in this matter, under date of November 22, 2004, complaining that the vacant Repairman jobs should be posted for bid as Repair Trainee (Repairman Apprentice) jobs. Notwithstanding the grievants' complaint, the Employer assigned all three jobs to

new employees.  These assignments were made on or about from January 4, 2005; February 21, 2005; and February 25, 2005, respectively.

The Union positions that the Employer is required, pursuant to the BCWA of 2003, the MOU of 2003 and the controlling ARB decisions, to post the vacant, unbid Repairman positions as Repairman Apprentice or Maintenance Trainee positions, because of anticipated increased production demands.  Further, the Union contends that the MOU of 2003 does not affect the rights of the existing classified employees and that the MOU of 2003 does not provide the Employer with the right to assign new hires to fill such vacant Repairman positions.

The Employer positions that the Parties' Agreement is unique to the Coal Industry and that it is a significant departure from the terms and conditions which were in effect through the National Bituminous Coal Wage Agreement when Arbitration Review Board Decisions 78-26 and 78-73 were decided, so that they no longer control.  Further, the Employer contends that the MOU of 2003 clearly provides the Company with the right to assign new hires to perform the work of any job on any shift, including the Repairman Classification; and at the completion of the Apprentice period, to either assign the new hire to a job classification or permit the new hire to bid on a job classification.  Additionally, the Employer cites Arbitrator Keenan's Award, discussed *supra*, as a source of arbitral authority, in a similar matter.

These positions, just discussed *supra*, were established by the Parties, through the hearing record and through their verbal and written arguments—and they define the scope of the issue in this matter.

The Union's position, in significant part, relies on the terms of the <u>BCWA of 2003</u> or Base Agreement; the precedent effect of ARB decisions; established arbitral authority in the Coal Industry; the past practice of the Parties; and its argument that the <u>MOU of 2003</u> does not amend the rights of employees hired prior to January 16, 2003.

The Union has argued that Arbitrator John F. Sass' Award in Case Number 98-12-99-43, decided September 23, 1999, stands for the proposition that the various mines or facilities covered under the Parties' Agreement can follow different interpretations of, or administer the Parties Agreement in a different and/or contrary manner from mine to mine. Thus, the Union positions, without contradiction from the Employer, that an Award issued in an analogous matter at one mine does not control any case which follows at another facility—so that the principle of res judicata is not applicable. Thus, the Union urges that I should not follow Arbitrator Keenan's line of thinking.

My reading of the Sass Award finds a different interpretation. Arbitrator Sass did not opine that the Parties' Agreement could be administered and interpreted differently from mine to mine; nor did he find that Awards from mine to mine do not decide an issue with finality. Arbitrator Sass did note that there is a different local union at each mine and that the histories at the mines are somewhat different,[3] but that was not his rationale for refusing to adopt or follow the Award of Arbitrator Sellman in a similar matter, which preceded the matter before him, but at Crown III, a different mine.

---

[3] Award Case Number 98-12-99-43, Grievance Number 1689, John F. Sass, Arbitrator, September 23, 1999, page 11.

Arbitrator Sass discussed his obligation to decide the case before him, at Crown II Mine, based on the evidence presented and the arguments submitted in that case. He continued that, thus, Arbitrator Sellman's decision, made under different circumstances, and with a different record, was not binding upon him; and that he was of the opinion that he should not adopt it unless he agreed that it provided a proper resolution to the case before him. He also mentioned that there were other differences in the operations of the Crown III Mine and Crown II Mine, which the Parties' live with.[4]

Continuing his rationale for not applying the Sellman Award to the matter before him, Arbitrator Sass stated: "The basic problem that this Arbitrator has with Arbitrator Sellman's decision is that it is not clear what the decision really is..." and relative to the remedy that Arbitrator Sellman crafted, Arbitrator Sass stated, "That just does not make any sense to this Arbitrator".[5]

None of this stands for the proposition that the previous Award of another Arbitrator, issued relative to an analogous matter, with the same fact record, between the same Parties, living under the same Collective Bargaining Agreement should not be followed, adopted, or viewed with deference. Arbitrator Sass rejected the Sellman Award because, in so many words, he found the Award an instance of bad judgment; and such an action is appropriate within the meaning of ARB 78-24.

It is noteworthy that the BCWA of 2003 does provide for flexibility in the carrying out of coal producing operations in the various mines of the Employer; such accommodation, by way of example, can be found at Article II, Section (g) and at

---

[4] Id, page 12.
[5] Id, page 13.

Article XVIII, Section (o).  Moreover, Article XXVI, Section (b) provides the establishment of local practices of customs at each mine, so long as such is not proscribed by the Parties' Agreement.

All of this is to say that the Parties are governed by a single Collective Bargaining Agreement and the terms and conditions provided under such agreement are equally applicable to and govern and bind the Parties at all the operations of the Employer[6]--so that no action of the Employer or the Union, which is proscribed by the Agreement, is allowed.  The absurd result of any other line of thinking is that arbitral authority can or will vary from mine to mine; and a consistent body of case law cannot or will not develop under the Parties' unique agreement.

The language of the BCWA of 2003 is similar in meaning and intent with its predecessor agreement, the BCWA OF 1998, and the various National Bituminous Coal Wage Agreements, which preceded it.  The Parties have edited it in specific areas, such as in Article XVII, Seniority, where the term "jobs" is changed throughout to "classifications", in context with the Parties' unique classification system adopted under the terms of the 1998 Agreement.  Notwithstanding the language of the Parties' Agreement, in its comprehensive context, its meaning and intent is substantially unchanged; and pursuant to Article XXIV, Section (k), all decisions of the Arbitration Review Board rendered prior to the expiration of the National Bituminous Coal Wage Agreement of 1978 continue to have precedent effect relative to the Articles discussed herein.

