E-FILED
Friday, 19 August, 2005  11:10:12 AM
Clerk, U.S. District Court, ILCD

to perform underground repair and maintenance work, New Hires <u>have been assigned to assist the employees in the Repairman Classification</u>. That there were two (2) such New Hires assigned to assist the employees in the Repairman Classification since July 10, 2003; and that the Employer pays the tuition for these two New Hires to attend electrical training the New Hires receive from a third party[10]--that these employees were not qualified for electrical certification issued by the Mine Safety and Health Administration (MSHA).

In contrast, the record in the instant matter establishes that, since the effective date of the Parties' Agreement on January 16, 2003, three (3) new hire employees <u>have been assigned to fill the three (3) vacant Repairman Classification positions</u> and/or Repairman Apprentice positions on the A Shift on a full-time basis. Respectively, the assignments have been ongoing since on or about January 4, 2005; February 21, 2005; and February 25, 2005. Initially, these employees were placed in the positions and classified as New Hires and/or as Apprentices; however, beginning on or about June 2, 2005, employees were reclassified to the Repairman Classification.

Notwithstanding the differences just discussed between the two cases, Arbitrator Keenan's Award warrants study and consideration relative to his reasoning in deciding the merits of the case before him at the Crown III Mine.

In his Discussion and Opinion, Arbitrator Keenan has made several findings of interest here:

---

[10] Id, page 3; also <u>Opening Statement for Management</u>, Case No. 02-12-03-18, Grievance Number 583, Rodney Hatten, January 22, 2004, page 21.

1) Relative to the last sentence of the first paragraph on page 1 of the MOU of 2003, "In the event of a conflict between the terms and conditions of the 2003 Collective Bargaining Agreement or any terms and conditions of employment, and this MOU, this MOU shall prevail", he found that it "was simply intended to act as a safety net and not a vehicle to render allegedly "conflicting terms of Article XVI, Section (e) of the Parties' 2003 BCWA no longer meaningful and effective."..."here the last sentence of the first paragraph of page 1 of the 2003 MOU, it must be found that the language in question is ambiguous."

> Here, the Company-urged interpretation would render meaningless and nullify Article XVI, Section (e) of the parties' 2003 BCWA, and the quasi-judicial gloss thereon of ARB Decision 78-73, and hence should be avoided since, as Arbitrator Updegraf noted, the general presumption is that the parties do not carefully write into a solemnly negotiated agreement language such as Article XVI, Section (e) of the 2003 BCWA document, only to simultaneously intend that such language have no effect. This is especially so here in the UMWA organized sector of the bituminous coal mining industry, where the parties have an established interpretation for the language of Article XVI, Section (e) of the parties' 2003 BCWA in ARB Decision 78-73, and where a long tradition of protecting the rights of senior employees exists. In these circumstances only the clearest of contract language could serve to establish that, nonetheless, the parties have simultaneously agreed that pursuant to the last sentence in the first paragraph of page 1 of the 2003 MOU, the parties have expressed their clear intent to nullify said Article XVI, Section (e). But, as found above, the aforesaid provision of the 2003 MOU is "ambiguous" and not therefore "the clearest of contract language." In sum, I find it more likely than not that the parties intended the "safety net" interpretation described above and they did not intend the nullification interpretation urged by the Company. In my judgement *(sic)*, for the reasons set forth hereinafter, both Article XVI Section (e) of the parties' 2003 BCWA document applicable to non-new hires, and the

Page 37 of 66 pages.

    2003 MOU applicable to new hires, can and do co-exist compatibly.[11]

2) Relative to the continuing vitality of Article XVI, Section (e), and the finding that the <u>MOU of 2003</u> now provides an additional method to train employees to fill future Repairman vacancies:

