Continuing, the Employer then progresses to its contention that the <u>MOU Regarding New Employees of 2003</u>, along with its reserved Management Rights, pursuant to Article I A, Section (d), permits it to assign any Probationary Trainee, New Hire, and Apprentice to perform the work of any Classification on any shift[19]; and it continues that it permits it to assign qualified new employees to fill the jobs created by any vacancy on any shift.

Preliminary to a discussion of the meaning, intent, and purpose of the <u>MOU of 2003</u> relative to this position, a determination relative to the extent of the Classification system is required. Although the Parties have described the Classifications covered by the Agreement to consist of four positions—Mine Examiner, Inby, Outby, and Repairman (and "grandfathered" Job Titles within Classification provided through Appendix B, Part I), the Parties' Agreement, de facto, contains the following Classifications and/or Job Titles within Classifications which are subject to the bid procedures of Article VII:[20]

1) Mine Examiner/Grade 5;
2) Inby Operations/Grade 5;
3) Outby Operations/Grade 3;
4) Repairman/Grade 5;
5) Repairman Apprentice/Grade 3;
6) Maintenance Trainee/Grade 2;
7) Fully-Trainer Helper (assigned to continuous mining machine operator)/Grade 5; and,
8) Helper Trainee (assigned to continuous mining machine operator)/Grade 4.

Additionally, there are, *de facto*, three additional Classifications that apply to New Employees pursuant to the terms of 11. Article XIX, Section (b) of the <u>MOU of 2003</u>, which amends the <u>BCWA of 2003</u> at Article XIX, Section (b). They are:

---

[19] <u>MOU Regarding New Employees (of) 2003</u>, pages 6 and 7.
[20] <u>BCWA of 2003</u>, pages 25 and 26, page 65, and page 130.

      1)      Probationary Trainee/initial ninety days of employment/no grade;
      2)      New Hire/for the next nine (9) calendar months/no grade; and
      3)      Apprentice/for the next subsequent twelve (12) months/no grade.[21]

The purpose of the <u>MOU of 2003</u> is clearly stated in the third paragraph of the document on Page 1. Its primary goal is to facilitate the Company's ability "to hire New Employees to work at its mines and facilities covered by a Collective Bargaining Agreement with the UMWA."

To that end, the Parties entered into a memorandum to amend the Collective Bargaining Agreement, only with respect to employees hired after January 16, 2003. And, to that end, the Parties constructed an understanding that enabled the Employer to hire new employees and manage and direct them to its best economic advantage in the market. The Parties did so by amending the economic provisions of the CBA to enable the Employer, during the first two (2) years for each employee hired after January 16, 2003, to reduce both its labor intensive costs and fringe benefits, salary and salary-related costs, such as holiday pay.

By way of example:

4. Article 4, B, provides that the standard hourly wage rates paid to a new employee are established in Appendix A at $15.15 per hour for a Trainee from January 16, 2003, through January 1, 2006; and the hourly rate paid to an Apprentice begins at $17.82 on January 16, 2003, and progresses to $18.22 on January 1, 2004; $18.62 on January 1, 2005; and to $18.92 on January 1, 2006. This is a significant reduction in wages compared to the hourly wages paid to any of the Classifications contained within the <u>BCWA of 2003</u>. For example, Mine Examiner, Inby Repairman, and Helper, are paid $19.31 on January 16, 2003; which progresses to $20.41 on

---

[21] <u>MOU Regarding New Employees (of) 2003</u>, pages 6 and 7.

January 1, 2006. Helper Trainee begins at $18.91 on January 1, 2003, and progresses to $20.01 on January 1, 2006. Repairman Apprentice begins at $18.54 on January 16, 2003, and progresses to $19.64 on January 1, 2006. The lowest paid Classification—Maintenance Trainee—begins at $18.32 on January 16, 2003, and progresses to $19.42 on January 1, 2006. So that the labor cost saving represented by the wages paid for the first two years for a New Employee, effective January 16, 2003, are substantial. Similarly, without resorting to a litany of examples, I have found that each amendment to the Collective Bargaining Agreement, contained within the MOU of 2003, provides the wages, hours, and terms and conditions of employment for new employees hired after January 16, 2003, are substantially less affirmative for the new employees compared to such for those hired prior to January 16, 2003.