---

[6] Freeman United Coal Mining Company and United Mine Workers of America, Bituminous Coal Wage Agreement of 2003, Article I A, Section (f), page 3.

The Union replies upon the language of Article XVI (Training), Section (e) and Article XVII (Seniority), Sections (a), (i), and (j) as the relevant language of these Articles has been interpreted with precedent effect by the Arbitration Review Board in ARB Decisions 78-26 and 78-73. Additionally, the Union has relied upon a long line of arbitral authority, identified *supra*, to support its position.

It is well settled in the Coal Industry, that:

1) The actions of the Employer may have the effect of creating a job, or classification, or perpetrating the vacancy without the formal announcement or posting such vacancy;

2) That such vacant positions must be posted for bid;

3) If such vacant positions are not filled through the bid process by qualified bidders, they will be posted as a Maintenance-Trainee or Electrician-Trainee in accordance with actual anticipated needs for developing maintenance skills at the mine; and,

4) Pending the appropriate qualification of trainees, or in cases where reasonable judgments fall short, or where unanticipated needs arise, the Employer may then and only then hire a new applicant, who has the ability to perform the work, to fill the vacancy—and then to later post a trainee vacancy if necessary to fill the job or classification.

Notwithstanding its recognition of the just-summarized case law, the Employer maintains that such case law is no longer applicable to the Parties because their Agreement, which consists of the BCWA of 2003 and the MOU of 2003, is a significant change from the historical, contractual provisions in the Coal

Industry, upon which such case law is based.  Specifically, as previously discussed *supra*, the Employer contends that the BCWA of 2003 with the MOU of 2003 construct the Parties' Agreement; and that such Agreement in concert with various letters of intent executed by the Parties, under date of January 7, 2003, excuses the Parties' Agreement from the precedent effect of the ARB decisions and such body of case law that had previously applied.  Moreover, the Company relies on Arbitrator Keenan's Award of May 5, 2005, relative to a similar case at the Crown III Mine as a source of arbitral authority in determining the instant matter.

The heart of this matter is a determination of the extent, if any, that the Memorandum of Understanding Regarding New Employees of 2003 affects the historical, applicable language contained within Article XVI, Section (e), Article XVII, Sections (i) and (j) of the Bituminous Coal Wage Agreement of 2003, and a determination of whether or not the Award of Arbitrator Keenan, in Case 02-12-03-18, under date of May 5, 2005, applies in the instant matter.

The Company has cited and relied upon Arbitrator Keenan's Award of May 5, 2005, arguing that the matter before Arbitrator Keenan and the instant matter are similar; and that the Keenan Award is dispositive of the instant matter.

While the Keenan Award is certainly of value as it relates to this matter, it is not analogous for several reasons:

1)    The scope of the grievance statement is not the same.  In the Keenan Award, the grievant states, "Grievant and Local # 12--et al, demands 2 repair trainee jobs be posted.  Demand made to Jerry Watson";[7] so that the

---

[7] Award Case No. 02-12-03-18, Grievance Number 583, Frank A. Keenan, Labor Arbitrator, May 5, 2005, page 3.

complaint is relative to the singular issue of repair trainee jobs not being posted.

In the instant matter, the grievant states: "Grievant believes Company has not posted Repair Trainee Bid. Instead Company has put someone as a "Repair Helper" which is not a classification. This is supposedly a Temporary Job Title..."; so that the grievant is complaining of several issues. The issues grieved include not posting a Repairman Trainee position, but also includes assigning someone to a vacant classification and assigning a non-existent job classification, one not provided through the Agreement, to the employee filling such vacancy. Although the literary syntax of the grievant's statement is poor (and that is not unexpected) the inference is clear, as I have interpreted it.

2)   The scope of the issue is not the same. In the Keenan Award, the scope of the issue was determined to be limited to Article XVI, Section (e).[8] In the instant matter, I have found that the scope of the issue includes Article XVI, Section (e); Article VII, Sections (i) and (j); Article XIX, Sections (e), (f), and (g); and Article XXVI, Section (b); and,

3)   In the matter before Arbitrator Keenan, the record did not evidence any requirement to anticipate growth at the Mine or that the Mine will expand, creating a need for additional employees in the Repairman Classification.[9]

In the instant matter, the record establishes an expectation of projected anticipated growth. The testimony established that the Company had acquired an additional customer and that production had increased 1.5 million

---

[8] Id, pages 41 through 43.
[9] Id, pages 26 and 27, and page 50.

tons in the year 2004; was projected to increase by 2 million tons in the year 2005; and that production was expected to further increase in 2006.

Specifically, the record establishes that the Company had bid on contracts for additional coal sales and that on or about October, 2003, the Company won a bid to sell coal to Tampa Electric in Florida. As a consequence, on or about January, 2004, the Company started to significantly increase production; and increased coal shipments from sixty-eight (68) to one hundred nineteen (119) railroad cars a day. Additionally, as discussed *supra*, during the life of the current Agreement, forty-seven (47) new employees have entered the underground work force at the Crown II mine. The Mine had an underground work force of approximately one hundred fifty-three (153) employees on November 22, 2004. Of this number, twenty-five (25) were new employees; so that the new employees comprised a work force increase of approximately 16 percent in November, 2004. That figure of twenty-five (25) new employees, in November, 2004, now stands at forty-seven (47) new employees—an additional twenty-two (22) employees. So that the current underground work force has increased to one hundred seventy-five (175) employees during the life of the current agreement; so that the total number of new employees comprise a work force increase of approximately 27 percent.

4)    In the matter before Arbitrator Keenan, the record established the Company's acknowledgement that, since the effective date of the Parties' Agreement on January 16, 2003, whenever additional personnel were needed