> I turn now to the Company's core contention, and rationale therefore, commencing with the first full paragraph on page twenty-two (22) of this Opinion and Award and culminating at line five (5) on page twenty-six (26) of this Opinion and Award. Add to this contention and rationale the lack of any evidence of record to counter the Company's representation commencing at the bottom of page twenty-six (26) to the effect that "it does not anticipate that the Mine will expand thereby creating a need for additional employees [over and above Kunkler and Ferrari] in the Repairman classification, and in my judgment the Company's core contention is made out. I find that for the reasons advanced by the Company, the 2003 MOU serves to modify the basis of ARB Decision 78-73, such that, as the Company essentially puts it, there are now three (3) ways Crown III Management can fill future Repairman classification vacancies or take care of its maintenance needs – in the words of Arbitrator Phalen: via the regular job bidding procedure contained in Article XVII, Section (i) 1 of the parties' 2003 BCWA; or via the provisions of Article XVI, Section (e) of the parties' 2003 BCWA; or via the procedure outlined in the 2003 MOU, since paragraph 11.(b)(1)(3) and (4) of that MOU now specifically authorizes the Company to assign New Hires such as Messrs. Ferrari and Kunkler to perform the work of the Repairman classification, and while performing such work to be trained to perform all the duties of a Repairman in a safe and efficient manner. This conclusion is fully supported by the overarching teaching of ARB Decision 73-73 *(sic—78-73)*, namely, that Article XVI, Section (e) is intended to insure *(sic)* that the Company fill vacancies from within the bargaining unit workforce, before hiring off-the-street. And here, both New Hires and non-new-hire employees are within the bargaining unit workforce.
>  In my judgment, the Company must continued to make a good faith effort to anticipate its repairman classification needs in the future. However, now, as pointed out above, it has more options, instead of just one prior to the 2003 MOU,

---

[11] Id, pages 47 through 50.

as to how it meets these future needs. Article XVI, Section (e) in my view very much remains a viable option. Thus, for example, (and I am confident there are many other examples), the record reflects that non-new hire employees are very likely to complete their training in a repairman training vacancy sooner than a New Hire's two years of training under the terms of the 2003 MOU, with the consequence that anticipated needs for Repairmen in less than the two years required to train a New Hire would likely result in the need to post a trainee vacancy for bid by a non-new-hire employee pursuant to the guidelines of ARB Decision 78-73, and as that decision was so ably elaborated upon by Arbitrator Phalen in his decision in *the Pittsburgh (sic) & Midway Coal Mining Co., Pleasant Hill Mine – and – UMWA District 23, Local Union 2395, supra.*[12]

Again, the case before me now involves Article XVI, Section (e); Article VII, Sections (i) and (j); Article XIX, Sections (e), (f), and (g); and Article XXVI, Section (b).

The query before the undersigned involves the following determinations:

1)  Were three (3) Repairman Classification positions or jobs still vacant after being posted for bid;

2)  If so, was the employer required to anticipate training needs; and to post the three vacant positions or jobs for bid by "non-new hire" employees as a Repairman Apprentice Classification position or job; and train any qualified employee(s) who successfully bid pursuant to a past practice, if any;

3)  Or, is the Company empowered by the Parties' Agreement, consisting together of BCWA of 2003 and the MOU of 2003, to assign a New Hire and/or Apprentice Classification employee to fill an existing vacancy for a Repairman Classified position or job, in lieu of posting such vacancy

---

[12] Id, pages 50 through 52.

for a Repairman Apprentice Classified position for bid by non-new hire employees?

As I have previously identified, *supra*, the Parties have cited a long line of arbitral authority in support of their respective positions, and I have studied each citation. However, in an exercise of brevity, I will only reference three, *infra*.

Arbitration Review Board Decision 78-26, relative to the criteria to be applied to determine if a vacancy exists, provides in relevant part:

> The latter comment leads to the further precautionary observation that even though the Employer retains the sole and exclusive discretion to determine what work is to be done and whether it is to be done in a classified job, and thus the discretion to declare the existence of a new job or a permanent vacancy, that determination may not always be made by an outright announcement or by posting the job. The actions, direction of work duties, and administration of the work tasks by the Employer may be found to have the effect of creating the job or perpetuating the vacancy in fact without the formal announcement or posting. If the evidence leads to a finding that the Employer has, in fact, by those actions, work directions, or administrative organization of the work tasks, created a job or perpetuated a vacancy, then of course, the finding should be that the Employer had made its determination of the existence of the job and should be required to post the job which the facts indicate has been created or recognized as existing.[13]