Significantly, and hand-in-hand with my findings just discussed, the amendment pursuant to the MOU of 2003 at 11. Article XIX does not provide a first-time opportunity for the Employer to train newly-hired employees who lacked experience in the Mining Industry. The Company could always provide on-the-job-training by assigning employees to perform the work of any Classification or job, but they were, prior to the MOU of 2003, required to do so according to the provisions of Article XIX Classification, Sections (a) through (e). Section (d) provided that such assignment is at "the higher rate of his regular pay or that of the Classification to which he is temporarily assigned"; and Section (e) provides the Classifications. Now, simply put, the Company can do what it always did but with greatly reduced, constant labor costs. Additionally, this also permits the Employer to address

additional production needs and avoid various types of additional labor costs. All of that is to say that, on its face, the primary purpose of the <u>MOU of 2003</u> is not to train.

That what the Parties created when they agreed to the <u>MOU of 2003</u> was primarily an instrument to reduce labor-related costs, during the first two years of a new employee's work life. The training of employees and the establishment of their terms and conditions of such training is related to economics—The Company historically could always provide on-the-job training.

It is within the framework of the purpose and intent just discussed that the merits of the Employer's position must be studied.

To begin with, the Employer positions that, following the Keenan Award, the well-settled standard of contract interpretation established in ARB 78-73 is disturbed and that there are three ways for the Company to address its manpower or maintenance needs.

> ...that there are now three (3) ways that Crown II Management can fill future Repairman classification vacancies (or take care of its maintenance needs – in the words of Mr. Phelan): via the regular job bidding procedure contained in Article XVII, Section (i) of the BCWA of 2003; or, via the provisions of Article XVI, Section (e); or, now via the procedure outlined in the MOU Regarding New Employees since 11. Article XIX, Section (b) (1), (3), and (4) of that MOU specifically authorizes the Employer to assign New Hires such as Larry Sinks (or <u>Michael</u> Riggs) to perform the work of the Repairman classification, and while performing such work to be trained to perform all of the duties of a Repairman in a safe and efficient manner. ...[22]

Continuing, the Company argues in the case before Arbitrator Keenan, the Employer permanently filled permanent vacancies in the Repairman Classification and that, further, they have done so in the instant manner.

---

[22] Closing Statement for Management, Case number 02-12-05-07-FMC, Grievance Number 3024, Rodney Hatten, June 15, 2005, page 12.

> ...the Employer permanently filled (some of) those permanent vacancies in the Repairman classification with employees in the New Hire classification – in the case before Arbitrator Keenan, with New Hires Ferrari and Kunkler, and in the instant case, with New Hire Wilson on April 19, 2004, with Michael Riggs on June 2, 2004 *(sic)* at the time he reached his two (2) year anniversary as a New Hire and/or when he had completed his twelve (12) months as an Apprentice; and it *(sic)* addition, on the "A" Shift with two (2) employees who are classified as New Hires, but have been assigned by Mine Management to perform the work of the Repairman classification, while being trained to perform all of the duties of a Repairman in a safe efficient manner...[23]

The Company further contends that the instant matter is not subject to the anticipated growth standard.

> ...the Employer does not anticipate that the Crown II Mine will expand in the future creating a need for additional employees in the Repairman classification, nor does it anticipate that it will be unable to fill future vacancies in the Repairman classification that are caused by attrition with current employees at the time those vacancies occur. As a result, in the considered opinion of the Employer, it is not necessary for Mine Management to post any "Repair Trainee" jobs at the present time in order to meet future anticipated needs for Repairmen. ...[24]

Finally, the Company arrives at its conclusion that, not only is the Employer entitled to fill vacant Repairman Classification positions during the first two (2) years of a New Employee's tenure, it is also empowered to assign such employees at the conclusion of their Apprentice year to vacancies in various Classifications, a) without resorting to the bid procedures of Article XVII, or b) to award such vacant Classification through the bid procedures of Article XVII.

> ...In addition, it is important to remember that one of the primary reasons the Employer currently employs forty-four (44) New Hires is for the express purpose of training them to be able to step into and perform all of the duties of the various classifications at the Mine to allow for attrition, or said differently to have trained and qualified New

---

[23] Id, page 16.
[24] Id, pages 19 and 20.