Arbitration Review Board Decision 78-73, relative to the criteria to be applied to determine if an employee training program is required, provides in relevant part:

> Neither provision, from a drafting standpoint, is trouble-free. According to Article XVI, Section (e), vacancies for trainees are to be posted in accordance with "actual anticipated needs." Surely, there is room for difference over the meaning of this phrase. Thus, there will be cases where, as here, disputes arise as to management's obligations to train.
>
> Article XVII also gives cause for pause. "Subject to the provisions of Article XVI", it says, hiring from the outside is permitted,

---

[13] Arbitration Review Board, UMWA-BCOA, Decision 78-26, Paul L. Selby, Jr., Chief Empire, March 18, 1980, page 15.

assuming a permanent vacancy and new job has been posted but remains unfilled. If no outside applicant is available, the section continues on to describe posting procedures for a training opportunity, concluding with "the employee who is to be trained shall be selected from the applications in accordance with the provisions of Article XVI, Section (g) (Training)."

If one ignores the initial clause subjecting the procedures to the provisions of Article XVI, the language suggests that management may post a vacancy, assumedly for a fully trained maintenance employee, then go to the street to hire if no qualified applicants are in the existing work force. Only in the absence of outside hires need the Company post a training vacancy, assuming the vacancy is still to be filled. But the first clause ("Subject to the provisions of Article XVI") does exist and one is faced with the unenviable prospect of reconciling the parties' intent in constructing this remarkable bit of draftsmanship.

The District Arbitrator weighed the opening clause of Article XVII heavily, noting management's obligation to abide by the training provisions which, in unequivocal language, require that the Employer "shall establish", for each mine, a training program for maintenance jobs. He found the Company had erred in failing to do so and thus required establishment of such programs and the filling of future anticipated vacancies by means of those programs.

The Employer contends the Arbitrator overlooked management's prerogative to decide whether, in a given case, a "permanent vacancy" or "new job" as opposed to a "training vacancy" would be required in a given instance. So long as there were no qualified electricians within the work force and there were trained individuals on the street, it was within its discretion under the terms of Article XVII to hire from outside. Only in the event fully trained personnel from outside were unavailable, says the Employer, would it be necessary to implement the training program.

The Board finds that this approach misconstrues the overall intent of the Wage Agreement. For the reasons that follow, and with the specific caveats to be noted, the District Arbitrator's opinion is affirmed.

It is possible to read Articles XVI and XVII in harmony with one another. And, in so doing, the true intent of the parties becomes apparent. In various areas in the Wage Agreement, the parties codified their joint endorsement of training programs. Article III – Health and Safety – states, in section (n):

Page 41 of 66 pages.

...Article III – HEALTH AND SAFETY

...Section (n)  Maintenance

A maintenance program shall be established at each mine to ensure that equipment is maintained in a safe operating condition. Such programs shall include the requirement that equipment operators report promptly all equipment defects of which they have actual knowledge. Maintenance Employees shall exercise required safety precautions while carrying out their duties.

Article XVI states:

The parties agree that the establishment of effective training programs for Employees is essential to safe and efficient production of coal.

Section (e) of Article XVI sets forth in generally (although as observed above, not entirely) clear language the Employer's obligation to establish training programs for each mine. Significantly, at this location, a grievance was settled on the basis that the Employer would, indeed, proceed with implementation of such a program. Even without such settlement, the Employer was to train employees in response to "actual anticipated needs." While one may quarrel over the particular meaning to be ascribed to this phrase, it is at least clear that when the need for more electricians was reasonably anticipated, it was management's obligation to begin training them. Management says its ability to hire from the outside in these positions obviates obligation to train from within. But precisely the opposite is true. The outside hiring proves that the need exists and, moreover, suggests that it may not have been properly anticipated.

The Arbitrator correctly required, in light of the evidence in this particular case that the training program go forward so that future vacancies could be filled from within instead of outside.