>Hires on hand and available <u>to be assigned to fill various classifications which are not filled by the regular job bidding procedure at the end of their first two (2) years of employment (as provided for in the Letter Agreement which became effective on January 8, 2003), or to be qualified to bid on and be awarded one of those classifications after those first two (2) years of employment</u>...[25]

*(Emphasis Added)*

The Employer's arguments fail and do not prevail in this matter for the reasons to be discussed, *infra.*

To begin with, just as the primary purpose of the <u>MOU of 2003</u> was not to establish a new type of training program, this case is not, as the Company has argued throughout, just about training. This case is about filling vacant classified positions and with posting such positions for Classified Repairman Apprentice/Maintenance Trainee training opportunities. Returning to the historical background, what transpired in this matter is that the Parties entered into an Agreement which consisted of the <u>Bituminous Coal Wage Agreement of 1998</u> and the <u>Memorandum of Understanding of 1998</u>, which for the first time within Appendix D provided for a new Classification system, while at the same time grandfathered in the previous job titles within Classifications. The new Classification system contained within Appendix D was then carried forward and is found within Article XIX of the Parties' current Collective Bargaining Agreement. This system provides for six (6) Classified positions which enjoy all the rights vested within the Collective Bargaining Agreement, including the Classifications of Repairman Apprentice at Grade 3 and Maintenance Trainee at Grade 2. Also, the Parties incorporated into the <u>BCWA of 2003</u> the <u>MOU Regarding New Employees</u>

---

[25] Id, page 20.

of 2003, which for the first time provided that new employees, those employees hired after January 16, 2003, were classified into three positions progressively during a period of their first two (2) years of employment. Those positions are: 1) <u>Probationary Trainee</u>, 2) <u>New Hire</u>, and 3) <u>Apprentice</u>. These three new Classifications, which are not Grade positions, are not similar and are not interchangeable with <u>Repairman Apprentice</u>/Grade 3 or <u>Maintenance Trainee</u>/Grade 2.

Following with the effective date of the <u>BCWA of 2003</u> and the <u>MOU of 2003</u>, the Company entered into a contract with a new customer, Tampa Electric, and this contract created an immediate and prospective need to increase coal production. In the initial year of 2004, production increased by 1.5 million tons; and, in 2005, production is projected at two million tons, with production expected to grow throughout the year 2006. As a result, the Employer hired twenty-five (25) new underground employees from April 5, 2004, through November 22, 2004; and continued to hire another twenty-two (22) new underground employees from November 22, 2003, through June 15, 2005—so that the total growth in the underground work force stands at forty-seven (47) employees—which as previously discussed, *supra*, constitutes a dramatic increase in the work force of 16 percent by November 22, 2004, and of 27 percent by June 15, 2005.

On June 5, 2003, eleven (11) permanent vacancies existed in the Repairman Classification. These jobs were posted for bid; five (5) positions were awarded on the first posting and two (2) positions were awarded on the second posting. The then-remaining four (4) Repairman Classified positions were filled by

assigning a new employee--that is an employee hired after January 16, 2003. The first such appointment was made on April 19, 2004; the second appointment followed on June 2, 2005; and the remaining two (2) positions were then filled by June 15, 2005.

The Employer's reliance on the Keenan Award is misplaced for several reasons:

1) The scope of the matter before Arbitrator Keenan was narrow and only related to Article VI and the appropriateness of training new employees, to the exclusion of posting Repairman Apprentice jobs, by assigning new employees to assist Repairmen and perform all the job duties of a Repairman, and thereby train and learn the necessary skills to qualify for Repairman Classification.

2) As discussed, *supra*, the record in the matter before Arbitrator Keenan did not evidence the assignment of new employees to fill vacancies for the Repairman Classification, as the Employer contends it did. This claim by the Employer is a significant misrepresentation of what it claimed before Arbitrator Keenan and what Arbitrator Keenan found in his Award. Specifically, before Arbitrator Keenan there was never a claim or a finding that the Employer assigned New Hires Ferrari and Kunkler or any other new employee to fill a Repairman vacancy or any Classified vacancy.

3) Contrary to the Company's contention, the record evidences, as discussed *supra*, significant growth at the Mine during the life of the

current CBA. It is not possible that the growth in production during the years 2004 and 2005 were not anticipated by the Company. And, certainly, the Company anticipates growth in 2006. It is simply not believable that the Company did not anticipate such production growth in the process of acquiring a new contract for sales to Tampa Electric, which necessitated a tonnage increase of 1.5 million tons in the year 2004.

4) The Company's position that they currently employ forty-four (44) New Hires for the express purpose of training them for their future manpower needs is nonsensical. The Company is employing forty-four (44) New Hires to produce coal, while at the same time, training them through on-the-job training pursuant to the provisions of the <u>MOU of 2003</u>.

5) The Employer's claim that it can assign New Classifications, without resorting to the bid procedures prescribed at Article XVII is in error, because its reliance on any letter agreement is misplaced. For all the reasons I have discussed, *supra*, there is no agreement which permits the Employer to assign any employee to any vacant, permanent Classified job, except as provided pursuant to Article XVII.