Several words of caution are appropriate, however, lest the District Arbitrator's opinion and the Board's review be misinterpreted. Nothing herein should be interpreted as requiring all vacancies in maintenance jobs to be posted as trainee positions. The language

Page 42 of 66 pages.

relevant to helper jobs, which does require that approach, is significantly different, as was suggested in ARB 78-7.[1]

What is required of the Employer is a reasonable effort to anticipate maintenance needs and to train in response thereto. That is the manner in which Article XVII (j) is "subject to the provisions of Article XVI,..." Pending the appropriate qualification of trainees or in cases where reasonable judgments nevertheless fall short, or where unanticipated needs arise, the Employer is free to hire from the outside, as is clearly suggested by Article XVII, and to later post a trainee vacancy to fill the job, if necessary.

In this way, managerial prerogatives with respect to the establishment of needed positions coexist reasonably with the contractual obligation to attempt to train the existing workforce to meet foreseeable needs.

The Board does not read the District Award as requiring all electrician vacancies to be filled either by qualified workers in the existing work force or by trainees. What it does require is that management implement the training program so that it, in due course, will fill the obvious needs of the Employer.[14]

Arbitrator Phelan, relative to the criteria to be applied to determine if an employee training program is required, opines in relevant part:

...
The Union is correct in pointing out that the language in this Section is mandatory and that a maintenance training program must be established at each mine. Section (e), however, goes on to provide that vacancies for trainees in the program are to be posted in accordance with actual anticipated needs for developing maintenance skills, and when the skills are presently available within

---

[1] Nor does the UMWA, intervening in this case, contend that this should be the result. On page 15 of its brief, it says:

> Article XVII, Section (j) permits the hiring of qualified job applicants for other classification if the need arises. We do not mean to infer that the Employer can never hire qualified maintenance applicants from outside the work force. If the Employer had made a good-faith effort to train its employees for its anticipated maintenance needs, and the needs surpassed their anticipation, or, if some of the employees were not able to finish the training for one reason or another, the Employer would be free at that point to hire qualified applicants from outside the work force.

[14] Arbitration Review Board, UMWA-BCOA, Decision 78-73, Richard T. Bloch, Chief Empire, March 3, 1981, pages 3 through 6.

Page 43 of 66 pages.

the classified workforce, the Company does not have to post trainee jobs under the program. The maintenance jobs can be filled with Employees who already have the ability to step into and perform the work of the job. Article XVI, Section (e) thus indicates two ways in which the Employer may take care of its maintenance needs. It can use the regular bidding procedure to fill the jobs with qualified Employees and, if it does not have Employees in the workforce with the necessary skills, the Employer is to train Employees for the jobs.

Article XVI, Section (c), however, cannot be read in isolation from the rest of the contract, especially Article XVII, which clearly suggests that the Employer may hire from the outside if the bidding procedure does not produce a qualified Employee from within, including the panels. The Employer is not required to postpone needed maintenance work while someone is being trained for it or if qualified Employees choose not to bid for the maintenance jobs. What is required is a reasonable effort to anticipate the maintenance needs at the mine and some type of plan to fill those needs from within the workforce, by training if necessary. While the training is going on or in a situation where unanticipated needs arise or where an otherwise reasonable judgment on the maintenance needs falls short, the Employer may hire from the outside to get the maintenance work done.[1]

...

Obviously, if the Company has an oversupply of qualified Employees who can do the maintenance work and are just waiting for an opportunity to bid into a maintenance job, there is no need to train anyone for the jobs and training is not required under those circumstances. On the other had, if there are no qualified Employees in the workforce outside of the maintenance jobs who could fill a vacancy in the maintenance category and the Employer knows, for example, that three new vacancies will be coming up in maintenance jobs in the next year, then the Employer would be contractually obligated to train someone for those jobs.[15]...

No analysis and discussion of the above-cited cases is necessary. They are often cited and they are the basis of settled law in the Coal Industry. What is established is that the Employer may address its staffing need via the bid process;

---

[1] See ARB 78-73.