In a nutshell, what the Parties agreed to under the <u>MOU of 2003</u> at 11. Article XIX was to permit new employees in their first two (2) years of employment to be assigned work under the instruction of a qualified Classified employee, while on the job, to learn how to do the job in a safe, efficient manner. Not only is this

the interpretation of the BCWA of 2003 and the MOU of 2003, it is also evidenced in the commonly-accepted use of the terminology the Parties agreed upon for the new positions, i.e., Apprentice, from the definition: "Any person who is acquiring a craft, trade, or skill..." or "any learner or novice".

The concept advanced by the Company that the MOU of 2003 permits it to assign any Probationary Trainee, New Hire, or Apprentice to fill the vacancy of a Repairman Classification is absolutely incredible. This type of action is precisely what is proscribed by ARB 78-73. ARB 78-73 proscribed the filling of a post-bid vacant position with a qualified candidate from outside the Company work force without first posting such position for bid for a Repairman Apprentice or Maintenance Trainee, unless the Company could not reasonably anticipate the need for such positions, or it was in response to an unanticipated need—that is an unforeseen eventuality. In point of fact, the Employer's actions in the instant matter, of filling vacant Repairman Classification jobs with new employees differs from what is proscribed by ARB 78-73 only relative to the qualifications processed by and wages the newly hired employee receives, as compared to being fully qualified and being classified as a Repairman at Grade 5. Simply put, the Company is contending that it can use a newly-hired employee, without any ability or qualification, and assign them to fill a vacant classification without a classified, experienced, or qualified employee to mentor or train them. Specifically, the Company's testimony went so far in this regard as to claim the MOU of 2003 enabled it to hire someone from outside the Company's work force, as a new employee, and assign such a new employee, without bidding, to fill, any

Page 60 of 66 pages.

permanent, full-time underground classified position, including to fill a Mine Examiner job. This contention tortures the meaning of the MOU of 2003 at 11. Article XIX, Section (b), which means and intends that all Probationary Trainees, New Hires, and Apprentices, may be assigned to perform the work of any classification for the purpose of being trained, on the job, by a qualified, classified employee they are assigned to assist.

Moreover, and of great significance, although the meaning of the relationship between the BCWA of 2003, the Collective Bargaining Agreement, and the MOU of 2003, the memorandum containing exceptions to the BCWA of 2003 for new employees, constructs an opportunity for the management of new employees with significant exceptions to the BCWA of 2003, the meaning of the whole Agreement does not mean or intend that any such management of new employees, or assignments of new employees, can be administered in any way which by its effect violates or eviscerates the rights of employees hired before January 16, 2003, or those recalled from a panel with at least twenty-four (24) months of service in the Coal Industry within the last ten (10) years. All of this is to say, notwithstanding the Employer's ability to assign new employees to perform the job duties of any classification on any shift, and thereby receive training, the rights of non-newly hired employees to acquire, hold, and possess such jobs, as provided pursuant to the BCWA of 2003, remain unaffected and in full force so that no employee may be assigned to fill any classified job or position contrary to the provisions of the BCWA of 2003.

Further, I find that the assignment of newly-hired employees, as defined in the <u>MOU of 2003</u>, to fill a Classified vacancy or to be assigned without bidding or awarded without bidding a Classified job is contrary to the bid procedure requirements of Articles XVII and is, thus, proscribed by the Parties' Agreement and is not allowed. The proper interpretation of the Parties' agreement, consisting of the <u>BCWA of 2003</u> and the <u>MOU of 2003</u>, in context with various precedent Arbitration Review Board decisions, specifically, ARB 78-26 and 78-73, and applicable arbitral authority, has been discussed, *supra*; and my discussion embodies the meaning and intent of the Parties' agreement.

Therefore, I find that the Company has failed to properly establish and to post for bid four Repairman Apprentice vacancies pursuant to Articles XVI, XVII, XIX, and XXVI; and appointed four new employees to fill, de facto, four vacant Repairman Apprentice positions in violation of Article XVI, Section (e); Article XVII, Sections (i) and (j); Article XIX, Sections (e), (f), and (g); and Article XXVI, Section (b).[26] The Company's behavior discussed here, *supra*, is proscribed by the <u>BCWA of 2003</u> and the <u>MOU of 2003</u> or the Parties' Agreement; and it is proscribed by the dicta of ARB decisions 78-26 and 78-73. Therefore, the grievance is sustained.

The discussion of the undersigned, *supra*, incorporates the official record, and no other documents and/or instrument constitutes such record, or shall purport to be a record of this matter.

The Company has, as in any industrial endeavor, the need to address various production-related needs, so that it will remain viable by maintaining or

---

[26] The first of the four (4) appointments to the four (4) vacant Repairman Apprentice positions preceded this grievance, date of November 11, 2004, and is not subject to a remedy.