[15] United Mine Workers of America, District 23, Local Union 2395, and Pittsburg & Midway Coal Mining Company, Case Number 81-23-82-83, Thomas M. Phelan, Arbitrator, July 20, 1982, pages 6 through 8.

by establishing a training program to address current and prospective anticipated needs; and, in the face of an unforeseen immediate need, may hire a qualified candidate from outside the Company. The query now turns to the heart of the Employer's case—that the MOU of 2003 permits it an exception to these standards—so that it can fill a vacant position with a new hire employee for the purpose of both training and/or production; or assign a new hire employee to a classified position(s), as it deems appropriate, both prior to and after completing training; by either direct assignment or through the bid procedure.

Primary, then, is a determination of the meaning, intent, and purpose of the various letters of intent and the MOU of 2003, which is the only contingency or aspect of this case not settled in the Industry.

The Parties' Agreement is contained within the provisions of the Bituminous Coal Wage Agreement of 2003, or the Collective Bargaining Agreement (CBA), and the Memorandum of Understanding Regarding New Employees (of) 2003. The Collective Bargaining Agreement (BCWA) is the primary Agreement and the MOU of 2003 only amends the Collective Bargaining Agreement and, specifically, with regard to terms and conditions for hiring and managing employees newly hired after January 16, 2003. Thus, the BCWA of 2003 is the primary document and the MOU of 2003 is the secondary document comprising the total Agreement of the Parties—because terms of the MOU of 2003 are only activated when matters are specifically and directly related to the management of employees hired after January 16, 2003; and it shall only apply for the first twenty-four (24) months of such employee's

tenure.[16] The nature of the <u>MOU of 2003</u> is essentially of the purpose of an "except and modified provision" to the Collective Bargaining Agreement. But, rather than having crafted the applicable "except and modified provisions" relative to newly-hired employees into the respective Articles contained within the Collective Bargaining Agreement—the preferred way of doing it—the Parties codified all these provisions into a memorandum of understanding. This method of drafting language and codifying an understanding, in my view, is undesirable; contributes to disagreements between the Parties; and should be avoided in future agreements. What all of this means is that, because the <u>BCWA of 2003</u> is primary, it supersedes and trumps the <u>MOU of 2003</u> in every regard, which the <u>MOU of 2003</u> does not specifically address. So that, whenever there is any ambiguity relative to the meaning and intent of the Parties, when they crafted the language of both documents, the ambiguity shall be resolved in favor of the <u>BCWA OF 2003</u> and the language of the <u>BCWA of 2003</u> shall govern and control. Moreover, this principle is applicable to any other document or written agreement between the Parties; and it is axiomatic that the Collective Bargaining Agreement supersedes and invalidates any agreement, regardless of the content of its language, which preceded the Collective Bargaining Agreement. Therefore, the burden is now shifted to the Employer to prove their case; and the proof of their case turns on the determination of the meaning, intent, and purpose of the <u>Memorandum of Understanding (of) 2003</u>.

The Employer bases its case both on the <u>MOU of 2003</u> and various letter agreements which preceded the Parties' agreement and on the <u>Memorandum of</u>

---

[16] <u>Memorandum of Understanding Regarding New Employees 2003</u>, pages 6 and 7.

Understanding Between United Mine Workers of America and Freeman United Coal Mining Company, effective December 14, 1998 (MOU of 1998).

The significance, according to the Employer, of the MOU of 1998 is found within Attachment D. This document is given little attention for several reasons. It precedes the Parties' agreement of January 16, 2003; its various substance has been incorporated into or removed by the BCWA of 2003; and, specifically, Attachment D, in its contemporary form, is now incorporated in the BCWA of 2003 at Article XIX, Classification, Sections (b), (e), and (f).[17]

Next, the Employer argues it has the right to assign jobs contrary to the bid procedures contained within the BCWA of 2003 and relies on Joint Exhibit 8, a letter agreement between Donald H. Dame, Vice President of Human Resources for the Employer, and Joseph R. Angleton, District President for the Union, under dates of January 7 and 8, 2003.

...

Mr. Joseph Angleton
District President
UMWA District 12
3695 South Sixth Street
Springfield, IL 62703

    Re:    Employee Classification After Completion of the Apprentice Program

Dear Mr. Angleton:

This is to document our understanding and agreement that after each New Hire successfully completes his twelve (12) month period as an Apprentice the Company shall assign him an appropriate classification.