Page 62 of 66 pages.

increasing production and profits. To this end, it must address its ever-changing manpower needs in such a way that it maintains its vitality by exercising its management rights consistent with the Parties' Agreement. Specific to the instant matter, it must address its need to maintain a well-trained, qualified maintenance and production work force and be capable to respond to current and prospective needs. Effective the new Classification system in concert with the provisions relative to new employees contained within the <u>MOU of 2003</u>, my discussion herein and the Award to follow, *infra*, constitute the appropriate way to address such needs and shall govern the Parties at all the facilities of the Employer covered by the Parties' Agreement.

### AWARD

The Employer shall cease and desist from the assigning of Probationary Trainee, New Hire, or Apprentice employees to fill vacant Classified positions, including Repairman and/or Repairman Apprentice or Maintenance Trainee positions.

The Employer shall vacate the assignment of any newly hired employees to any vacant, classified position, and specifically, the assignment of three (3) newly-hired employees to the three (3) Repairman, or *de facto* three (3) Repairman Apprentice positions discussed herein effective the date of such assignment; and shall re-assign such newly-hired employees consistent with the bid provisions of Article XVII.[27] Seniority and all economic benefits shall accrue for any such assignment, effective the date such newly-hired employee qualifies for assignment

---

[27] Id.

to an appropriate classification, but not earlier than the date the newly hired employee completes his/her apprentice year.

The Employer shall post for bid, pursuant to the provisions of Articles XVI and XVII, the three (3) vacated, vacant Repairman positions, properly, or *de facto*, as Repairman Apprentice positions. Successful bidders shall be made whole for all seniority and all economic benefits retroactive to November 22, 2004, or the date such bidder qualified to be a successful bidder, whichever period is greater.

The Employer shall immediately evaluate and project its anticipated training needs, as such needs are established through its marketing and projected production contingencies, and post Repairman Apprentice and Maintenance Trainee positions adequate to meet such anticipated needs; provided, however, that the Company shall immediately post not less than three (3) additional Repairman Apprentice positions as an immediate, adequate response to its recent underground work force growth of twenty-six (26) percent. And the Company shall continue, on an on-going basis, during the life of the Parties' Agreement, to anticipate its training needs; and shall continue to post Repairman Apprentice and/or Maintenance Trainee positions in an adequate manner to meet such anticipated needs.

The Employer shall fill all prospective, vacant classified positions, during the life of the Parties' current Agreement, in accord with the following procedure:

1) Any vacant Classified Repairman and/or Classified Maintenance position must first be posted for bid pursuant to the provisions of Article XVII;

2)  In the event the position remains vacant after it has been posted for bid, the position shall be converted to and posted as either a vacant <u>Repairman Apprentice</u> or a vacant <u>Maintenance Trainee</u> position as is appropriate;

3)  In the event the vacant <u>Repairman Apprentice</u> or vacant <u>Maintenance Trainee</u> position remains vacant after it has been posted for bid, the Company may, at its discretion, assign a <u>Probationary Trainee</u>, <u>New Hire</u>, or <u>Apprentice</u> to fill the <u>Repairman Apprentice</u> or <u>Maintenance Trainee</u> vacancy. If so assigned, the newly-hired employee shall be entered into and remain in the Company's established <u>Maintenance Training Repairman Trainee Program</u>,[28] but continue to be paid and receive all economic benefits pursuant to 9. Article XVI, A, (e) of the <u>MOU of 2003</u>.

4)  In the event that there are not any <u>Probationary Trainees</u>, <u>New Hires</u>, or <u>Apprentices</u>, qualified to be appointed to a <u>Repairman Apprentice</u> or <u>Maintenance Trainee</u> position and the position continues to remain vacant, the Company, at its discretion, may hire a qualified candidate from outside the Company's work force and assign him/her to the

---

[28]
<u>Maintenance Training
Repairman Trainee Program</u>

- 1 year program
- 1 week per month classroom
- 3 weeks per month hands on Class Subject Areas
  -1. Four Weeks Electrical Training
  -2. Four Weeks Mechanical Training
  -3. Four Weeks Hydraulic Training

Page 65 of 66 pages.

vacant, Classified Repairman and/or Classified Maintenance position, as previously identified herein, *supra*.

This Award shall be administered within fourteen (14) days of its receipt by the Parties.

I shall retain jurisdiction over this matter and shall resolve any dispute arising out of the interpretation, administration, or application of this Award.

John Joseph D'Eletto, Arbitrator
Waynesburg, Pennsylvania
August 3, 2005