                Sincerely

---

[17] Joint Exhibits 4 (MOU of December 14, 1998), 5 (Letter Agreement of January 8, 2003), 6 (Attachment D to MOU of 1998), and BCWA of 2003, pages 63 through 65.

/s/ Donald H. Dame
Donald H. Dame
Vice President of Human Resources
Freeman United Coal Mining Company

/s/ Joseph R. Angleton    /s/ 1-8-03
Accepted and Agreed       Date
John R. Angleton
Authorized Representative
International Union
United Mine Workers of America
...

This document is basic to the Employer's position that it has authority and discretion, through mutual agreement of the Parties, to assign newly hired employees (all employees hired after January 16, 2003, or any employee who has worked in the Coal Industry less than twenty-four [24] months within the last ten [10] years) to any classified position at the mines with or without resorting to the bid procedures of Article XVII. This reliance and argument is misplaced, and it fails for the following reasons:

1) This District Agreement or letter agreement precedes the Parties' Collective Bargaining Agreement and, therefore, it is superseded by the terms of the Collective Bargaining Agreement; and the CBA trumps and controls any conflict between it and any prior District or local agreement.[18]

2) As I have previously discussed and found, *supra*, the BCWA of 2003 is the Parties' primary agreement, and it trumps and controls in any matter involving a conflict in which the language of the parties is ambiguous or there is a conflict with the terms of the BCWA of 2003

---

[18] Bituminous Coal Wage Agreement of 2003, Article XXVI, pages 119 and 120.

and any other agreement, except conflicts involving clear and unambiguous language, between the BCWA and the MOU. But, again, the MOU of 2003 is an "except and provided for" document, and conflict should not exist—as Arbitrator Keenan pointed out, the "shall prevail" provisions of the MOU of 2003 is primarily a safety net provision.

3) The term "assign" in its normal usage means to place at some task or duty. The meaning and intent of this term as used by the Parties in this letter agreement is to ensure the placement of the post-Apprentice employee in an appropriate Classified position; and to ensure that such a provision is contained within the Agreement.

4) That, in its normal usage in the Coal Industry, relative to the placement of employees in the appropriate classification or job, the terms "assign", "award", or "grant" are synonymous and are used interchangeably when referring to the bidding procedure; i.e., the awarding of a bid, the granting of a bid, or the bid assignment, et cetera—and such is evidenced in the Parties' current agreement.

5) The employees referred to in the District Agreement have all similarly completed their Apprentice year and, therefore, unless specifically provided for in the MOU of 2003, are not covered by any provision of the MOU Regarding New Employees of 2003. Upon the completion of the Apprentice year, the Company must appoint, grant, assign, or

award the employee an appropriate classification according to the provisions of Article XVII contained within the BCWA of 2003; and,

6) Lastly, the language contained within the MOU Regarding New Employees of 2003 clearly addresses any ambiguity in the use of the term "assign" and the issue of whether or not the Parties meant and intended that post-Apprentice employees were subject to the bid procedures established in Article XVII of the BCWA of 2003, which governs terms and conditions of their employment, as in 5) above. The MOU at 9. Article XVI, A, paragraph 3, "...a New Hire shall not be eligible to bid on a Maintenance-Trainee or Electrical-Trainee job *(sic— Repairman Apprentice or Maintenance Trainee Classification)* or vacancy until such New Hire has completed his twelve (12) month period of work as an Apprentice." Again, at 11. Article XIX, (Paragraph 3) (4) "...Subsequent to completion of active work for twelve (12) months as an Apprentice, each employee may bid on another Classification as provided for in Article XVII of the 2003 Collective Bargaining Agreement." It is noteworthy that this language, and the use of the term "New Hire", when the employee is clearly no longer a "New Hire", further evidences the poor allocution of words and the poor syntax of the language. Clearly, post-Apprentice employees are no longer New Employees within the meaning of the MOU of 2003 and, therefore, the terms and conditions of the BCWA of 2003 govern the terms and conditions of such employees exclusively.